Shiloh S. Hernandez (MT Bar No. 9970)
Melissa Hornbein (MT Bar No. 9694)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4861
hornbein@westernlaw.org
hernandez@westernlaw.org

*Counsel for Plaintiffs*

Nathaniel Shoaff, *admitted pro hac vice* (CA Bar No. 256641)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Ph: (415) 977-5610
nathaniel.shoaff@sierraclub.org

*Counsel for Sierra Club*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS; MONTANA ENVIRONMENTAL INFORMATION CENTER; POWDER RIVER BASIN RESOUCE COUNCIL; NORTHERN PLAINS RESOURCE COUNCIL; CENTER FOR BIOLOGICAL DIVERSITY, WILDEARTH GUARDIANS, and SIERRA CLUB, | Case No. 4:20-cv-00076-BMM |
| | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| vs. | |

1

UNITED STATES BUREAU OF
LAND MANAGEMENT,

        Defendant.

## INTRODUCTION

1.     The Powder River Basin is an area of stark beauty with its rolling grasslands, badlands, abundant wildlife, and remote wilderness areas. Its grass and water support extensive, sustainable livestock grazing and small agricultural producers. It is also ground zero for fossil fuel development in the United States, producing approximately 40% of the coal in the United States, along with vast amounts of oil and gas.

2.     In 2018 this Court held that the U.S. Bureau of Land Management (BLM) violated the National Environmental Policy Act (NEPA) by approving two resource management plans (RMPs) in the Powder River Basin (the RMPs for the Miles City and Buffalo Field Offices) because the agency: (1) failed to consider any alternative that reduced the amount of coal available for strip-mining and; (2) failed entirely to address or disclose the toxic and harmful impacts of fossil fuel combustion enabled by BLM's actions.

3.     On remand, BLM failed to remedy these errors. Instead, BLM's supplemental environmental impact statements (SEISs) again considered alternatives that would result in identical amounts of coal development—the strip-

mining and combustion of approximately 6 billion tons of low grade, highly polluting sub-bituminous coal—and identical impacts.

4.       With respect to the impacts of downstream combustion, BLM failed entirely to address or disclose any impacts of fossil fuel combustion except greenhouse gas emissions. This myopic approach ignores the fact, as documented in the record, that combustion of billions of tons of coal and large amounts of oil and gas will result in tens of thousands of premature deaths and countless cases of respiratory and cardiac illness.

5.       BLM's SEISs and approval of the remanded Powder River Basin RMPs violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations promulgated by the Council on Environmental Quality, 40 C.F.R. §§ 1500 *et seq*.

6.       Accordingly, Plaintiffs Western Organization of Resource Councils, Montana Environmental Information Center, Northern Plains Resource Council, Powder River Basin Resource Council, the Center for Biological Diversity, WildEarth Guardians, and the Sierra Club bring the present action.

## JURISDICTION AND VENUE

7.       This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C.
§ 1331, because the action raises a federal question. The Court has authority to
issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201,
2202, and 5 U.S.C. §§ 705, 706.

9.      This action reflects an actual, present, and justiciable controversy
between the Conservation Groups and BLM. The Conservation Groups' interests
will be adversely affected and irreparably injured if BLM continues to violate
NEPA and affirmatively implements the decisions, as alleged herein. These
injuries are concrete and particularized and fairly traceable to BLM's challenged
decisions, providing the requisite standing in the outcome of this controversy
necessary for this Court's jurisdiction.

10.     The requested relief would redress the actual, concrete injuries to the
Conservation Groups caused by BLM's failure to comply with duties mandated by
NEPA and its implementing regulations.

11.     The challenged agency actions represent the consummation of BLM's
actions on remand. They are final and subject to judicial review pursuant to 5
U.S.C. §§ 702, 704, and 706.

12.     The Conservation Groups have exhausted any and all available and
required administrative remedies.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action—the 2.76 million surface acres of public land and 11 million acres of subsurface mineral estate administered by the BLM's Miles City Field Office—is located in Montana. Venue is also proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is named as defendant, and a substantial part of the events and omissions giving rise to this case occurred in the BLM Miles City Field Office located in Montana. Plaintiffs Western Organization of Resource Councils, Montana Environmental Information Center, and Northern Plains Resource Council reside in Montana. Additionally, Plaintiff Sierra Club has a Montana Chapter located in Missoula, Montana. Plaintiff WildEarth Guardians maintains a major office in Missoula, Montana. Venue is proper with respect to claims related to BLM's Buffalo Field Office in Wyoming because the Montana and Wyoming portions of the Powder River Basin are inextricably intertwined with respect both to the natural environment (it is a shared river basin) and energy development (which is physically tied together with railroads, pipelines, and other infrastructure). Impacts from energy development in the Powder River Basin in the Buffalo Field Office cause significant impacts to the public, the environment, and Conservation Groups in Montana. The cumulative impacts of energy development in the Wyoming and Montana portions of the Powder River Basin further

aggravate these problems, threatening both the ecology and the sustainable economy in the Montana portion of the Powder River Basin.

14.    Venue is proper in the Great Falls Division of this Court because the Miles City Field Office encompasses Daniels, Sheridan, and Valley Counties, which are within the jurisdiction of the Great Falls Division.

## PARTIES

15.    Plaintiff Western Organization of Resource Councils (WORC) is a non-profit corporation with its principle office in Billings, Montana and additional offices in Washington, D.C. and Montrose, Colorado. WORC is a regional network of grassroots community organizations that includes 39 local chapters and 18, 132 members. WORC's mission is to advance the vision of a democratic, sustainable, and just society through community action. WORC's members live, work, and recreate on lands impacted by BLM's resource management plans for the Miles City and Buffalo Field Offices. WORC brings this action on its own behalf and on behalf of its affected members.

16.    Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information

6

concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of greenhouse gas pollution as a means to ameliorate the climate crisis, and the land, air, water, and communities impacted by fossil fuel development. MEIC members live, work, and recreate in areas that will be adversely impacted by approval of the Miles City and Buffalo RMPs. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

17.     Plaintiff Powder River Basin Resource Council (PRBRC) is a nonprofit organization founded in 1973 and located in Sheridan, Wyoming. Powder River Basin Resource Council has approximately 1,000 landowner and citizen members in Wyoming dedicated to the stewardship of Wyoming's water, air, land, and wildlife resources. The organization's many agricultural members ranch and derive a livelihood from the land, many above federal split estate minerals managed by BLM. Others live in, use, and enjoy the communities and

landscapes affected by BLM's actions. Powder River Basin Resource Council's mission includes the preservation and enrichment of Wyoming's agricultural heritage and rural lifestyle, the conservation of Wyoming's unique land, mineral, water, and clean air resources consistent with responsible use of those resources to sustain the livelihood of present and future generations, as well as the education and empowerment of Wyoming's citizens to raise a coherent voice in the decisions that will impact their environment and lifestyle. Powder River Basin Resource Council members live, work, and recreate in areas that will be adversely impacted by approval of the Miles City and Buffalo RMPs. Powder River Basin Resource Council brings this action on its own behalf and on behalf of its adversely affected members.

18.     Plaintiff Northern Plains Resource Council (Northern Plains) is a grassroots conservation and family agriculture non-profit organization based in Billings, Montana. Northern Plains organizes Montana citizens to protect water quality, family farms and ranches, and Montana's unique quality of life. Northern Plains is dedicated to providing the information and tools necessary to give citizens an effective voice in decisions that affect their lives. Northern Plains formed in 1972 over the issue of coal strip mining and its impacts on private surface owners who own the land over federal and state mineral reserves as well as the environmental and social impacts of mining and transporting coal. While Northern

Plains was founded on coal issues, the group quickly expanded into helping

preserve the land, air, and water of its members from similar threats caused by

irresponsible oil and gas development. Many of the organization's roughly 3,000

members farm, ranch, and recreate adjacent to or above minerals covered by the

Miles City RMP, and their livelihoods depend entirely on clean air and water, a

healthy climate, native soils and vegetation, and lands that remain intact.

Accordingly, Northern Plains members are adversely affected by approval of the

Miles City RMP and will be injured by its implementation. Northern Plains brings

this action on its own behalf and on behalf of its affected members.

19.     Plaintiff Center for Biological Diversity (the Center) is a non-profit

membership corporation with offices in Arizona, New Mexico, California, Nevada,

Oregon, Washington, Alaska, Illinois, Minnesota, Vermont, and Washington D.C.

The Center works through science, law, and policy to secure a future for all

species, great or small, hovering on the brink of extinction. The Center has 320,000

members and online activists throughout the United States, Montana, Wyoming,

and the world. The Center is actively involved in species and habitat protection

issues worldwide, including throughout the western United States. The Center, its

members, and staff members use the lands in and near the Miles City and Buffalo

planning areas—for recreational, scientific, and aesthetic purposes. They also

derive recreational, scientific and aesthetic benefits from these lands through

wildlife observation, study, and photography. The Center and its members have an interest in preserving their ability to enjoy such activities in the future. As such, the Center and its members have an interest in helping to ensure their continued use and enjoyment of the activities on these lands. The Center brings this action on its own behalf and on behalf of its adversely affected members.

20.    Plaintiff WildEarth Guardians (Guardians) is a nonprofit conservation organization with more than 200,000 members and activists throughout the United States, including nearly 900 in Montana. Guardians' mission is to protect and restore the wildlife, wild rivers, wild places, and health of the American West. Through its Climate and Energy Program, Guardians is dedicated to protecting the American West from the dangers it faces from the climate crisis. Guardians' members and staff have recreational, aesthetic, scientific, professional, and spiritual interests in a protected and stable climate, and an environment that is sustained by a protected and stable climate. Guardians' members use and plan to continue to use and enjoy landscapes impacted by the Miles City and Buffalo RMPs. Guardians brings this action on its own behalf and on behalf of its adversely affected members.

21.    Plaintiff Sierra Club is America's largest grassroots environmental organization, with more than 2 million members and supporters nationwide. In addition to creating opportunities for people of all ages, levels and locations to

have meaningful outdoor experiences, the Sierra Club works to safeguard the health of our communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and litigation. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club members live, work, and recreate in areas that will be adversely impacted by approval of the Miles City and Buffalo RMPs. Sierra Club's concerns encompass the exploration, enjoyment, and protection of the land and air of Montana and Wyoming. Sierra Club brings this action on its own behalf and on behalf of its adversely affected members.

22.     The Conservation Groups' and their members' interests are deeply rooted in the communities of the American West where the Conservation Groups and their members live, work, and recreate. These interests are also bound to the land, wildlands, air, rivers, streams, habitat, wildlife, topography, and other components of healthy, intact landscapes in the Miles City and Buffalo planning areas—all of which are threatened by coal, oil and gas development, human-caused climate change, and the myriad pollution impacts caused by the continued burning of fossil fuels. The Conservation Groups and their members use and enjoy these

11

landscapes for hiking, hunting, camping, photography, aesthetic enjoyment, spiritual contemplation, ranching, and other vocational, scientific, and recreational activities. Some of Conservation Groups' members own surface lands overlying federal minerals that are subject to the Miles City and Buffalo RMPs. Conservation Groups and their members intend to continue to use and enjoy lands managed by BLM, and other public lands, wildlands, wildlife habitat, rivers, streams, and healthy environments located in Montana and Wyoming frequently, and on an ongoing basis in the future, including this summer, fall, winter, and spring.

23.     The aesthetic, recreational, scientific, educational, religious, and procedural interests of the Conservation Groups and their members have been adversely affected and irreparably injured by the process in which BLM approved the SEISs for the Miles City and Buffalo RMPs, and by the resulting RODs. The adverse impacts that will result from BLM's processes and decisions threaten actual, imminent, concrete, and particularized harm to the interests of the Conservation Groups and their members.

24.     The relief sought would remedy the injuries suffered by the Conservation Groups and their members by requiring the agencies to evaluate alternatives limiting and reducing the myriad impacts of fossil fuel development.

25.     Federal Defendant U.S. Bureau of Land Management is a Federal agency within the United States Department of the Interior that is responsible for

the management of more than 245 million acres of public lands in the United States and nearly 700 million acres of federal subsurface mineral estate.

## STATEMENT OF FACTS

26.     The Miles City planning area covers 25.8 million acres of federal, state, and private lands. Of the total area, there are 2.75 million federal surface acres and 10.6 million acres of federal minerals in Carter, Custer, Daniels, Dawson, Fallon, Garfield, McCone, Powder River, Prairie, Richland, Roosevelt, Rosebud, Sheridan, Treasure, Wibaux, and portions of Big Horn and Valley counties in eastern Montana.

27.     The adjacent Buffalo planning area covers 7.4 million acres of federal, state, and private lands. Of the total area, there are 780,000 federal surface acres and 4.8 million acres of federal minerals in Campbell, Johnson, and Sheridan counties in northeastern Wyoming.

28.     Together, the contiguous Miles City and Buffalo planning areas compose the northern and southern portions of a broader region known as the Powder River Basin, an area of stark beauty with rolling grasslands, badlands, abundant wildlife, and remote wilderness. The Montana and Wyoming portions of the Powder River Basin are ecologically and economically integrated.

29.     For example, fish and wildlife in the Powder River Basin migrate between the Montana and Wyoming portions of the basin, and Sage Grouse

populations in the Montana and Wyoming portions of the basin are closely connected and depend on each other to maintain genetic diversity. If these Montana and Wyoming sage grouse populations are isolated from each other, it increases the likelihood of extirpation for both.

30.     Energy development across the basin and the worsening impacts of fossil-fuel driven climate change are pushing these species to the brink of extinction. They are particular threats to the interconnected sage grouse populations in the Powder River Basin. Since sage grouse are an indicator species, their peril suggests that energy development across the Powder River Basin and the worsening impacts of climate change represent grave threats to the ecology of the region.

31.     The region's grass and water support extensive, sustainable livestock grazing and small agricultural producers. Both the ecology and the sustainable agricultural economy in the region are threatened by the cumulative effects of energy development in Wyoming and Montana.

32.     The Powder River Basin is also one of the nation's most prolific energy producing regions. The Powder River Basin is the largest coal producing region in the United States, accounting for nearly 40% of all domestic production. The Powder River Basin also produces significant amounts of natural gas and oil, about 1% and 1.3% of total U.S. natural gas and oil production, respectively. Coal

strip-mining and oil and gas extraction cause water pollution, including increased salinity and toxic heavy metal pollution. Water pollution from the Wyoming portion of the Powder River Basin migrates downstream to Montana in water and alluvial sediment. The two principal rivers in the basin, the Powder River and the Tongue River are impaired for agricultural use in Montana due to excessive salinity, which limits use of the water for irrigation, causing significant hardship for farmers and ranchers in Montana. The cumulative salinity pollution from coal mining and oil and gas extraction in Wyoming and Montana is an important source of this pollution.

33. Elevated levels of numerous toxic heavy metals, including cadmium, chromium, copper, lead, mercury, selenium, and zinc, have been identified in the cross-boundary Powder River and Tongue River. Samples of these pollutants were significantly higher in the Powder River than in other rivers in the region. These pollution levels may be harmful to fish, including the tiny population of endangered pallid sturgeon (*Scaphirhynchus albus*) that survives in the Yellowstone River and, recently, the Powder River, in Montana. Given the concentration of these elevated pollution levels in the Powder River, a report by scientists from the U.S. Fish and Wildlife Service identifies energy development in the upper basin of the Power River and long-range atmospheric deposition from

coal-fired power plants as likely sources of this pollution. The Powder River in Wyoming is impaired for excessive selenium and arsenic.

34.     The combustion of the vast amounts of fossil fuels extracted in the Powder River Basin in Wyoming worsens climate change, which is adversely affecting communities and the environment in Montana. The Powder River Basin in Wyoming is one of the most prolific sources of greenhouse gas (GHG) pollution in the world. Instream flow in Montana rivers, including the Yellowstone River, has declined due to climate change and is projected to decline significantly in the future if GHG emissions are unabated. Such reduced river flows adversely affect communities and the environment in Montana, which are dependent on the state's limited water resources. Climate change is also significantly increasing wildfire conditions in Montana and extending the fire season, which is significantly harming the health and wellbeing of Montana communities and the environment.

35.     Fossil fuel infrastructure also connects the Wyoming and Montana portions of the Powder River Basin. Coal from strip-mines in the Buffalo Field Office is shipped through Montana, causing local pollution issues from locomotive emissions and coal dust and coal chunks that fall off of trains into Montana's waterways. Numerous oil and gas pipelines tie together production areas in the Wyoming and Montana portions of the Powder River Basin.

36.     In 2015, BLM approved RMPs for the Miles City and Buffalo Field Offices. The RMPs made vast amounts of fossil fuels in the Powder River Basin available for development. However, the agencies' accompanying environmental impact statements (EISs), issued pursuant to NEPA, failed to analyze any alternative development scenarios, specifically scenarios that would result in the availability of less coal for leasing and development, and failed to disclose to the public the results of combustion of vast amounts of fossil fuels that the Powder River RMPs made available for development.

37.     In 2018, the U.S. Federal District Court for the District of Montana held that BLM's NEPA analyses for these RMPs were deficient and ordered the agency to remedy its errors through remand.

38.     In October 2019, BLM issued supplemental EISs for both the Miles City and the Buffalo Field Offices and issued two records of decision in November 2019. The Miles City supplemental EIS and the Buffalo supplemental EIS are mirror documents, which suffer from virtually identical shortcomings.

39.     The RMPs were finalized in accordance with the process outlined in FLPMA's implementing regulations, 43 C.F.R. § 1610.3-2(a)-(b), under Acting

BLM Director William Perry Pendley's Authority on November 22, and November 25, 2019.[1]

40.     BLM operated without a Senate-confirmed director since January 19, 2017. That day, outgoing Secretary of the Interior Sally Jewell, issued a Secretarial Order temporarily delegating the "functions, duties, and responsibilities" of the BLM Director to Kristin Bail, the current Assistant Director for the Office of National Conservation Lands and Community Partnerships.  Secretarial Order No. 3345 (Jan 19, 2017).

41.     Secretarial Order No. 3345 was amended thirty-two times over the next three years, during which time five people—none of whom were approved by the Senate—exercised the "functions, duties, and responsibilities" of the BLM Director.

42.     Pendley was initially delegated by Secretary of the Interior David Bernhardt to exercise the "functions, duties, and responsibilities" of the BLM Director through Amendment 28 to Order 3345 on July 29, 2019.

43.     Secretary Bernhardt extended Pendley's tenure four times by amendment.  Amendments 29-32 of Order No. 3345.

---

[1] Bureau of Land Management, Director's Summary Protest Resolution Reports for the Buffalo and Miles City Field Offices, dated November 22 and November 25, 2019.

44.     Following the fourth extension, Pendley, "exercising the delegated authority of BLM Director, issued a memorandum clarifying BLM's "order of succession" for "Vacancies Reform Act" purposes.[2] The Memorandum claimed to designate Pendley as the "First Assistant for the purposes of the [FVRA]" and delegated Pendley "the authority to perform all duties and responsibilities of the director." *Id.* Pendley exercised the authority of BLM Director pursuant to this self-delegation beginning June 5, 2020.

45.     Pendley continued to serve as acting director to the BLM while his nomination for the position of Director was pending, in violation of the FVRA. Pendley was serving in this capacity in violation of the FVRA at the time that the Miles City and Buffalo RMP Protest Resolution Reports were issued.

46.     On September 25, 2020, this Court determined that Pendley had served as Acting BLM Director in violation of the Federal Vacancies Reform Act and the Appointments Clause of the United States Constitution for 424 days, and enjoined Pendley from exercising the authority of BLM Director or Interior Secretary Bernhardt from delegating that authority.[3]

---

[2] Memorandum from William Perry Pendley on Designation of Successors for Presidentially-Appointed, Senate-Confirmed Positions (May 22, 2020).

[3] *Bullock v. United States Bureau of Land Mgmt.*, No. 4:20-CV-00062-BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020).

47.    On October 16, 2020, this Court determined that as a result of these violations, the Lewistown RMP, Missoula RMP, and Miles City RMP were unlawful and must be set aside under both the FVRA and APA.[4]

48.    BLM's supplemental EISs, did not remedy the agency's inadequate alternatives analysis or its failure to analyze and disclose the impacts of fossil fuel combustion.

49.    Regarding coal alternatives, BLM again considered alternatives that would result in identical amounts of coal development. Under all alternatives, 775 million tons of coal from 9,730 acres would be strip-mined over 20 years in the Miles City Field Office, and under all alternatives 4.9 billion tons of coal from 36,620 acres would be strip-mined over 20 years in the Buffalo Field Office.

50.    Regarding the impacts of fossil fuel combustion, BLM discussed the greenhouse gas emissions that would result from fossil fuel development under the RMPs; however, the agency refused entirely to analyze or disclose the toxic and harmful impacts of non-greenhouse gas pollution from fossil fuel combustion.

51.    The record before the agency showed that combustion of fossil fuels from the planning areas would result in tens of thousands of premature deaths, countless respiratory and cardiac illnesses, and significant harm to the brain

---

[4] *Bullock v. United States Bureau of Land Mgmt.*, No. 4:20-CV-00062-BMM, 2020 WL 6204334 (D. Mont. Oct. 16, 2020).

development of children and fetuses across the nation. The record documented that the widespread fossil fuel combustion envisioned and enabled by the RMPs would cause increased risks of cancer, premature births, and widespread exposure of children and fetuses to lead and mercury, which impair brain development. Further, drawing on a robust body of science, comments in the record showed that the cumulative economic harm to the public from this toxic and harmful air pollution would range from $95 billion (low estimate) to $1.8 trillion.

52.     Despite this compelling evidence in the record, BLM refused to acknowledge or disclose the devastating impacts of this air pollution from fossil fuel combustion or the monetary costs of this pollution. Nevertheless—in an entirely one-sided account of benefits (but not costs)—the agency's analyses detailed at length the purported monetary benefits from fossil fuel development.

53.     On December 28, 2020, the Department of Interior issued a new Protest Resolution Report for the Miles City RMP and SEIS.  The new Protest Resolution Report notes this Court's October 16, 2020 decision in *Bullock*, and states that while the Department disagrees with the Court's reasoning in that case, the newly issued Protest Resolution Report, reviewed and approved by Secretary Bernhardt, addresses the deficiency found by this Court in *Bullock*. On January 5, 2021, BLM reissued the Miles City RMP ROD that this Court vacated in *Bullock* with the signature of then-Secretary of Interior David Bernhardt. Aside from the

21

signature and the official purporting to sign-off on the Protest Resolution, neither the RMP, the SEIS, nor the Protest Resolution Report changed in any respect.

54.     On January 8, 2021, BLM issued an "errata sheet" for the Buffalo RMP stating that the protest resolution was signed by the acting Assistant Director of Resources and Planning.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (NEPA Violation: Failure to Consider Adequate Alternatives)

55.     The Conservation Groups incorporate by reference all preceding paragraphs.

56.     NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An EIS must consider "alternatives to the proposed action." *Id.* § 4332(2)(C)(iii).

57.     Federal Defendants were required to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a). The alternatives analysis is the "heart" of the EIS. *Id.*

58.     The supplemental EISs for the Miles City and Buffalo RMPs violated NEPA by failing to consider a reasonable range of coal alternatives. In the Miles

City and Buffalo supplemental EISs, BLM only considered alternatives that would result in identical amounts of coal development and identical impacts. By considering only alternatives that would have identical impacts on the ground, BLM reduced the NEPA process to a meaningless paper exercise.

59.     BLM's failure to consider any alternative that would result in reduced coal development or reduced impacts from coal development was arbitrary and capricious and unlawful in violation of NEPA, in 42 U.S.C. § 4332(2)(C)(iii), (E), its implementing regulations, 40 C.F.R. § 1502.14(a), and the APA, 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION

### (NEPA Violation: Failure to Consider Non-GHG air pollution impacts of coal combustion)

60.     The Conservation Groups incorporate by reference all preceding paragraphs.

61.     NEPA requires a federal agency's EIS to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

62.     Agencies are required to take a hard look at the indirect impacts of a proposed action. 40 C.F.R. § 1502.16(b).

63.     BLM is required to provide a hard look analysis of these impacts before making "any irreversible and irretrievable commitments of resources which

would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); see also 40 C.F.R. §§ 1501.2, 1502.5(a).

64.     "Indirect effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

65.     In the supplemental EISs, BLM acknowledged that virtually all of the fossil fuels developed pursuant to the Powder River Basin RMPs would be burned. BLM further analyzed the greenhouse gas emissions from fossil fuel combustion. Nevertheless, despite abundant record evidence demonstrating widespread deleterious impacts to the public from non-greenhouse gas emissions from fossil fuel combustion, BLM refused to analyze or disclose such impacts.

66.     BLM's complete failure to consider these impacts is arbitrary, capricious, an abuse of discretion, and contrary to NEPA, in 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, 40 C.F.R. § 1508.8(b), and the APA, 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

**(FVRA, APA, and Constitutional Violation: the Buffalo and Miles City RMPs are invalid as a matter of law because William Perry Pendley Improperly Exercised the Authority of BLM Director when the RMPs were Finalized.)**

67.     The Conservation Groups incorporate by reference all preceding paragraphs.

68.     Under the Federal Vacancies Reform Act ("FVRA"), a person may not serve as an acting officer for an office if the President has submitted their nomination to the Senate "for appointment to such office." 5 U.S.C. § 3345(b).

69.     The Appointments Clause of the U.S. Constitution requires that "Officers of the United States" must be appointed by the President "with the Advice and Consent of the Senate." U.S. Const. Art. II, § 2, cl. 2.

70.     The Director of the BLM is an officer of the United States requiring Senate confirmation to be appointed.  43 U.S.C. §1731(a).

71.     The APA forbids agency action that is "not in accordance with law," is taken "without observance of procedure required by law," or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (D).

72.     Defendant William Perry Pendley continued to serve as acting director to the BLM while his nomination for position of Director was pending in

violation of the FVRA.  Pendley was serving in violation of the FVRA at the time that he resolved the protests for the Miles City and Buffalo RMPs.

73.    Pendley exercised the authority of an officer of the United States without Senate confirmation in violation of Article II, Section 2 of the United States Constitution.  Pendley was serving in this capacity in violation of the Appointments Clause at the time that he resolved the protests for the Miles City and Buffalo RMPs.

74.    Secretary of the Interior David Bernhardt's appointment of Pendley as acting director on July 29, 2019, was an unlawful agency action because it violated both the FVRA and the Appointments Clause of the U.S. Constitution.  The order therefore violated the APA.  Secretary Bernhardt's subsequent orders reauthorizing Pendley to serve as acting director, including his service after his nomination was sent to the Senate, also violate the APA.

75.    Pendley's exercise of the authority of the Director, and his actions taken in that role—including his resolution of the protests for the Miles City and Buffalo RMPs—violate the APA.

76.    This Court previously determined that the Miles City RMP is unlawful and must be set aside under 5 U.S.C. §3348(d)(1) and 5 U.S.C. §706(a)(2). Plaintiffs request a reaffirmation of that determination in the instant litigation.

26

77. The BLM's approval of the Buffalo RMP suffers from the same deficiencies as the Miles City RMP, and must likewise be set aside.

78. BLM's reissuance of the Miles City RMP with the signature of then-Secretary of Interior Bernhardt in December 2020, and of the Miles City RMP Protest Resolution Report, and "errata sheet" for the Buffalo RMP in January 2021, did not cure these errors.

## REQUEST FOR RELIEF

WHEREFORE the Conservation Groups respectfully request that this Court:

A. Declare that BLM's actions violate NEPA, the regulations and policies promulgated thereunder, and the APA;

B. Vacate and set aside the RMPs as reissued in January 2021;

C. Enjoin BLM from approving the leasing or development of coal, oil or gas resources in the planning areas until BLM has demonstrated compliance with NEPA and the APA;

D. Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein;

E. Award Conservation Groups their attorneys' fees, costs, and other expenses as provided by applicable law; and

F. Issue such relief as Conservation Groups subsequently request or that this Court may deem just, proper, and equitable.

27

Respectfully submitted this 30th day of March 2021.

/s/ Melissa A. Hornbein
Melissa Hornbein (MT Bar No. 9694)
Shiloh S. Hernandez (MT Bar No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Ph: (406) 204-4861
hornbein@westernlaw.org
hernandez@westernlaw.org

*Counsel for Plaintiffs*

Nathaniel Shoaff, *pro hac vice pending* (CA
Bar No. 256641)
Sierra Club
2101 Webster Street, Suite 1300  Oakland,
CA 94612
Ph: (415) 977-5610
nathaniel.shoaff@sierraclub.org

*Counsel for Sierra Club*