Shiloh S. Hernandez
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9649
shernandez@earthjustice.org

Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Nathaniel Shoaff (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS et al., | Case No. 4:20-cv-00076-BMM-JTJ |
|        Plaintiffs, | **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
|    vs. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, | |
|        Defendant, | |
|    and | |
| STATE OF WYOMING, | |
|        Intervenor-Defendant. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

TABLE OF EXHIBITS ................................................................ vii

GLOSSARY ......................................................................... viii

INTRODUCTION ....................................................................... 1

BACKGROUND ......................................................................... 2

I.      PROCEDURAL HISTORY ........................................................ 2

II.     THE PLANNING AREAS ........................................................ 4

III.    ENVIRONMENTAL IMPACTS ..................................................... 7

STANDARDS OF REVIEW .............................................................. 10

ARGUMENT .......................................................................... 11

I.      PLAINTIFFS HAVE STANDING .................................................. 11

II.     BLM VIOLATED NEPA BY AGAIN ONLY CONSIDERING
        ALTERNATIVES WITH IDENTICAL AMOUNTS OF COAL
        PRODUCTION AND GHG EMISSIONS. ............................................ 13

        A.      BLM Violated NEPA by Considering Essentially Identical
                Alternatives. ..................................................... 16

        B.      BLM Violated NEPA by Failing to Consider a Reasonable
                Range of Alternatives. ............................................ 19

III.    BLM VIOLATED NEPA BY COMPLETELY FAILING TO
        CONSIDER PUBLIC HEALTH CONSEQUENCES OF
        DOWNSTREAM FOSSIL FUEL COMBUSTION. ....................................... 24

IV.     REMEDY .................................................................... 31

CONCLUSION ....................................................................................................32

CERTIFICATE OF COMPLIANCE .......................................................................34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)...........................................................10

*City of Davis v. Coleman*,
    521 F.2d 661 (9th Cir. 1975) ...........................................24

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ...........................................25

*Diné Citizens Against Ruining Our Environment v. OSM*,
    82 F. Supp. 3d 1201 (D. Colo. 2015), *vacated as moot* 643 F.
    App'x 799 (10th Cir. 2016) ...............................................26

*High Country Conservation Advocates v. USFS*,
    951 F.3d 1217 (10th Cir. 2020) ........................................20

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977)..................................................... 10-11

*League of Wilderness Defs. v. USFS*,
    549 F.3d 1211 (9th Cir. 2008) ..........................................11

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ............................................25

*Mont. Envtl. Info. Ctr. v. OSM*,
    274 F. Supp. 3d 1074 (D. Mont. 2017).......................25, 30

*Motor Vehicle Mfrs. v. State Farm*,
    463 U.S 29 (1983)..............................................26, 27, 30

*Occidental Eng'g Co. v. I.N.S.*,
    753 F.2d 766 (9th Cir. 1985) ..............................................2

*New Mexico ex rel. Richardson v. BLM*,
    535 F. 3d 683 (10th Cir. 2009) .................................... 21-22

*Salmon Spawning v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008) ..........................................11

*State of Cal. v. Block*,
    690 F.2d 753 (9th Cir. 1982) .............................................................30

*W. Org. of Res. Councils v. BLM* (*WORC I*),
    No. CV 16-21-GF-BMM, 2017 WL 374705 (D. Mont. Jan. 25,
    2017) ..............................................................................................................5

*W. Org. of Res. Councils v. BLM* (*WORC II*),
    No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26,
    2018) ......................................................................................................*passim*

*W. Organization of Res. Councils v. BLM* (*WORC III*),
    No. CV 16-21-GF-BMM, 2018 WL 9986684 (D. Mont. July 31,
    2018) ............................................................................................................31

*Westlands Water Dist. v. DOI*,
    376 F.3d 853 (9th Cir. 2004) ..................................................... 15-16

*WildEarth Guardians v. Bernhardt*,
    No. CV 17-80-BLG-SPW, 2021 WL 363955 (D. Mont. Feb. 3,
    2021) .....................................................................................................25, 30

*WildEarth Guardians v. U.S. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) ...........................................................11

*Wilderness Workshop v. BLM*,
    342 F. Supp. 3d 1145 (D. Colo. 2018)............................................15

## REGULATIONS AND LEGISLATIVE MATERIALS

5 U.S.C.
    § 706(2)(A) ........................................................................................10

30 U.S.C.
    § 181 *et seq.* ......................................................................................23
    § 201(a) ..............................................................................................23

42 U.S.C.
    § 4332(2)(C)(ii)................................................................................24
    § 4332(2)(C)(iii)...............................................................................15
    § 4332(2)(E)......................................................................................15

43 U.S.C.
   § 1701(a)(7) ........................................................................................22
   § 1701(a)(8). .......................................................................................22
   § 1702(c) .............................................................................................22
   § 1712(c)(7) ........................................................................................23
   § 1732(b) .............................................................................................22

40 C.F.R. 1500 *et seq.* ......................................................................15

40 C.F.R.
   § 1502.14.............................................................................................15
   § 1502.14(a) ..................................................................................15, 19
   § 1502.16(b) ........................................................................................24
   § 1508.8(b) ..........................................................................................24

43 C.F.R.
   § 3400.2...............................................................................................23
   § 3420 *et seq.* .....................................................................................20

85 Fed. Reg. 43,304 (July 16, 2020)...................................................15

86 Fed. Reg. 7,619 (Jan. 27, 2021) .....................................................14

86 Fed. Reg. 7,037 (Jan. 20, 2021) .......................................................1

Sec'y Ord. 3398 (April 16, 2021) ..........................................................1

Sec'y Ord. 3399 (April 16, 2021) ....................................................1, 14

John D. Leshy, *Interior's Authority to Curb Fossil Fuel Leasing*,
   Comment, 49 Envtl. L. Rep. (2019). ..............................................23

## RULES

Fed. R. Civ. P. 56(a)..........................................................................10

Local Rule 7.1(d)(2)(E)......................................................................34

Local Rule 56.1(a)-(b).........................................................................2

## TABLE OF EXHIBITS

Exhibit 1    Declaration of Shannon Anderson

Exhibit 2    Declaration of Lori Byron

Exhibit 3    Declaration of Jeremy Nichols

Exhibit 4    Declaration of Terry Punt

Exhibit 5    Declaration of Wade Sikorski

# GLOSSARY

AR          Administrative Record[1]

BFO         Buffalo Field Office

BLM         Bureau of Land Management

FSEIS       Final Supplemental Environmental Impact Statement

GHG         Greenhouse Gas

MCFO        Miles City Field Office

NEPA        National Environmental Policy Act

RMP         Resource Management Plan

---

[1] Citations to the record are provided in the following format: [Record Folder Name]-AR-[Excel Index Row Number]-[Record Bates Number or Range]. MCFO stands for "Miles City Field Office," BFO stands for "Buffalo Field Office."

## INTRODUCTION

The Federal Government is increasingly aware of the pervasive and deleterious impacts of fossil fuel development,[2] yet Defendant U.S. Bureau of Land Management (BLM) refuses to deviate from its pro-fossil fuel management of the Powder River Basin, one of the largest fossil fuel producing regions in the United States. Despite this Court's unambiguous prior ruling instructing the agency to consider reduced coal mining alternatives and to disclose the downstream impacts of fossil fuel combustion, on remand BLM again failed in each of these tasks. First, BLM refused to consider any alternative that would reduce coal production and, instead, considered only "alternatives" that would result in *identical* amounts of coal development and greenhouse gas (GHG) emissions. Second, BLM only analyzed the impacts of *one* pollutant (carbon dioxide) emitted from downstream fossil fuel combustion. BLM refused to consider the impacts of myriad other harmful and toxic pollutants—such as particulate matter, sulfur dioxide mercury, and lead—from downstream fossil fuel combustion, despite record evidence that these pollutants cause widespread and lethal impacts to public health. Accordingly, BLM has again violated NEPA. In light of BLM's refusal to

---

[2] *See, e.g.*, Exec. Order No. 14,008: Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7,619 (Jan. 27, 2021); Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021); *see* Dep't of Interior, Sec'y Ord. 3398 (April 16, 2021); Dep't of Interior, Sec'y Ord. 3399 (April 16, 2021).

follow the law, this Court should declare BLM's action unlawful and remand for

expeditious correction of these errors.

**BACKGROUND[3]**

**I.     PROCEDURAL HISTORY**

Plaintiffs Western Organization of Resource Councils, Montana

Environmental Information Center, Powder River Basin Resource Council,

Northern Plains Resource Council, Center for Biological Diversity, WildEarth

Guardians, and Sierra Club (together, "Conservation Groups") challenge BLM's

amendments to the Resource Management Plans (RMPs) for the Miles City and

Buffalo Field Offices.

This action follows Conservation Groups' initial challenge to the 2015

revisions of these management plans. *W. Org. of Res. Councils v. BLM* (*WORC II*),

No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26, 2018). *WORC II*

held that BLM violated the National Environmental Policy Act (NEPA) in

approving the RMPs for the Miles City and Buffalo Field Offices because the

agency: (1) failed to consider any alternative that reduced the amount of coal

available for strip-mining; (2) failed entirely to disclose the impacts of downstream

---

[3] While Local Rule 56.1(a)-(b) contemplates statements of disputed and undisputed facts, the parties agree that is unnecessary here, where the Court can resolve this case based on the administrative record alone. *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

2

fossil fuel combustion; and (3) failed to disclose the short-term climate impacts of methane emissions. *Id.* at *9, *12-13, *17-18.

On remand, BLM failed to remedy the first two of these errors. In October 2019, BLM issued final supplemental environmental impact statements (FSEIS) and amended RMPs for both the Miles City and the Buffalo Field Offices,[4] and subsequently issued separate protest resolution reports and records of decision for each plan in November of 2019. MCFO-AR-403-46205; MCFO-AR-387-45581; MCFO-AR-339-44029; BFO-AR-235-4632; BFO-AR-573-14120; BFO-AR-501-9497.

For each plan, BLM's FSEIS again considered alternatives that would result in identical amounts of coal production—together approximately 6 billion tons of low-grade, highly polluting sub-bituminous coal—and identical environmental impacts. MCFO-AR-339-44073; BFO-AR-501-9539. In the Miles City plan, 775 million tons of coal from 9,730 acres would be strip-mined over 20 years under each considered alternative. MCFO-AR-339-44069-70. Similarly, under each alternative considered in the Buffalo plan, 4.9 billion tons of coal from 36,620 acres would be strip-mined over 20 years. BFO-AR-501-9539.

---

[4] For both plans, the same document serves as the FSEIS and amended RMP.

With regard to impacts from downstream fossil fuel combustion, BLM quantified and discussed GHG emissions, but declined to disclose emissions or analyze impacts of the harmful and toxic non-GHG pollutants that will result from burning coal, oil, and gas developed under the plans. MCFO-AR-54-1392-407; BFO-AR-42-3497-502; MCFO-AR-387-45600-03 (acknowledging but failing to address public health impacts from downstream non-GHG pollution); BFO-AR-573-14135-38 (same); *see also* MCFO-AR-339-44029-304; BFO-AR-501-9497-754.

## II.    THE PLANNING AREAS

**Image 1:** Thunder Basin National Grasslands. Anderson Decl. ¶ 9 (Exhibit 1).



The areas encompassed by these plans comprise the northern and southern portions, respectively, of a region known as the Powder River Basin, and include rolling grasslands, badlands, and remote wilderness. MCFO-AR-339-44043; BFO-AR-501-9511; MCFO-AR-203-17928, -17980; MCFO-AR-115-9178-79, -9187-93. The Basin stretches more than 13 million acres from Wyoming's Bighorn Mountains, and the headwaters of the Tongue and Powder Rivers, north to the Yellowstone River in eastern Montana. MCFO-AR-203-17928 (basin "covers about 19,500 square miles" or approximately 13 million acres). The Powder River Basin provides premier habitat for elk, mule deer, and pronghorn antelope, as well as greater sage-grouse. MCFO-AR-115-9195. The basin also supports extensive, sustainable livestock grazing and small agricultural producers that "play a critical role in national food security." MCFO-AR-56-4151, -4153, -4162-63. Indigenous tribes have occupied the region from time immemorial. MCFO-AR-56-4153, -4173.

The Miles City planning area includes 2.75 million federal surface acres and 11.9 million acres of federal minerals across eastern Montana. MCFO-AR-339-44043, -44048. The Buffalo planning area includes approximately 800,000 federal surface acres and 4.7 million acres of federal minerals in Wyoming. BFO-AR-501-9517. Together, the contiguous Miles City (Montana) and Buffalo (Wyoming) planning areas compose the northern and southern portions of the Powder River

Basin, which is ecologically and economically integrated. *W. Org. of Res. Councils v. BLM* (*WORC I*), No. CV 16-21-GF-BMM, 2017 WL 374705, at *10 (D. Mont. Jan. 25, 2017).

The Powder River Basin is the largest coal-producing region in the United States, accounting for 43.2% of U.S. coal production. MCFO-AR-339-44108. In addition, the plans are forecast to result in production of approximately 100 million barrels of oil and 160 billion cubic feet of fossil gas. MCFO-AR-339-44086, -44088 (60 million barrels and 102 billion cubic feet from Miles City); BFO-AR-501-9555-56 (43.6 million barrels and 61.5 billion cubic feet from Buffalo); *see also* MCFO-AR-56-4172. BLM has acknowledged that virtually all of these fossil fuels will be burned, resulting in GHG emissions. MCFO-AR-339-44079 to -44082; BFO-AR-501-9553, -9555.

**Image 2:** Strip-mine in Thunder Basin Grasslands. Anderson Decl. ¶ 10.



## III.   ENVIRONMENTAL IMPACTS

Globally, leading scientific bodies warn that the world's governments must take immediate action to reduce fossil fuel use and GHG emissions to avoid catastrophic climate disruption. For example, the 2018 Fourth National Climate Assessment explains that climate impacts, such as intensifying droughts, storms, and wildfires, are exacerbated by continued GHG emissions and that the United States must transform its energy sector to avoid severe climate impacts. MCFO-AR-54-1366; MCFO-AR-56-3235. Similarly, the Intergovernmental Panel on Climate Change found in 2018 that if GHG emissions continued at the then-current

7

rate, the atmosphere would warm by at least 1.5°C above pre-industrial levels between 2030 and 2052, causing severe droughts, flooding, and sea level rise, exposing hundreds of millions of people worldwide to life-threatening conditions, among other harms. MCFO-AR-54-1376. The report concluded that warming could not be limited to 1.5°C or 2°C unless GHG "emissions decline rapidly across all of society's main sectors," including energy. MCFO-AR-54-1377.

The Powder River Basin is one of the most prolific sources of climate-warming GHG pollution in the world. Combustion of the vast amounts of fossil fuels extracted from the Powder River Basin will exacerbate the climate crisis, which is already adversely affecting communities and the environment in Montana and Wyoming by extending droughts and fire seasons. *E.g.*, MCFO-AR-56-3236, -3259, -3275-77, -4157, -4177. Accordingly, BLM's decision as to how much coal to lease on public lands has real consequences. More than 43% of all coal produced in the United States comes from the Powder River Basin and is controlled by the Buffalo or Miles City RMPs. MCFO-AR-339-44108. BLM has found that mining and burning federal coal accounts for up to 11% of annual U.S. GHG emissions. MCFO-AR-54-1661. An independent peer-reviewed analysis modelled energy markets and concluded that if federal coal production were reduced to zero over the next decade, it would reduce greenhouse gas emissions by 240 million tons per year by 2030. MCFO-AR-391-45663-64.

In addition to information about the climate impacts from fossil fuels from the planning areas, Conservation Groups submitted expert testimony and peer-reviewed scientific reports demonstrating the deleterious impacts to public health from non-GHG pollutants emitted from the downstream combustion of these fossil fuels. This combustion would emit significant amounts of particulate matter (PM), sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), and toxic pollutants such as mercury and lead—that would, in turn, cause widespread harm to public health. MCFO-AR-54-1392-98; BFO-AR-42-3487-502. This pollution contributes significantly to human mortality and other public health impacts. MCFO-AR-391-45884; BFO-AR-532-12314.

The record demonstrates that non-GHG emissions from combustion of fossil fuels from the planning areas would result in tens of thousands of premature deaths, countless respiratory and cardiac illnesses, and significant harm to the brain development of children and fetuses across the nation. MCFO-AR-54-1392; BFO-AR-42-3487. Other impacts include increased risks of cancer, premature births, and widespread exposure of children and fetuses to lead and mercury, which impair brain development. MCFO-AR-54-1392-95; BFO-AR-42-3487-93. Further, drawing on a robust body of science, data in the record show that the cumulative economic harm to the public from this harmful and toxic non-GHG air pollution

9

would range from $95 billion (low estimate) to $1.8 trillion. MCFO-AR-54-1402-07; BFO-AR-42-3498-502.

Despite this compelling evidence in the record, BLM refused to acknowledge or disclose the devastating impacts of non-GHG air pollution from fossil fuel combustion or the monetary costs of this pollution in its NEPA analysis. MCFO-AR-387-45601-03 (acknowledging but failing to respond to public comment about public health impacts from downstream non-GHG pollution); BFO-AR-573-14135-38 (same); *see generally* MCFO-AR-339-44029-304; BFO-AR-501-9497-754. Nevertheless—in an entirely one-sided account of benefits (but not costs)—the agency's analyses fulsomely detailed the purported monetary benefits from fossil fuel development. MCFO-AR-339-44107-20 (Tables 3-19 and 3-20 quantifying employment, "labor income," and "economic output"); BFO-AR-501-9514, -9563-69 (Table ES-2 Economic Considerations citing "civic pride and community cohesion" supported by coal development and projecting support of "3,413 coal jobs and $391.3 million in direct labor income on an annual average over the next 20 years").

## STANDARDS OF REVIEW

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Agency compliance with NEPA is reviewed pursuant to the

10

Administrative Procedure Act, which provides that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). While the standard of review is deferential, courts must nonetheless engage in a "thorough, probing, in depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Courts must set aside agency decisions if the agency "failed to consider an important aspect of the problem," or if the agency's explanations run counter to evidence in the record. *League of Wilderness Defs. v. USFS*, 549 F.3d 1211, 1215 (9th Cir. 2008) (citation omitted).

## ARGUMENT

## I.   PLAINTIFFS HAVE STANDING

Conservation Groups have standing because each organization has at least one member who has demonstrated an injury that is "traceable" to the challenged action and likely to be redressed by a favorable decision, the suit is germane to each organization's purpose, and neither the claims presented nor relief sought require individual plaintiffs. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."

*WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). "Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury," they need only show that if exercised, the procedural right "*could* protect their concrete interests." *Id.* (quoting *Salmon Spawning v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008)).

*WORC II* held plaintiffs had standing. 2018 WL 1475470, at *6. Conservation Groups' members continue to live, work, and recreate in areas that will be impacted by fossil fuel development occurring under the Miles City and Buffalo RMPs, and such development will lessen their use and enjoyment of these areas. Anderson Decl. ¶¶ 2-15; Byron Decl. ¶¶ 3-10 (Exhibit 2); Nichols Decl. ¶¶ 2-16 (Exhibit 3); Punt Decl. ¶¶ 2-7 (Exhibit 4), Sikorski Decl. ¶¶ 2-9, 13-17 (Exhibit 5). The members have identified specific areas covered by the RMPs they use for these purposes and that the RMPs will allow mineral development to occur on or under. These areas include split estate minerals underlying members' property (Punt Decl. ¶ 4), lands near to and/or visible from their property (Sikorski Decl. ¶¶ 2-8), and public lands (and waters) used by members for recreational and aesthetic enjoyment (Anderson Decl. ¶¶ 5-15; Byron Decl. ¶¶ 3-10; Nichols Decl. ¶¶ 6-15). Fossil fuel development permitted under the RMPs would impact members' aesthetic, recreational, and spiritual interests. Anderson Decl. ¶¶ 2-15; Byron Decl. ¶¶ 3-10; Nichols Decl. ¶¶ 9-15; Punt Decl. ¶¶ 2-7; Sikorski Decl. ¶¶ 2-

9, 13-17. These injuries could be at least partially remedied if BLM revised its NEPA analysis and limited fossil fuel development. Anderson Decl. ¶ 15; Byron ¶ 10; Nichols ¶¶ 16-19; Punt ¶ 7; Sikorski ¶¶ 8, 14. Thus, Conservation Groups have standing.

## II.   BLM VIOLATED NEPA BY AGAIN ONLY CONSIDERING ALTERNATIVES WITH IDENTICAL AMOUNTS OF COAL PRODUCTION AND GHG EMISSIONS.

BLM's analysis on remand violated NEPA and flouted this Court's prior order by once again considering only alternatives with identical amounts of coal production and greenhouse gas emissions. *WORC II* held, "BLM's failure to consider any alternative that would decrease the amount of extractable coal available for leasing rendered inadequate the Buffalo EIS and Miles City EIS in violation of NEPA." 2018 WL 1475470, at *9. In identical language in both plans, BLM acknowledged that this Court ordered the remand because NEPA compels BLM to "consider an alternative that would reduce the amount of recoverable coal and consider climate change impacts, in order to make a reasoned choice on the amount of recoverable coal made available." MCFO-AR-339-44042; BFO-AR-501-9509. Inexplicably, BLM then refused to analyze *any alternative* that reduced the amount of coal mining or GHG emissions expected in either planning area over the next two decades.

On remand, BLM considered the following alternatives:

13

| Buffalo FSEIS Alternatives | | |
|---|---|---|
| | Coal Development (Tons)[5] | Greenhouse Gas Emissions (Tons CO2e)[6] |
| Alternative A | 4.9 billion | 7.3 billion |
| Alternative B | 4.9 billion | 7.3 billion |

| Miles City FSEIS Alternatives | | |
|---|---|---|
| | Coal Development (Tons)[7] | Greenhouse Gas Emissions (Tons CO2e)[8] |
| Alternative A | 775 million | 774.88 million |
| Alternative B | 775 million | 774.88 million |
| Alternative C | 775 million | 774.88 million |

Rather than weigh competing alternatives as this Court instructed, BLM embarked on a paper exercise that gave the appearance of limiting coal mining by only excluding from development areas that BLM never expects to be developed while considering no differences between alternatives in the amount of coal mined, burned, or the resultant greenhouse gas emissions that are fueling the ongoing

---

[5] BFO-AR-501-9539.

[6] BLM reported GHG emissions for federal coal production only, excluding production of state and private coal. BFO-AR-501-9554.

[7] MCFO-AR-339-44069.

[8] BLM quantified GHG emissions for federal coal production only. MCFO-AR-339-44084.

14

climate crisis.[9] As explained below, because it is prohibitively expensive to open a new coal mine and construct the necessary infrastructure, in order to meaningfully reduce coal mining and GHG emissions from the planning areas, BLM would have to consider at least one alternative that limited the ability of existing mines to expand. But in both plans BLM steadfastly refused to do so. BFO-AR-501-9536; MCFO-AR-339-44069-70, -44290. BLM thus failed to comply with clear direction from this Court to "consider[]… alternatives that would reduce the amount of available coal," and "consider climate change impacts." *WORC II*, 2018 WL 1475470, at *17. As this Court explained, doing so would allow BLM to "make a reasoned decision on the amount of recoverable coal made available in the RMPs." *Id.*

NEPA requires agencies to "study, develop, and describe" reasonable alternatives to the agency's proposed action. 42 U.S.C. § 4332(2)(C)(iii), (2)(E). This analysis forms the "heart" of the NEPA process. 40 C.F.R. § 1502.14.[10] To fulfill this mandate, federal agencies must "[r]igorously explore and objectively evaluate *all* reasonable alternatives." 40 C.F.R. § 1502.14(a) (emphasis added).

---

[9] *See* Exec. Order No. 14,008, § 101, 86 Fed. Reg. at 7,619 (recognizing climate crisis); *accord* Dep't of Interior, Sec'y Ord. No. 3399, § 1.

[10] The NEPA regulations, 40 C.F.R. 1500 *et. seq.*, were amended in July 2020, effective September 2020. 85 Fed. Reg. 43,304 (July 16, 2020). This brief cites the regulations in effect at the time of BLM's 2019 decision, which apply to this Court's analysis.

"The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist. v. DOI*, 376 F.3d 853, 868 (9th Cir. 2004). Thus, BLM violates NEPA if it fails to consider reasonable alternatives to fossil fuel leasing and development by omitting any option that would meaningfully limit leasing and development within the planning area. *WORC II*, 2018 WL 1475470, at *9, *15; *see Wilderness Workshop v. BLM*, 342 F. Supp. 3d 1145, 1166-67 (D. Colo. 2018) (refusal to consider any alternative that closed more than 25.7% of planning area to oil and gas development violated NEPA).

### A.    BLM Violated NEPA by Considering Essentially Identical Alternatives.

When analyzing the climate impacts of coal development, the two key considerations are: (1) tons of coal mined, and (2) tons of greenhouse gases emitted.[11] In these two respects, the Buffalo and Miles City plans each analyzed essentially identical alternatives. For Buffalo, both alternatives contemplate 4.9 billion tons of coal production and 7.3 billion tons of GHG emissions. BFO-AR-501-9539, -9554. In Miles City all alternatives entail 775 million tons of coal

---

[11] BLM acknowledges that all coal mined under the plans will be burned to generate electricity. MCFO-AR-339-44083; BFO-AR-501-9552.

production and approximately 775 million tons of GHG emissions. MCFO-AR-339-44069, -44084.

BLM's purported distinctions between alternatives are meaningless to an evaluation of options for reducing GHGs by reducing coal development, as this Court directed. This is because the so-called alternatives entail identical amounts of coal mining, coal burning, and GHG emissions. For Buffalo, Alternative A (no action) continues existing management in the planning area; and Alternative B purports to limit acres open to leasing and tons of coal developed, but in fact allows exactly the same amount of expected coal development and climate impacts as Alternative A. BFO-AR-501-9529-30, -9539, -9554. Thus, although on paper Alternatives A and B allow slightly different amounts of coal production (73 billion and 52 billion tons, respectively), this is a meaningless distinction because under both alternatives, BLM notes that "[t]here are 4.9 billion tons of coal forecast for development in Campbell County over the 20-year planning period." BFO-AR-501-9539. For both alternatives, the amount of coal production "allowed" is more than an order of magnitude greater than BLM expects industry

to produce.[12] BFO-AR-501-9539. BLM concedes that "[t]he GHG emissions for production, transportation, and downstream combustion *are the same under Alternative A (No Action Alternative) and Alternative B (the action alternative)*." BFO-AR-501-9550 (emphasis added).

In Miles City, BLM likewise evaluated only alternatives that entail identical amounts of coal mining, coal burning, and GHG emissions. In the Miles City FSEIS, BLM considered three alternatives: Alternative A (no action); Alternative B (preferred alternative), which restricts acres available to coal development in certain areas currently used by other resources, such as oil and gas development; and Alternative C, which purports to "limit" coal production only to areas within an 8-mile radius of the four existing mines in the planning area, which is where all future production will occur in any case. MCFO-AR-339-44062, -44065.[13] To drive this point home, BLM reiterated more than 20 times in response to comments that the agency "does not anticipate new leasing beyond approved leases or

---

[12] Alternative A would allow more than 14 times the amount of "reasonably foreseeable development" of coal, whereas Alternative B would allow more than 10 times the amount of "reasonably foreseeable development." Both entailed the same amount of coal production and climate pollution. BFO-AR-501-9529-30, -9539.

[13] Thus, although Miles City Alternative A allows mining on 1.5 million acres, Alternative B on 1.2 million acres, and Alternative C on 158,000 acres, BLM projects only 9,730 acres of surface coal development will occur over the next twenty years. MCFO-AR-339-44064-66, -44069.

existing lease applications and does not forecast different production levels among alternatives." *E.g.*, MCFO-AR-339-44236-40, -44268-69. The proposed "limits" thus offer no meaningful restriction on coal development. As with the Buffalo analysis, BLM conceded that these paper differences in Miles City result in identical amounts of coal production and GHGs: "[t]he GHG emissions for production, transportation, and combustion *are the same under the No Action Alternative (Alternative A) and the action alternatives (Alternatives B and C)*." MCFO-AR-339-44081 (emphasis added).

BLM's evaluation of "essentially identical" alternatives with respect to coal development violated NEPA's core mandate and this Court's prior order. *WORC II*, 2018 WL 1475470, at *9.

## B. BLM Violated NEPA by Failing to Consider a Reasonable Range of Alternatives.

BLM also failed to "[r]igorously explore and objectively evaluate *all* reasonable alternatives," 40 C.F.R. § 1502.14(a) (emphasis added), including No Leasing and Reduced Leasing alternatives. BFO-AR-461-8180-89; BFO-AR-42-3476-79; MCFO-AR-269-33696-705; MCFO-AR-54-1381-84. Instead, BLM dismissed No Leasing and Reduced Leasing options out of hand, including them only in a short description of alternatives "eliminated from further study." BFO-AR-501-9535-36; MCFO-AR-339-44067 (No Leasing only). As to reduced

19

leasing, BLM explained in the Buffalo plan[14] that it could have evaluated an alternative limiting leasing to areas immediately adjacent to existing mines, but chose not to because it was "highly unlikely … that a new coal mine would start and new infrastructure would be constructed within the next 20 years." BFO-AR-501-9536. BLM then undercut that rationale in the next paragraph, noting that "some areas not immediately adjacent to, but between the mines, might be needed for future leasing." BFO-AR-501-9536. BLM refused to consider the alternative in detail based on the legally irrelevant, but nonetheless astounding, statement that "it could not be implemented without disrupting existing mining operations." BFO-AR-501-9536. BLM's failure to consider reduced leasing alternatives purely from a desire to support existing mining operations violated NEPA's mandate that BLM evaluate all reasonable alternatives. *See High Country Conservation Advocates v. USFS*, 951 F.3d 1217, 1227 (10th Cir. 2020) (agency refusal to consider middle ground alternatives with different levels of coal production violates NEPA).

In the Buffalo FSEIS, BLM offered four unavailing excuses for its refusal to consider a No Leasing alternative. BLM asserted that a No Leasing alternative:

1. Was precluded by the coal screening process in 43 C.F.R. § 3420 *et seq.*

---

[14] The Miles City FSEIS/RMP does not address reduced leasing alternatives. MCFO-AR-339-44061-67.

2. Would not meet BLM's multiple use mandate under the Federal Land Policy and Management Act (FLPMA);

3. Would not meet the leasing requirements under the Mineral Leasing Act; and

4. Is precluded because coal development is an authorized use of public lands.

BFO-AR-501-9536; MCFO-AR-339-44067.[15]

First, this Court rejected BLM's reliance on coal screens as a justification for refusing to evaluate otherwise reasonable alternatives that would reduce the climate impacts of coal leasing in the planning areas: "BLM cannot acknowledge that climate change concerns defined, in part, the scope of the RMP revision while simultaneously foreclosing consideration of alternatives that would reduce the amount of available coal based upon deference to an earlier coal screening that failed to consider climate change." *WORC II*, 2018 WL 1475470, at \*17; BFO-AR-501-9536; BFO-AR-573-14133; MCFO-AR-339-44067; MCFO-AR-403-46215; MCFO-AR-387-45596. BLM's assertion in Miles City that "coal unacceptability for leasing is based on protecting specific, high-value resources and does not consider unspecific resource concerns," MCFO-AR-339-44067,

---

[15] In Miles City, BLM acknowledged that "[a]lthough a land use planning-level decision can be made that precludes coal development throughout the planning area, it does so by making areas unacceptable for further consideration" during the coal screening process, and "BLM's authorities are clear in their direction that coal unacceptability for leasing is based on protecting specific, high-value resources and does not consider unspecific resource concerns." MCFO-AR-339-44067.

merely rephrases its previously rejected argument that the coal screens do not specifically account for climate change concerns. This Court ordered BLM to go through the coal screens to consider climate change, so BLM cannot credibly protest that the coal screens again constrain its ability to consider reduced leasing alternatives in the RMPs.

Second, it is clear that FLPMA's multiple use mandate does not require BLM to prioritize mineral development over other uses, such as closing areas to fossil fuel development. As to this point, and BLM's fourth excuse, while coal mining is a potentially allowable use of public lands, BLM is not required to lease, and thus the agency is free to consider a No Leasing alternative for *these* public lands under NEPA in order to address climate change. *See, e.g.*, *New Mexico ex rel. Richardson v. BLM*, 565 F. 3d 683, 710 (10th Cir. 2009) ("BLM's obligation to manage for multiple use does not mean that development must be allowed … Thus, an alternative that closes [public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration."). Under FLPMA's "multiple use" directive, BLM must manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources … without permanent impairment of the productivity of the land." 43 U.S.C. §§ 1701(a)(7),

1702(c), and requires that the "Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands," *id.* § 1732(b). FLPMA further provides the "public lands be managed in a manner that will protect the quality of … air and atmospheric … values." *Id.* § 1701(a)(8).

In its 2017 scoping report for a subsequently-cancelled review of the federal coal program, BLM explained that climate change must be evaluated as part of the BLM's land use planning (RMP) process:

> Consideration of the implications of Federal coal leasing for climate change, as an extensively documented threat to the health and welfare of the American people, falls squarely within the factors to be considered in determining the public interest. Moreover, *this consideration is critical in development of land use plans* where the Secretary must "weigh long-term benefits to the public against short-term benefits."

MCFO-AR-54-1570 (emphasis added) (quoting 43 U.S.C. § 1712(c)(7)).

Third, the Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*, authorizes, but does not require, the Secretary of the Interior to offer coal deposits on public lands for leasing "in [the Secretary's] discretion" so long as doing so is "in the public interest." 30 U.S.C. § 201(a); 43 C.F.R. § 3400.2 (Secretary "*may* issue coal leases on all Federal lands except" a prescribed list, including national parks, wildlife refuges, and wilderness areas, among others (emphasis added)); *accord* John D. Leshy, *Interior's Authority to Curb Fossil Fuel Leasing*, Comment, 49 Envtl. L. Rep. 10631-32 (2019).

23

In sum, BLM's decision to ignore this Court's clear instruction resulted in meaningless distinctions among essentially identical alternatives and foreclosed the opportunity for the agency "to make a reasoned decision on the amount of recoverable coal made available in the RMPs." *WORC II*, 2018 WL 1475470, at *17. As the Court explained, the point of a reduced development alternative is to consider ways to *limit* coal mining on public lands and the resulting GHG emissions. *See id.* at *9 ("BLM's failure to consider any alternative that would *decrease* the amount of extractable coal available for leasing" violated NEPA.). Yet in its FSEISs, BLM considered only alternatives that made available 10 to 162 times the amount of coal and acres that industry planned to develop.[16] BLM's flouting of this Court's order was arbitrary and unlawful.

## III.   BLM VIOLATED NEPA BY COMPLETELY FAILING TO CONSIDER PUBLIC HEALTH CONSEQUENCES OF DOWNSTREAM FOSSIL FUEL COMBUSTION.

BLM violated NEPA when it failed entirely to address the widespread harm to public health—including tens of thousands of mortalities—that will result from non-GHG air pollution emitted when burning the billions of tons of coal and significant volumes of oil and gas that BLM projects to be extracted under the RMPs.

---

[16] *See supra* notes 12-13.

NEPA requires agencies to analyze "any adverse environmental impacts which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). These include "direct" and "indirect" (or "secondary") effects. 40 C.F.R. § 1502.16(b). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). "[C]onsideration of secondary impacts may often be more important than consideration of primary impacts," because "secondary or induced effects may be more significant than the project's primary effects." *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975). Indeed, agencies must disclose indirect impacts even "when the *nature* of the effect is reasonably foreseeable but its *extent* is not." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003).

"An EIS that does not adequately consider the indirect effects of a proposed action violates NEPA." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020). It is well established that downstream air pollution from fossil fuel combustion, including both GHGs and other non-GHG pollution, is a reasonably foreseeable result of fossil fuel extraction. *Id.* at 737-40 (failure to quantify GHG emissions from foreign combustion of oil from drilling project was arbitrary); *Mont. Envtl. Info. Ctr. v. OSM*, 274 F. Supp. 3d 1074, 1093-94 (D. Mont. 2017) (failure to consider "non-local effects of non-[greenhouse gas]

25

emissions" resulting from coal mine expansion was arbitrary); *WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955, at \*7-8 (D. Mont. Feb. 3, 2021) (analysis of public health impacts from non-GHG air pollution from coal mine arbitrary).

Here, this Court previously held that BLM's prior EISs violated NEPA by failing to assess "the environmental consequences of the downstream combustion of the coal, oil, and gas resources potentially open to development under these RMPs." *WORC II*, 2018 WL 1475470, at \*13. Thus, this Court ordered BLM to "supplement the Miles City FEIS and Buffalo FEIS with an analysis of the environmental consequences of downstream combustion of coal, oil, and gas open to development under each RMP," because "[t]he specific projections in the RMPs of the amounts of resources to be extracted, and their foreseeable uses, makes such analysis reasonably possible." *Id.* at \*18.

If an agency "entirely fail[s] to consider an important aspect of the problem," its decision is arbitrary and capricious. *Motor Vehicle Mfrs. v. State Farm*, 463 U.S 29, 43 (1983). In *Motor Vehicle Manufacturers*, the National Highway Traffic Safety Administration (NHTSA) rescinded a requirement for automobiles to be equipped with passive restraints (automatic seatbelts or airbags) because it concluded that automatic seatbelts would not be effective. *Id.* at 38-39, 47. The Court held that the rule was arbitrary because, even if automatic seatbelts

26

were ineffective, the agency entirely failed to consider retaining the requirement

for airbags. *Id.* at 48 ("Not one sentence of its rulemaking statement discusses the

airbags-only option."). Similarly, in *Diné Citizens Against Ruining Our*

*Environment v. OSM*, 82 F. Supp. 3d 1201, 1214, 1217 n.18 (D. Colo. 2015),

*vacated as moot* 643 F. App'x 799 (10th Cir. 2016), where very small amounts of

mercury deposition threatened protected fish in the adjacent San Juan River, the

District of Colorado held the U.S. Office of Surface Mining violated NEPA when

it "completely fail[ed] to address the deleterious impacts of combustion-related

mercury deposition" that would result indirectly from a coal mine expansion.

So too here. On remand, Conservation Groups alerted the agency to the

issue, but BLM "entirely fail[ed] to consider" the foreseeable public health

impacts, including tens of thousands of unnecessary and avoidable premature

deaths, from combustion of the vast quantities of fossil fuels that BLM allowed for

development in the RMPs. *See Motor Vehicle Mfrs.*, 463 U.S at 43. This was

arbitrary and capricious.

BLM's RMPs enable extensive coal strip-mining, and oil and gas drilling

and fracking. The RMPs forecast strip-mining and burning of 5.675 billion tons of

coal over 20 years—4.9 billion tons from the Buffalo Planning Area and 775

million tons from the Miles City Planning Area. MCFO-AR-339-44073; BFO-AR-

501-9539. In addition, BLM forecasts production of approximately 100 million

27

barrels of oil and 160 billion cubic feet of fossil gas from the planning areas.

MCFO-AR-339-44086, -44088; BFO-AR-501-9555-56. BLM acknowledges that

virtually all these fossil fuels will be burned. MCFO-AR-339-44079 to -44082;

BFO-AR-501-9553-56.

Conservation Groups submitted detailed expert testimony and peer-reviewed

reports demonstrating that downstream fossil fuel combustion of this magnitude

would emit significant amounts of non-GHG pollutants—harmful criteria

pollutants such as particulate matter, sulfur dioxide, nitrogen oxides, and toxic

pollutants such as mercury and lead—that would, in turn, cause widespread harm

to public health. An exhaustive review by a commission of the Lancet concluded

that "[p]ollution is the largest environmental cause of disease and premature death

in the world today"; that environmental pollution is responsible for approximately

"16% of all deaths worldwide"; and that "[c]oal is the world's most polluting fossil

fuel, and coal combustion is an important cause of both pollution and climate

change." MCFO-AR-391-45884; BFO-AR-532-12314.

A detailed literature review by Brian Moench, M.D., concluded that

combustion of the billions of tons of coal from the planning areas "will have a

significant, broad-based impact on [] public health across [the] United States,

including tens of thousands of premature deaths, countless more cases of

respiratory and cardiac illness, and significant harm to the brain development of

children and fetuses." MCFO-AR-54-1392; BFO-AR-42-3487.[17] Dr. Moench

assessed numerous peer-reviewed analyses of mortality and morbidity from coal

combustion and explained how air pollution affects "all the critical organs" and

that "the entire spectrum of public health outcomes" are associated with air

pollution. MCFO-AR-54-1392-94; BFO-AR-42-3488-90. Dr. Moench then

reviewed stillbirths caused by ozone and impaired fetal development and IQ-loss

from mercury and lead emitted from coal combustion. MCFO-AR-54-1395-98;

BFO-AR-42-3491-94.

Economist Peter Howard, Ph.D., explained the costs to the public caused by

the non-greenhouse gas emission of pollutants including sulfur dioxide, nitrogen

oxides, particulate matter, volatile organic compounds, and toxic heavy metals,

among others, that result from burning fossil fuels from the planning areas.

MCFO-AR-54-1402-07; BFO-AR-42-3497-502. Dr. Howard surveyed the

extensive literature on the topic and concluded that the "premature mortality,

---

[17] Dr. Moench based his estimate of premature mortality on the approximately 11
billion tons forecast in BLM's prior NEPA analyses for the planning areas. MCFO-
AR-54-1392. BLM's revised forecasts project approximately 5.7 billion tons of
coal production. MCFO-AR-339-44073 (MCFO FSEIS); BFO-AR-501-9539. Dr.
Moench concluded, based on his review of peer-reviewed scientific literature, that
in 2010 combustion of approximately 1 billion tons of coal caused "over 10,000
premature deaths" in the United States. MCFO-AR-54-1392; BFO-AR-550-12743.
Thus, Dr. Moench's estimate of "tens of thousands of premature deaths" remains
accurate for BLM's forecast combustion of 5.7 billion tons of coal.

cardiovascular diseases, lost work productivity, and other damages" to the public from this non-GHG pollution would cost the public hundreds of billions of dollars and would exceed the benefits of extraction many times over. MCFO-AR-54-1407-18; BFO-AR-42-3502-13. While ignoring the exorbitant public costs of non-GHG pollution, BLM trumpeted the economic benefits of fossil fuel development. MCFO-AR-339-44107-20; BFO-AR-501-9514.[18]

BLM acknowledged but failed entirely to address the comments, expert testimony, and the substantial supporting evidence submitted by the Conservation Groups.[19] Indeed, BLM did not dedicate even a single sentence to evaluating this information in its FSEIS, protest resolutions, or records of decision. MCFO-AR-46-919 (scoping report); MCFO-AR-387-45600-03 (summarizing comment but failing to address public health impacts from downstream non-GHG pollution); BFO-AR-573-14135-38 (same); *see generally* MCFO-AR-339-44029-304; BFO-AR-501-9497-754. Similar to NHTSA's arbitrary disregard of the widespread mortality impacts from the removal of the seatbelt and airbag mandates in *Motor*

---

[18] BLM's thumbing of the scales by touting economic benefits, while ignoring costs was arbitrary. *WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955, at *8 (D. Mont. Feb. 3, 2021); *Mont. Envtl. Info. Ctr. v. OSM*, 274 F. Supp. 3d 1074, 1098 (D. Mont. 2017).

[19] BLM's complete failure to provide *any* response to these detailed expert comments providing "opposing viewpoints" was itself arbitrary. *State of Cal. v. Block*, 690 F.2d 753, 773 (9th Cir. 1982).

*Vehicle Mfrs.*, 463 U.S at 43, BLM's complete failure to consider and disclose an aspect of its action—non-GHG air pollution from downstream fossil fuel combustion—that will result in "tens of thousands of premature deaths, countless more cases of respiratory and cardiac illness, and significant harm to the brain development of children and fetuses" was—at a minimum—arbitrary and capricious.

## IV.   REMEDY

BLM has now had two opportunities to comply with NEPA in amending the Buffalo and Miles City RMPs and has twice failed to do so. While BLM drags its feet, the status quo of fossil fuel development continues unabated while the unequivocal scientific consensus dictates that we must drastically reduce emissions to stand a chance of averting ever more catastrophic consequences. In its prior remedy decision, this Court directed an expeditious remand and required interim BLM actions regarding fossil fuel development to "undergo comprehensive environmental analyses" in compliance with the Court's merits decision. *W. Org. of Res. Councils v. BLM* (*WORC III*), No. CV 16-21-GF-BMM, 2018 WL 9986684, at *2 (D. Mont. July 31, 2018).

Conservation Groups have been imploring BLM to tell the hard truth about fossil fuel development and consider appropriate alternatives in these plans for

more than six years. At some point, justice delayed becomes justice denied. To correct BLM's recalcitrant lawlessness, this Court should:

1. Order BLM to conduct new coal screens and revise the RMPs for the Buffalo and Miles City field offices, with specific instruction to:

   (a) consider no coal leasing and limited coal leasing alternatives; and

   (b) disclose the public health impacts, both climate and non-climate, of burning fossil fuels from the planning areas;

2. Order BLM to finalize the coal screens and NEPA processes no later than 12 months from the date of this Court's Order; and

3. Require that any approval of coal, oil, or gas leases, lease modifications, lease renewals, applications for permits to drill, or reductions in fossil fuel royalty rates approved by BLM during this period undergo NEPA review, including public comment, consistent with the Court's Order addressing alternatives and environmental consequences of downstream combustion.

## CONCLUSION

For the foregoing reasons, Conservation Groups respectfully request that the Court declare BLM's approval of the Buffalo and Miles City RMPs and FSEISs arbitrary and capricious and remand to BLM to correct its errors.

Respectfully submitted October 29, 2021.

32

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
T: 406.586.9692 ext. 1929
shernandez@earthjustice.org

/s/ Melissa Hornbein
Melissa A. Hornbein
Western Environmental Law
Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

/s/ Nathaniel Shoaff
Nathaniel Shoaff (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

33

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that this brief contains 6,458 words, excluding caption, certificate of compliance, tables, and signatures. I relied on the word count of the word-processing system used to prepare this brief to calculate this word count.

/s/ Shiloh Hernandez
Shiloh Hernandez