Travis Jordan, MT Bar No. 53199056
Senior Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov

*Attorney for the State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, *et al*., <br><br> Plaintiffs, <br><br><br> v. <br><br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendant. | Case No. 4:20-cv-76-BMM-JTJ <br><br> **WYOMING'S MEMORANDUM IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTFF'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

GLOSSARY ................................................................................................. vii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 2

    I.      Procedural Background ....................................................... 2

    II.    Buffalo Resource Management Plan Amendment............................ 3

        A.     Purpose and Need....................................................... 4

        B.     Coal Screening ........................................................... 5

            1.    Federal Coal Screening Criteria ..................................... 5

            2.    The Revised Coal Screen................................................ 7

        C.     Range of Alternatives.................................................. 9

        D.     Consideration of Downstream Environmental
             Consequences........................................................... 10

STANDARD OF REVIEW ........................................................................... 10

ARGUMENT .............................................................................................. 12

    I.      The Bureau's alternatives are not identical........................ 12

    II.    The Bureau evaluated a reasonable range of alternatives................. 17

        A.     The Bureau adequately explained its elimination of a no
             leasing alternative .................................................... 17

B.   The Bureau properly considered and eliminated a reduced emissions alternative from further study .................... 21

C.   The Bureau considered an alternative that reduced the amount of coal areas available for leasing ............................... 23

III.   The Bureau adequately considered air quality impacts .................... 24

A.   This Court previously determined that the Bureau took a hard look at the environmental consequences of air quality in the 2015 Buffalo RMP ............................................. 25

B.   Downstream non-GHG emissions are beyond the scope of this Court's previous order .................................................. 26

C.   The Bureau explained air quality comments are outside the scope of its analysis .......................................................... 28

CONCLUSION ...................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Am. Trucking Ass'ns Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) ............................................................... 11

*Ariz. Past & Future Found., Inc. v. Lewis,*
722 F.2d 1423 (9th Cir. 1983) ............................................................... 18

*Backcountry Against Dumps v. Jewell,*
674 F. App'x 657 (9th Cir. 2017) .......................................................... 22

*Bair v. California Dep't of Transp.,*
982 F.3d 569 (9th Cir. 2020) ................................................................ 16

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
631 F.3d 1072 (9th Cir. 2011) ............................................................... 11

*California v. Block,*
690 F.2d 753 (9th Cir. 1982) ................................................................ 26

*City of Carmel-by-the-Sea v. Dep't of Transp.,*
123 F.3d 1142 (9th Cir. 1997) ............................................................... 16

*City of Sausalito v. O'Neill,*
386 F.3d 1186 (9th Cir. 2004) ............................................................... 24

*Conservation Cong. v. U.S. Forest Serv.,*
No. 2:13-cv-01977-JAM-DB, 2018 WL 1142199 (E.D. Cal. March 2,
2018) (unpublished) .............................................................................. 28

*Ctr. for Biological Diversity v. BLM,*
No. 2:14-cv-00226-APG-VCF; 2:14-cv-00228-APG-VCF, 2017 WL
3667700 (D. Nev. Aug. 23, 2017) (unpublished) ................................. 22

*Ecology Ctr. v. Castaneda,*
574 F.3d 652 (9th Cir. 2009) ................................................................ 29

*Friends of Animals v. Sparks*,
    200 F. Supp. 3d 1114 (D. Mont. 2016) ..............................................29

*Headwaters, Inc. v. BLM*,
    914 F.2d 1174 (9th Cir. 1990) ........................................................29

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ..........................................................11

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v.
    U.S. Forest Serv.*,
    689 F.3d 1060 (9th Cir. 2012) ........................................................18

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
    177 F.3d 800 (9th Cir. 1999) ..........................................................15

*N. Alaska  Envtl. Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ..........................................................22

*Nat'l Mining  Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) ..........................................................20

*Nat'l Wildlife Fed'n v. Burford*,
    677 F. Supp. 1445 (D. Mont. 1985) ..................................................5

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ................................................. 10, 11

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ........................................................12

*Pac. Coast Fed'n of Fisherman's Ass'ns. v. Blank*,
    693 F.3d 1084 (9th Cir. 2012) ........................................................18

*W. Org. of  Res. Councils v. BLM*,
    No. CV-16-21-GF-BMM, 2018 WL 1475470 (D. Mont. March 26, 2018)
    (unpublished) ............................................... 1, 2, 5, 19, 25, 26, 27, 28

*Wilderness Watch v. King*,
   No. CV 12-102-M-DWM, 2013 WL 3331264 (D. Mont. July 1, 2013)
   (unpublished) ...................................................................................................18

**Statutes**

5 U.S.C. § 706.....................................................................................................11

30 U.S.C. § 201...................................................................................................18

30 U.S.C. § 1272........................................................................................ 5, 7, 18

43 U.S.C. § 1701.................................................................................................18

43 U.S.C. § 1712...................................................................................................3

43 U.S.C. § 1732...................................................................................................3

**Regulations**

40 C.F.R. § 1500.1 (2019) ..................................................................................28

40 C.F.R. § 1501.7 (2019) ..................................................................................26

40 C.F.R. § 1502.13 (2019) ................................................................................16

40 C.F.R. § 1502.14 (2019) .......................................................................... 17, 24

40 C.F.R. § 1503.4 (2019) ..................................................................................29

43 C.F.R. Part 1600..............................................................................................5

43 C.F.R. § 1601.0-5.............................................................................................3

43 C.F.R. § 1601.0-6.............................................................................................4

43 C.F.R. § 1610.7-1.............................................................................................5

43 C.F.R. §§ 3400 through 3480...........................................................................5

43 C.F.R. Part 3400..............................................................................................5

43 C.F.R. § 3420.0-2 .................................................................................19

43 C.F.R. § 3420.1-1 ..............................................................................5, 19

43 C.F.R. § 3420.1-4 ............................................................................ 5, 6, 7

43 C.F.R. § 3461.2-1 ..................................................................................6

43 C.F.R. § 3461.5 ......................................................................................6

# GLOSSARY

Buffalo Field Office……………………………………………………BFO

Bureau of Land Management…………………………………………….Bureau

Environmental Impact Statement…………………………………………EIS

Environmental Protection Agency………………………………………..EPA

Federal Land Policy and Management Act………………………………FLPMA

Greenhouse Gas…………………………………………………..…GHG

National Ambient Air Quality Standards………………………………..NAAQS

National Environmental Policy Act………………………………..NEPA

Resource Management Plan………………………………………...RMP

Resource Management Plan Amendment………………………...RMPA

Secretary of Interior…………………………………………..Secretary

Supplemental Environmental Impact Statement…………………………SEIS

Surface Mining Control and Reclamation Act…………………………..SMCRA

## INTRODUCTION

Previously, this Court ordered the Bureau to prepare a new coal screen for the RMP governing federal resources in the Powder River Basin in Wyoming.[1] The Bureau responded with the Buffalo RMPA. After preparing a revised coal screen, the Bureau reduced the amount of acceptable land for potential coal leasing by 191,645 acres. The Bureau also supplemented its analysis of the downstream environmental impacts of fossil fuel combustion originating from the Buffalo planning area.

The Western Organization of Resource Councils and other conservation organizations (the Groups) now assert the Bureau considered "essentially identical" alternatives in the Buffalo RMPA, did not consider a reasonable range of alternatives, and did not consider the public health consequences of fossil fuel combustion. These assertions are a bridge too far. The Bureau reduced the amount of acres available for potential coal leasing, adequately explained why it eliminated certain alternatives from detailed study, and explained that air quality impacts were previously considered and outside the scope of the Buffalo RMPA. This Court should deny the Groups' motion for summary judgment because the corrected

---

[1] *See W. Org. of Res. Councils v. BLM*, No. CV-16-21-GF-BMM, 2018 WL 1475470 (D. Mont. March 26, 2018) (unpublished).

1

Buffalo RMPA is consistent with the Bureau's criteria for identifying lands for potential coal leasing and this Court's previous order.

## BACKGROUND

### I.    Procedural Background

The Bureau amended the Buffalo RMP in 2015, and the Groups challenged that decision. (*See* BFO-ARMPA-009509). This Court granted in part, and denied in part, the Groups' motion for summary judgment. *W. Org. of Res. Councils*, 2018 WL 1475470, at *19. Specifically, the Bureau was required to conduct a new coal screen for the Buffalo RMP. *Id.* at *17 (Claim 1). This Court also ordered the Bureau to supplement its analysis of the environmental impacts of downstream combustion associated with fossil fuels. *Id.* at *18 (Claim 3). With respect to the air quality analysis in the Buffalo RMP, this Court denied the Groups' motion and held the Bureau did not violate NEPA. *Id.* (Claim 6). In response to this Court's order, the Bureau supplemented its analysis in 2019. (*See* BFO-ARMPA-9509). This litigation followed.

The Groups now allege the Bureau violated NEPA on two grounds. (ECF No. 37 at 22-24). First, the Groups claim the Bureau failed to consider an adequate range of alternatives when it prepared the Buffalo RMPA.[2] (*Id.* at 22-23). Second, the

_____

[2] Wyoming's Motion for Summary Judgment focuses on the Buffalo RMPA because the natural resources and federal lands at issue are located in Wyoming.

2

Groups claim the Bureau failed to consider the downstream consequences of non-GHG emissions resulting from fossil fuel combustion. (*Id.* at 23-24). The Groups also alleged a third cause of action relating to the legal authority of the acting Bureau Director, but they have not pursued this argument in their motion for summary judgment. (*See id.* at 25-27).

## II.    Buffalo Resource Management Plan Amendment

The Bureau's planning area for the Buffalo RMPA covers 7.4 million acres of intermingled federal, state, and private land in north-central Wyoming, including land in Campbell, Johnson, and Sheridan counties. (BFO-ARMPA-001184). Within the Buffalo RMPA planning area, the Bureau manages approximately 800,000 surface acres and 4.7 million subsurface federal mineral acres. (BFO-ARMPA-009517). The Bureau's Proposed Plan for potential coal leasing in the Buffalo RMPA focuses on the eastern half of Campbell County where coal mining is already highly consolidated. (BFO-ARMPA-009536-37).

The Bureau prepared the Buffalo RMPA consistent with its obligations in FLPMA. (*See* BFO-ARMPA-009526). FLPMA requires the Secretary, through the Bureau, to "manage the public lands under principles of multiple use and sustained yield[.]" 43 U.S.C. § 1732(a). The Bureau fulfills its multiple use mandate by developing, maintaining, and revising land use plans. 43 U.S.C. § 1712(a). A land use plan, or RMP, describes allowable resource uses, goals, and restrictions for a

3

particular tract of federal land. *See* 43 C.F.R. § 1601.0-5(n). An amendment to an RMP "is considered a major Federal action significantly affecting the quality of the human environment" and requires an EIS under NEPA. *See* 43 C.F.R. § 1601.0-6.

### A.   Purpose and Need

The Bureau prepared the Buffalo RMPA in response to this Court's order in *Western Organization of Resource Councils v. Bureau of Land Management*. (BFO-ARMPA-004636). The Bureau's purpose for the Buffalo RMPA was "to provide additional analysis for land use planning, specifically for analyzing coal, oil, and gas in the BFO and to determine the lands to be made available for coal leasing." (BFO-ARMPA-009517). To accomplish this purpose, it conducted a new coal screening process. (*Id.*). The Bureau then considered an alternative in the Buffalo RMPA that reduced the amount of recoverable coal and analyzed the related climate change impacts. (*Id.*). It also supplemented its analysis on the environmental consequences of downstream emissions resulting from fossil fuel combustion and considered a 20-year and 100-year horizon for estimated global warming impacts. (*Id.*). The Bureau's analysis is contained in its SEIS and Record of Decision. (*See* BFO-ARMPA-009497-9754; *and* BFO-ARMPA-004632-91). The Bureau completed the Buffalo RMPA using land use planning criteria in existing regulation. (*See* BFO-ARMPA-009525).

**B.     Coal Screening**

This Court ordered the Bureau to conduct a new coal screen for the Buffalo RMPA. *W. Org. of Res. Councils*, 2018 WL 1475470, at *7. SMCRA requires the Secretary to "conduct a review of the Federal lands to determine … whether there are areas on Federal lands which are unsuitable for all or certain types of surface coal mining operations …." 30 U.S.C. § 1272(b). The process outlined by SMCRA is known as coal screening. (*See* BFO-ARMPA-009587). The pertinent regulatory requirements for coal screening are incorporated into the Secretary's land use planning regulations. *Nat'l Wildlife Fed'n v. Burford*, 677 F. Supp. 1445, 1459 (D. Mont. 1985) (citing 43 C.F.R. §§ 3400 through 3480). Federal regulations explain that land use planning is the "chief process" in which the Bureau reviews federal land to assess whether areas are unsuitable for coal mining operations. 43 C.F.R. § 1610.7-1(a)(1).

**1.     Federal Coal Screening Criteria**

The federal coal resources in this case are governed by the regulations at 43 C.F.R. Parts 1600 and 3400. (BFO-ARMPA-009587). During land use planning, the Bureau screens public land through a series of criteria to determine if land is suitable for coal mining. (*Id.*). All lands subject to coal leasing under the mineral leasing laws are subject to the coal screening process. 43 C.F.R. § 3420.1-1. The Bureau uses a

four-step process for identifying areas acceptable for potential coal leasing. 43 C.F.R. § 3420.1-4(e).

First, the Bureau identifies areas that have development potential. 43 C.F.R. § 3420.1-4(e)(1). Coal companies, state and local governments, and the general public are encouraged to submit information to the Bureau about coal development potential. *Id.* If the data indicates an area has development potential, the Bureau may include the area in the RMP for coal leasing evaluation. *Id.*

Second, the Bureau considers a set of twenty criteria to determine if any identified areas are unsuitable for coal mining. 43 C.F.R. § 3420.1-4(e)(2); *see also* 43 C.F.R. § 3461.5. The Bureau will exclude unsuitable federal land with coal potential from the RMP unless an exception applies. *See* 43 C.F.R. § 3461.2-1(a)(1); (*see also* BFO-ARMPA-009587). For example, certain lands are categorically excluded as unacceptable for leasing, including National Park System components, wilderness study areas, National Forests with exclusions, and federal lands within incorporated cities and towns. *See, e.g.,* 43 C.F.R. § 3461.5(a)(1), (d)(1). Lands with critical habitat for threatened and endangered species and cultural resources are also categorically excluded. *See, e.g.,* 43 C.F.R. § 3461.5(g)(1), (i)(1). The unsuitability criteria in the regulation do not account for climate change impacts. *See generally* 43 C.F.R. § 3461.5. Third, the Bureau must make multiple use decisions and may eliminate coal deposits from leasing consideration to protect other land use values.

43 C.F.R. § 3420.1-4(e)(3). Section 522(a)(3) of SMCRA enumerates some of the land use values the Bureau may consider including impacts to historic or culturally significant lands, renewable resources such as water supply or grazing, or natural hazards that could substantially endanger life and property. *Id.; see also* 30 U.S.C. § 1272(a)(3).

Finally, the Bureau consults with all surface owners whose lands overlie coal deposits to determine the landowner's preference for mining activities. 43 C.F.R. § 3420.1-4(e)(4). The Bureau must consider surface owner preferences when making land use planning decisions involving coal mining. *Id.*

The coal screening process is designed to identify lands suitable for coal mining in an RMP. (BFO-ARMPA-009588). After the RMP is adopted, the Bureau conducts additional NEPA analysis before holding a lease sale. (*Id.*).

## 2.   The Revised Coal Screen

The Bureau's previous 2015 Buffalo RMP relied on data from its 2001 coal screen. (BFO-ARMPA-009587). In response to this Court's order, the Bureau completed a revised coal screen for the Buffalo RMPA using updated economic estimates. (*See* BFO-ARMPA-009588). The biggest change in the revised coal screen was the Bureau's decision to exclude coal deposits in Sheridan County based on economic forecasts for future development. (BFO-ARMPA-004640). The Bureau's decision to exclude Sheridan County was made, in part, on coal quality and

7

stripping ratios which influenced the cost to produce coal in Sheridan County. (BFO-ARMPA-009588). The Bureau also considered climate change as a multiple use factor in step three of its coal screening process. (*See* BFO-ARMPA-009536). After the revised coal screen, the Bureau reduced the area for potential coal development in the Buffalo RMPA from current levels. (*See* BFO-ARMPA-009529-30; BFO-ARMPA-009513) (reducing the number of acres acceptable for potential coal leasing by 231,429 acres).

The Bureau also used an updated reasonably foreseeable development coal forecast for the planning area. (BFO-ARMPA-009617). The Energy Information Administration prepared the reasonably foreseeable development forecast based on estimates and modeling. (*Id.*). Lower energy demand for coal is expected to reduce domestic coal production through 2038. (BFO-ARMPA-009619). Over the next twenty years, the forecast projects that an estimated 36,620 acres of surface disturbance may produce 4.2 billon short tons of coal from the Buffalo RMPA planning area. (BFO-ARMPA-009621). The Bureau also determined that economic forecasts indicate new mining activity in Sheridan County is "highly unlikely." (*Id.*). Based on information collected in its revised coal screening process, the Bureau refined the alternatives it considered in the Buffalo RMPA. (BFO-ARMPA-009529).

8

C.    **Range of Alternatives**

The Bureau considered in detail two alternatives in the Buffalo RMPA. (BFO-ARMPA-009529). Alternative A, the no action alternative, relied on previous management decisions and the 2001 coal screen. (*Id.*). The Bureau identified 686,896 acceptable acres for potential coal leasing in Alternative A. (*Id.*).

Alternative B was based on the Bureau's revised coal screen. (BFO-ARMPA-009530). The Bureau identified 455,467 acceptable acres for potential coal leasing in Alternative B. (*Id.*). Compared to the no action alternative, Alternative B reduced coal acceptability by thirty-four percent. (*Id.*).

After considering the two alternatives, the Bureau chose a Proposed Plan that slightly modified Alternative B. (BFO-ARMPA-009513). After the revised coal screen, the Bureau added 39,784 acres to Alternative B to account for future new uses for coal and to provide flexibility for mining operations using existing infrastructure. (BFO-ARMPA-009535). The Proposed Plan identified 495,251 acceptable acres for potential coal leasing resulting in less coal leasing than Alternative A. (BFO-ARMPA-009513).

The Bureau also considered and eliminated two alternatives from further study. (BFO-ARMPA-009535-36). The Bureau eliminated a no leasing alternative from detailed review because it was not consistent with the Bureau's statutory mandates or its coal screening regulations. (*Id.*). The Bureau also eliminated a

9

reduced emissions alternative because it would disrupt existing mining operations, and therefore, was not feasible. (BFO-ARMPA-004640). In addition, a detailed study of a reduced emissions alternative was not necessary because existing mine operations meet federal air quality standards and the Bureau's Proposed Plan resulted in less potential coal leasing. (*See* BFO-ARMPA-009536).

### D.    Consideration of Downstream Environmental Consequences

In response to the Court's order, the Bureau supplemented its analysis of the environmental consequences of downstream combustion emissions associated with the coal, oil, and gas open to development in the Buffalo RMPA. (BFO-ARMPA-004636). The Bureau's evaluation focused on studying the downstream impacts of three primary GHGs – carbon dioxide, nitrous oxide, and methane. (BFO-ARMPA-009545). The Bureau also explained its use of global warming potential time horizons and the evolving science supporting its analysis. (*Id.*). The Bureau explained that review of downstream non-GHG emissions was outside the scope of the Buffalo RMPA because this Court upheld the Bureau's air quality analysis in the 2015 Buffalo RMP.  (*See* BFO-ARMPA-009521; BFO-ARMPA-009544-45).

### STANDARD OF REVIEW

This court reviews alleged violations of NEPA under the Administrative Procedure Act. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Agency actions may only be set aside if they are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)(A)). "[T]his standard is highly deferential, presuming the agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (internal quotation marks and citation omitted). The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (citations omitted), *overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009). Instead, the Court may:

> reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quotation marks and citations omitted).

## ARGUMENT

### I.    The Bureau's alternatives are not identical.

The Groups first argue that the Bureau's alternatives in the Buffalo RMPA are "essentially identical" because the "alternatives contemplate 4.9 billion tons of coal production and 7.3 billion tons of GHG emissions." (ECF No. 49 at 16-17). But this argument suffers a major flaw. The numbers cited by the Groups are analytical assumptions the Bureau considered to evaluate environmental impacts, not the substance of the alternatives that the Bureau actually considered.

When courts evaluate the reasonableness of the alternatives considered by an agency, they focus on "**the substance of the alternatives**." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (emphasis added). Here, the Bureau's alternatives in the Buffalo RMPA are not identical because they are based on very different numbers of acceptable acres for coal leasing. (*See* BFO-ARMPA-009513). The Bureau considered, in full detail, alternatives that ranged between 686,896 and 455,467 acres of acceptable land for potential coal leasing. (*Id.*). The Bureau's summary of its alternatives demonstrates clear substantive distinctions between the alternatives.

12

**Table ES-I**
**Alternatives Summary and Coal Acceptability for Leasing**

| Alternative | Acres Acceptable |
|---|---|
| Alternative A: No Action Alternative | 686,896 |
| Alternative B | 455,467 |
| Proposed Plan | 495,251 |

Source: BLM GIS 2019

(*Id.*).

Instead of challenging the substance of the Bureau's alternatives in the Buffalo RMPA, the Groups created their own table purporting to show that the Bureau's alternatives are "essentially identical."(ECF No. 49 at 14).

Case 4:20-cv-00076-BMM   Document 49   Filed 10/29/21   Page 22 of 42

| Buffalo FSEIS Alternatives | | |
|---|---|---|
| | Coal Development (Tons)[5] | Greenhouse Gas Emissions (Tons CO2e)[6] |
| Alternative A | 4.9 billion | 7.3 billion |
| Alternative B | 4.9 billion | 7.3 billion |

(*Id.*).

But the Groups' table is misleading because it cites **analytical assumptions** that the Bureau used for calculating environmental impacts (*See* BFO-ARMPA-009539).  In essence, the Groups' table ignores the key element that the Bureau used in distinguishing its alternatives – the acres acceptable for potential coal leasing.

13

For example, the 4.9 billion number in the Groups' table is a coal development forecast prepared by the Energy Information Administration, using its own model, which the Bureau relied on to estimate reasonably foreseeable coal development.[3] (*See* BFO-ARMPA-009621). The Energy Information Administration, a statistical agency, calculates the coal development forecast based on market conditions. (*See id.*). The Bureau clearly identified this coal forecast number as an **analytical assumption** to measure potential environmental impacts. (BFO-ARMPA-009539). Tellingly, the forecast number cited in the Groups' table was culled from the Bureau's environmental consequences chapter in the Buffalo RMPA, not the Bureau's chapter on the alternatives. (*See id.*). The coal development forecast number is the same across all alternatives because it was a baseline used for modeling purposes. (*See id.*).

The Groups' reliance on the GHG emission estimate in the table is also dubious because it too was intentionally designed for all the alternatives. (*See* BLM-ARMPA-009553). The Bureau lacks a precise scientific tool for forecasting climate change at a local scale that can capably attribute a particular climate impact to a particular source, such as coal mining. (BLM-ARMPA-009553). Using the EPA's State Inventory and Projection tool, the Bureau applied the model across all the

---

[3] More accurately, the Bureau only administers 4.2 billion tons of the forecasted coal reserves in the Buffalo RMPA area. The remainder are under state, private, or other management. (BLM-ARMPA-009539).

alternatives. (BLM-ARMPA-009550). The downstream estimates for GHG emissions are the same for each alternative because the Energy Information Administration's reasonably foreseeable development estimate for coal production in the project area is the same. (*Id*.).

An EIS may violate NEPA when the only action alternatives considered in detail are "virtually identical." *See, e.g., Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800, 813 (9th Cir. 1999) (per curiam). But the Groups offer no legal authority to support their argument that the Bureau violated NEPA by allegedly considering "essentially identical" alternatives in the Buffalo RMPA. (*See* ECF No. 49 at 16-19). There are, in fact, meaningful differences in the alternatives considered in the Buffalo RMPA.

After a new coal screen, the Bureau considered Alternative B with a thirty-four percent reduction in potential coal leasing compared to the status quo considered by Alternative A. (BFO-ARMPA-009530). Although the Bureau's Proposed Plan modified Alternative B by adding 39,784 additional acres of potential coal leasing, the Bureau still reduced the amount of coal available for potential leasing in the Buffalo RMPA. (*See* BFO-ARMPA-009596). The alternatives consider significantly different amounts of acres acceptable for potential coal leasing, and therefore, are not "essentially identical."

The Groups did not challenge the stated purpose for the Buffalo RMPA and did not argue that the Bureau's purpose was impermissibly narrow. *See City of Carmel-by-the-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Courts have a standard for determining the reasonableness of the Bureau's alternatives: "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives...." *Id.*; *see also* 40 C.F.R. § 1502.13 (2019).[4] The purpose of the Buffalo RMPA is "to determine the lands to be made available for coal leasing." (BFO-ARMPA-009517). The Bureau met its objective using a new coal screen and in particular considered Alternative B that reduced the amount of coal available for leasing. (*See id.*); (*see also* BFO-ARMPA-009530).

Therefore, the Groups offer no legal basis for this Court to conclude that the Bureau violated NEPA by considering alternatives based on differing amounts of acres acceptable for potential coal leasing. Their selective use of analytical assumptions from the administrative record provides an inaccurate portrait of what the Bureau actually considered in the Buffalo RMPA. The Bureau prepared distinct alternatives based on varying levels of acceptable acres for potential coal leasing in

---

[4] The Council on Environmental Quality amended 40 C.F.R. part 1500 effective September 14, 2020. For this litigation, the Court should apply the NEPA regulations in effect when the Buffalo RMPA was finalized in November 2019. *See, e.g., Bair v. California Dep't of Transp.*, 982 F.3d 569, n. 20 (9th Cir. 2020).

16

the Powder River Basin. This Court should reject the Groups' effort to portray the Bureau's alternatives as "essentially identical."

## II.    The Bureau evaluated a reasonable range of alternatives.

Next, the Groups argue the Bureau did not consider a reasonable range of alternatives because the Bureau eliminated a no leasing alternative from further analysis. (ECF No. 49 at 19). The Groups also argue that the Bureau improperly eliminated a reduced emission alternative and "reduced leasing" option from additional consideration. (*Id.*). However, the Bureau reasonably eliminated proposals that did not meet its objectives and dismissed alternatives that were not feasible.

### A.    The Bureau adequately explained its elimination of a no leasing alternative.

The Bureau properly eliminated a no leasing alternative from detailed consideration because it conflicted with the Bureau's statutory and regulatory obligations. (*See* BFO-ARMPA-009536). When the Bureau eliminates alternatives from detailed study, it must "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (2019). Here, the Bureau explained that a no leasing alternative in the Buffalo RMPA was inconsistent with its coal screening regulations, its multiple use mandate under FLPMA, and the Mineral Leasing Act. (BFO-ARMPA-009536).

17

The Groups summarily disregard the Bureau's statutory and regulatory obligations as "unavailing excuses." (ECF No. 49 at 20).  But courts are not as dismissive of federal law. *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012) ("In assessing the reasonableness of a purpose and need specified in an EIS, [courts] must consider the statutory context of the federal action.").

Congress authorized coal development on federal land and the Bureau's objective for the Buffalo RMPA was to "determine the lands to be made available for coal leasing." (BFO-ARMPA-009509); *see* 30 U.S.C. § 201; 30 U.S.C. § 1272(b); 43 U.S.C. § 1701(a)(12); (*see also* BFO-ARMPA-009517). The Bureau's decision was reasonable because it eliminated an alternative that did not meet the Bureau's objectives or statutory mandates. *See Ariz. Past & Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1428 (9th Cir. 1983) ("Alternatives that do not accomplish the purposes of the project may properly be rejected as imprudent."); *Pac. Coast Fed'n of Fisherman's Ass'ns v. Blank,* 693 F.3d 1084, 1100 (9th Cir. 2012) (concluding that agencies do not need to consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives of the project"); *Wilderness Watch v. King*, No. CV 12-102-M-DWM, 2013 WL 3331264, at *10 (D. Mont. July 1, 2013) (unpublished) ("Alternatives that do not advance the purpose of the Project will not be considered reasonable or appropriate.").

18

The Groups also argue that the Bureau's explanation for eliminating the no leasing alternative was inconsistent with this Court's previous order. (ECF No. 49 at 20-21). Specifically, the Groups argue that BLM cannot rely on its coal screening regulation to foreclose consideration of a no leasing alternative. (*Id.* at 21). But this Court did not give the Bureau carte blanche to ignore existing regulatory requirements. Instead, the Court ruled that "NEPA requires BLM to conduct **new coal screening** and consider climate change impacts to make a reasoned decision on the amount of recoverable coal made available in the RMPs." *W. Org. of Res. Councils*, 2018 WL 1475470, at *17 (emphasis added). The Bureau responded to the Court's order by performing a new coal screen with updated information. (BFO-ARMPA-004640; BFO-ARMPA-009517).

Importantly, the coal screening process is designed to identify which federal lands have coal leasing potential during land use planning. *See* 43 C.F.R. § 3420.0-2. The coal screening regulation makes clear that "all lands subject to coal leasing under the mineral leasing laws are subject to evaluation" under the screening process. 43 C.F.R. § 3420.1-1. As the Bureau explained, it is "required to go through the coal screening process outlined in 43 CFR 3420 et [*sic*] seq." when making land use allocations. (BFO-ARMPA-009536). The Bureau's elimination of the no leasing alternative was consistent with its coal screening regulations which are designed to identify which lands are acceptable for potential leasing.

19

The Groups also argue that the Bureau had an obligation under FLPMA to consider an alternative that eliminated an entire class of activity from the Buffalo RMPA in the name of "multiple use." (ECF No. 49 at 22-23). Multiple use, in fact, is a balancing act. *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 872 (9th Cir. 2017) ("[T]he principle of multiple use confers broad discretion on an implementing agency to evaluate the potential economic benefits of mining against the long-term preservation of valuable natural, cultural, or scenic resources."). As the Bureau explained in rejecting the no leasing alternative:

> Making the entire decision area unacceptable for further consideration for coal leasing would not meet the BLM's multiple use mandate under FLPMA, the leasing requirements under the Mineral Leasing Act of 1920, as amended, and 43 CFR 3400.2. Coal development is an authorized use of public lands and meets the BLM's multiple use objectives.

(BFO-ARMPA-009536). Not only is coal leasing an authorized multiple use in the Buffalo RMPA planning area but multiple use criteria are inherently considered in the coal screening process. (*See* BFO-ARMPA-009589).

The Groups also argue that the Bureau impermissibly prioritized coal development over other uses. (ECF No. 49 at 22). They are wrong. The Bureau administers 800,000 acres of surface lands and 4.7 million acres of subsurface federal mineral estate in the Buffalo RMPA planning area. (BFO-ARMPA-004636). The Bureau's Proposed Plan identified 495,251 acres as acceptable for coal leasing, a reduction from the 686,896 acceptable acres under Alternative A. (BFO-ARMPA-

009513). After the Bureau's revised coal screening, it then calculated the "reasonably foreseeable development" scenario within those 495,251 acres. (BFO-ARMPA-009617). The Bureau's map of the Buffalo RMPA decision area provides a visual representation of the overlapping coal development areas analyzed by the Bureau compared to the whole Buffalo RMPA planning area. (*See* BFO-ARMPA-009511). The map clearly shows that the Bureau limited potential coal leasing to portions of the planning area where coal mining already existed and did not prioritize coal development over other uses. (*See id.*).

Here, the Bureau reasonably eliminated a no leasing alternative that was inconsistent with its objectives and statutory mandates. The Bureau explained that making the entire planning area unacceptable for future coal leasing did not meet its obligations because coal development is an authorized use of public lands. (BFO-ARMPA-009536). In doing so, the Bureau met its burden under NEPA.

**B.    The Bureau properly considered and eliminated a reduced emissions alternative from further study.**

The Bureau also considered and eliminated a reduced emissions alternative from further study in the Buffalo RMPA. (BFO-ARMPA-009535-36). The Groups argue that the Bureau violated NEPA by eliminating this alternative from further study. (*See* ECF No. 49 at 19) (citing BFO-ARMPA-009535-36). But the Bureau explained that the reduced emissions alternative was infeasible. (*See* BFO-ARMPA-004640).

An agency does not need to discuss alternatives which are "infeasible." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). The Bureau explained that the reduced emissions alternative was "not considered a feasible alternative because it could not be implemented without disrupting existing mining operations." (BFO-ARMPA-004640). Therefore, the Bureau reasonably eliminated this alternative from further consideration. *See Ctr. for Biological Diversity v. BLM*, No. 2:14-cv-00226-APG-VCF; 2:14-cv-00228-APG-VCF, 2017 WL 3667700, at *7 (D. Nev. Aug. 23, 2017) (unpublished) (finding the Bureau reasonably eliminated proposed alternatives that were not feasible).

The Bureau also considered other reasons for eliminating the reduced emissions alternative from further study. (*See* BFO-ARMPA-004640). For example, the Bureau reviewed reducing air emissions, as a nexus for climate change, under its multiple use coal screen. (BFO-ARMPA-009536). Because previous coal development in the Buffalo planning area met state and federal air quality standards and the foreseeable development scenario for coal mining in the Buffalo RMPA resulted in less coal development in the future, the Bureau dismissed the reduced emissions alternative. (*Id.*). From a practical perspective, the Bureau eliminated the reduced emissions alternative because the Bureau's existing alternatives were not projected to increase emissions. Therefore, the Bureau's decision to eliminate the reduced emissions alternative was reasonable. *See, e.g., Backcountry Against Dumps*

22

*v. Jewell*, 674 F. App'x 657, 662-63 (9th Cir. 2017) (finding the Bureau's elimination of alternatives was reasonable for practical considerations).

### C.   The Bureau considered an alternative that reduced the amount of coal areas available for leasing.

The Groups also argue that the Bureau did not consider a "reduced leasing alternative" in the Buffalo RMPA. (ECF No. 49 at 19-20). They are mistaken.

In fact, the Bureau considered a reduced coal leasing alternative in full detail. (*See* BFO-ARMPA-009530). Alternative B reduced the boundary for potential coal development. (BFO-ARMPA-009530). Under Alternative B, the Bureau identified 455,467 acres as acceptable for potential coal leasing in the Buffalo RMPA. (BFO-ARMPA-009513). The Bureau's Alternative A, the no action alternative, identified 686,896 acres for potential leasing. (*Id.*). As a result, Alternative B evaluated a reduction in the overall area acceptable for potential coal leasing. (BFO-ARMPA-009513).

The only support that the Groups offer for their argument that the Bureau allegedly did not consider a "reduced leasing alternative" in the Buffalo RMPA are record citations from the Bureau's explanation for eliminating a **reduced emissions alternative**. (ECF No. 49 at 20) ("[The Bureau] could have evaluated an alternative limiting leasing to areas immediately adjacent to existing mines, but chose not to because it was 'highly unlikely … that a new coal mine would start and new infrastructure would be constructed within the next 20 years.'") (citing BFO-

23

ARMPA-009536). The Bureau's explanation for eliminating the reduced emissions alternative from detailed review has nothing to do with a "reduced leasing alternative." The Groups' suggestion that the Bureau relied on "legally irrelevant" statements in allegedly dismissing a reduced leasing alternative is not only factually inaccurate but unsupported by the record.

The Bureau's range of alternatives was reasonable because it evaluated different scenarios with varying levels of acceptable areas for potential coal leasing. The Bureau reasonably eliminated alternatives that did not fulfill its objectives or were not feasible. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Cir. 2004) (citing 40 C.F.R. § 1502.14(a)-(c) ("The EIS, however, 'need not consider an infinite range of alternatives, only reasonable ones.'")). Accordingly, this Court should deny the Groups' motion for summary judgment because the Bureau considered a reasonable range of alternatives.

## III.   The Bureau adequately considered air quality impacts.

The Groups argue that the Bureau did not consider downstream air quality impacts in the Buffalo RMPA. (ECF No. 49 at 27-28). Specifically, the Groups argue that the Bureau did not consider impacts associated with "non-GHG air pollution" resulting from the combustion of coal, oil, and natural gas. (*Id.* at 24). However, this Court previously considered the Bureau's cumulative impact analysis on air quality in the 2015 Buffalo RMP and held "BLM's reliance on the NAAQS in its air quality

analyses did not violate NEPA." *W. Org. of Res. Councils*, 2018 WL 1475470, at *18 (denying Claim 6).

Unsatisfied with that outcome, the Groups now seek to impermissibly expand the scope of this Court's previous order on Claim 3 by suggesting the Bureau was required to review downstream impacts of non-GHG emissions. (*See* ECF No. 49 at 26). This Court's order, however, focused on downstream GHG emissions. *See W. Org. of Res. Councils*, 2018 WL 1475470, at *11-13 (noting that the impact of greenhouse gases was "readily apparent" when the Bureau prepared the Buffalo RMP). The Court should not allow the Groups to revive previously considered air quality concerns that were outside the scope of the Buffalo RMPA.

### A. This Court previously determined that the Bureau took a hard look at the environmental consequences of air quality in the 2015 Buffalo RMP.

In the previous litigation, this Court considered the Groups' claim that the "BLM [] violated NEPA by failing to consider cumulative impacts on air quality for all federal mineral development and for regional (non-BLM) sources of air pollution." *W. Org. of Res. Councils*, 2018 WL 1475470, at *16 (alteration added). The Court explained that the EIS for the 2015 Buffalo RMP "considered regional or statewide air quality from BLM and non-BLM sources" and concluded that the "BLM reasonably used the NAAQS as a standard in these analyses." *Id.* This Court

then denied Claim 6 challenging the Bureau's cumulative air quality impact analysis. *Id.* at *19.

Notwithstanding the Court's previous order, the Groups suggested in public comment that the Bureau once again consider "cumulative impacts to air quality" of fossil fuel combustion in the Buffalo RMPA. (BFO-ARMPA-003486). The Groups then identified the same non-GHG pollutants that the Bureau considered in the EIS accompanying the 2015 Buffalo RMP using the NAAQS criteria. (*Compare* BFO-ARMPA-003486 *with* BUF_0120112; BUF_0120506-508).[5] In response to the Groups' comments, the Bureau explained the concern was outside the scope of the RMPA because the "[a]nalysis was included as part of the 2015 Proposed RMP/Final EIS." (BFO-ARMPA-009521).

## B. Downstream non-GHG emissions are beyond the scope of this Court's previous order.

The detail that NEPA requires in an EIS depends on the nature and scope of the proposed action. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). The scoping process requires the Bureau to "[i]dentify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review[.]" 40 C.F.R. § 1501.7(a)(3) (2019). Here, the Bureau correctly relied on this Court's previous order when it focused on evaluating the

---

[5] *See* 2017 administrative record in *W. Org. of Res. Councils*.

downstream GHG emissions in the Buffalo RMPA. As the Bureau explained, it carried forward its air quality analysis from the 2015 Buffalo EIS which "[was] upheld and [was] not the subject of the court's order." (BFO-ARMPA-009544-45).

The Bureau prepared the Buffalo RMPA with the understanding that this Court was satisfied by its evaluation of air quality impacts performed in the previous 2015 Buffalo RMP. (*See* BFO-ARMPA-009521) (stating the impact of fossil fuel combustion on public health was adequately addressed in the 2015 analysis and outside the scope of the Buffalo RMPA); (*see also* BFO-ARMPA-004497). The Groups, however, attempt to revive their challenge to the Bureau's air quality analysis by insisting that this Court's ruling on Claim 3 in the previous litigation required the Bureau to consider **non-GHG** impacts in the Buffalo RMPA analysis. (ECF No. 49 at 26); (BFO-ARMPA-003486) (emphasis added).

This Court granted summary judgment in favor of the Groups on Claim 3 in the previous litigation. *W. Org. of Res. Councils*, 2018 WL 1475470, at *19. Claim 3 evaluated the adequacy of the Bureau's analysis on "indirect effects of downstream combustion of resources extracted from the planning areas." *Id.* at *11. The Groups' briefing in the prior case focused on the indirect impacts of **GHG emissions** from fossil fuel combustion. *See* Pls.' Mem. Supp. Mot. Summ. J., *W. Org. of Res. Councils,* 4:16-cv-21 at 16-21 (ECF No. 72-1) (emphasis added). This Court, in explaining its decision in the previous litigation, similarly focused on the

downstream combustion of **GHG emissions**. *See, e.g., W. Org. of Res. Councils*, 2018 WL 1475470, at *13 ("The impact on the climate borne by the burning of greenhouse gases proved 'readily apparent' at the time that BLM scoped and completed the Buffalo EIS and Miles City EIS.").

This Court should reject the Groups' transparent effort to expand the scope of the previous order which held the Bureau adequately considered the cumulative air quality impacts in the 2015 Buffalo RMP. *See, e.g., Conservation Cong. v. U.S. Forest Serv.*, No. 2:13-cv-01977-JAM-DB, 2018 WL 1142199, at *7 (E.D. Cal. March 2, 2018) (unpublished) (rejecting plaintiff's effort to challenge agency's supplemental analysis following remand as "beyond the scope of the Court's order"). Requiring the Bureau to revisit environmental impacts beyond the scope of this Court's order will only resort in additional needless detail and delay. *See* 40 C.F.R. § 1500.1(b) (2019) ("NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.").

### C.    The Bureau explained air quality comments are outside the scope of its analysis.

The Groups argue that the Bureau did not respond to testimony on the potential impacts of non-GHG pollutants resulting from fossil fuel combustion. (ECF No. 49 at 28-29). In response to comments about air quality and public health concerns, the Bureau explained,

28

> Both the Buffalo EIS and the Miles City FSEISs considered regional or statewide air quality from BLM and non-BLM sources. BLM compared the projected emissions of its activity with statewide emissions totals to measure the impact of the plans on the National Ambient Air Quality Standards (NAAQS). This analysis fostered "informed decision making" by providing an appropriate context to evaluate BLM's emissions. Block, 690 F.2d at 761. This appropriate context included a comparison of those emissions to regional or statewide emissions. BLM reasonably used the NAAQS as a standard in these analyses.

(BFO-ARMPA-014136). In response to public comment, the Bureau similarly explained that toxic air emissions are "out of the scope because it does not meet the purpose and need of the SEIS/RMPA." (BFO-ARMPA-009520).

The Bureau's response to public comment must "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position[.]" 40 C.F.R. § 1503.4(a)(5)(2019). "Moreover, an agency need not respond to every single scientific study or comment." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009). Here, the Bureau adequately responded that the air quality comments were beyond the scope of its analysis. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1128 (D. Mont. 2016) (noting that the Bureau adequately explained that it did not address comments that were "outside the scope of the analysis"); *see also Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990) (noting that although the Bureau considered all suggestions, some were not discussed in the final document because they were "beyond the scope of the management plan"). Therefore, this Court should deny the

Groups' motion for summary judgment on the basis that the Bureau failed to consider the downstream impacts of non-GHG emissions.

## CONCLUSION

The Bureau adhered to its statutory and regulatory obligations when it prepared the Buffalo RMPA. The Bureau corrected the deficiencies that this Court outlined in its previous order, and the State of Wyoming is entitled to summary judgment on all of the Groups' claims.

Accordingly, this Court should deny the Groups motion for summary judgment and uphold the Buffalo RMPA.

Dated this 23rd day of December, 2021.

/s/ *Travis Jordan*
Travis Jordan, MT Bar No. 53199056
Senior Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov

*Attorney for Intervenor-Defendant*
*State of Wyoming*

30

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that Wyoming's Memorandum in Support of its Cross Motion for Summary Judgment complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 6,257, excluding caption, certificate of compliance, table of contents and authorities, and certificate of service. The undersigned relies on the  word count of the word processing system used to prepare this document.

*/s/ Travis Jordan*
Travis Jordan
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2021, a true copy of the

foregoing was served on all counsel via the Court's CM/ECF system.

*/s/ Travis Jordan*
Travis Jordan
Senior Assistant Attorney General