MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North
Suite 3200
Billings, MT 59101
Ph: (406) 247-4667
Fax: (406) 657-6058
mark.smith3@usdoj.gov

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
LUTHER L. HAJEK (CO Bar 44303)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Ph: (202) 305-0465
Fax: (202) 305-0506
arwyn.carroll@usdoj.gov
luke.hajek@usdoj.gov

*Counsel for Federal Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | | |
|---|---|---|
| WESTERN ORGANIZATION OF RESONANCE COUNCILS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:20-cv-00076-BMM-JTJ |
| v. | ) ) | **FEDERAL DEFENDANT'S BRIEF IN SUPPORT OF ITS CROSS-** |
| U.S. BUREAU OF LAND MANAGEMENT, | ) ) ) ) | **MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS'** |
| Defendant, and | ) ) | **MOTION FOR SUMMARY JUDGMENT** |
| STATE OF WYOMING, | ) ) | |
| Intervenor Defendant. | ) ) | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL BACKGROUND .......................................................................................2

    I.    National Environmental Policy Act ........................................................2

    II.   Federal Land Policy and Management Act ...........................................3

    III.  Mineral Leasing Act of 1920 ................................................................4

    IV.  Administrative Procedure Act ...............................................................6

PROCEDURAL BACKGROUND............................................................................7

ARGUMENT ...........................................................................................................9

    I.    BLM considered a reasonable range of alternatives ..........................10

        A.   BLM's range of alternatives complied with NEPA and the
            Court's order ...............................................................................11

        B.   BLM was not required to consider additional alternatives.......15

            1.    Plaintiffs' "meaningful difference" argument is
                  based on a misunderstanding of the EIS.........................16

            2.    BLM adequately explained its rejection of a no-
                  leasing alternative .........................................................20

            3.    BLM considered "reduced-leasing" alternatives and
                  the BFO reasonably its decision to eliminate a
                  "reduced emissions" alternative .....................................23

    II.   BLM complied with NEPA and the Court's prior order in
         analyzing the downstream effects of coal combustion .......................25

        A.   BLM analyzed the downstream effects of GHG emissions .....26

        B.   BLM was not required to analyze non-GHG emissions...........27

    III.  Plaintiffs waived their third claim........................................................30

CONCLUSION .....................................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Abington Mem'l Hosp. v. Burwell*,
   216 F. Supp. 3d 110 (D.D.C. 2016) ....................................................30

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995)...............................................................10

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ...........................................................................3, 7

*Bullock v. Bureau of Land Mgmt.*,
   No. 4:20-CV-00062-BMM, 2020 WL 6204334 (D. Mont. Oct. 16, 2020) ..........9

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982)......................................................... 10, 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .............................................................................6

*City of Angoon v. Hodel*,
   803 F.2d 1016 (9th Cir. 1986)............................................................21

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
   123 F.3d 1142 (9th Cir. 1997)................................................. 10, 19, 20

*City of Olmsted Falls, Ohio v. F.A.A.*,
   292 F.3d 261 (D.C. Cir. 2002) ..............................................................7

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004)............................................... 20, 21, 24

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
   833 F.3d 1136 (9th Cir. 2016)..............................................................6

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) .............................................................................6

*George v. Bay Area Rapid Transit*,
   577 F.3d 1005 (9th Cir. 2009)..............................................................7

*Grand Canyon Trust v. F.A.A.*,
   290 F.3d 339 (D.C. Cir. 2002) ..............................................................3

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
   52 F. Supp. 3d 1174 (D. Colo. 2014) ...................................................30

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
   951 F.3d 1217 (10th Cir. 2020)............................................................25

*High Sierra Hikers Ass'n v. U.S. Dep't of Interior*,
   848 F. Supp. 2d 1036 (N.D. Cal. 2012) .............................................29

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
   42 F.3d 517 (9th Cir.1994)..................................................................21

*Marsh v. Oregon Nat. Res. Council*,
   490 U.S. 360 (1989) .............................................................................3

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999)...............................................................15

*N. Alaska Env't Center v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006)......................................................... 10, 24

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ...............................................................................4

*Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*,
   56 F.3d 1060 (9th Cir. 1995)...............................................................11

*Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*,
   684 F.3d 1002 (10th Cir. 2012)...........................................................20

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..........................................................................2, 3

*Saunders v. Mills*,
   172 F.Supp.3d 74 (D.D.C. 2016) ........................................................31

*Sierra Club v. U.S. Dep't of Energy*,
   867 F.3d 189 (D.C. Cir. 2017) ..............................................................3

*Sierra Club v. U.S. Dep't of Transp.*,
   310 F. Supp. 2d 1168 (D. Nev. 2004)..................................................28

*W. Org. of Res. Councils v. Bureau of Land Mgmt. (WORC II)*,
   No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26, 2018) ... *passim*

*W. Org. of Res. Councils v. Bureau of Land Mgmt. (WORC III)*,
   No. CV 16-21-GF-BMM, 2018 WL 9986684 (D Mont. Jul. 31, 2018) ......... 8, 12

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004)..............................................................2, 3

**Statutes**

30 U.S.C. § 1272(b) ...................................................................................................5

30 U.S.C. § 181 .........................................................................................................4

30 U.S.C. § 201 .........................................................................................................4

30 U.S.C. § 201(a) ...................................................................................................23

30 U.S.C. § 201(a)(3)(A)(i) .......................................................................................4

30 U.S.C. § 201(a)(3)(B) ...........................................................................................4

30 U.S.C. § 203(a)(1) ................................................................................................5

30 U.S.C. § 207(c) .....................................................................................................6

42 U.S.C. § 4321 .....................................................................................................1, 2

42 U.S.C. § 4331 ........................................................................................................2

42 U.S.C. § 4332 ........................................................................................................2

43 U.S.C. § 1701 ......................................................................................................19

43 U.S.C. § 1712(a) ...................................................................................................3

43 U.S.C. § 1732(a) ...................................................................................................3

5 U.S.C. § 706(2)(A) ..................................................................................................6

5 U.S.C. §§ 701–706 ..................................................................................................6

**Regulations**

30 C.F.R. § 746.13 .....................................................................................................6

40 C.F.R. § 1501.1 .....................................................................................................2

40 C.F.R. § 1502.14 ...................................................................................................2

40 C.F.R. § 1502.14(a) .............................................................................................10

40 C.F.R. § 1502.14(a)-(c) .......................................................................................19

40 C.F.R. § 1506.13 ...................................................................................................2

40 C.F.R. § 1508.8(b) ...............................................................................................30

40 C.F.R. pt. 1500 ......................................................................................................2

40 C.F.R. pt. 1502 ......................................................................................................2

43 C.F.R. § 1601.0-5(n) ..................................................................................4

43 C.F.R. § 1601.0-6 .......................................................................................4

43 C.F.R. § 1610.7-1 ......................................................................................22

43 C.F.R. § 3420 ...........................................................................................22

43 C.F.R. § 3420.1-4(a) ..................................................................................4

43 C.F.R. § 3420.1-4(d) ..................................................................................4

43 C.F.R. § 3420.1-4(e) ..................................................................................4

43 C.F.R. § 3420.1-4(e)(1)–(4) ......................................................................5

43 C.F.R. § 3425.2 ..........................................................................................5

43 C.F.R. § 3425.3 ..................................................................................... 5, 22

43 C.F.R. § 3425.3(b) ......................................................................................6

43 C.F.R. § 3432.3(c) ......................................................................................5

43 C.F.R. §§ 1601.0-2 .....................................................................................4

43 C.F.R. subpt. 3425 .....................................................................................5

43 C.F.R. subpt. 3432 .....................................................................................5

43 C.F.R. subpt. 3461 .....................................................................................5

**Other Authorities**

85 Fed. Reg. 43,304 (July 16, 2020)...............................................................2

## TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|---|---|
| ARMPA | Approved Resource Management Plan Amendment |
| BFO | Buffalo Field Office |
| BLM | Bureau of Land Management |
| EIS | Environmental Impact Statement |
| GHG | Greenhouse Gas |
| SEIS | Supplemental Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| MCFO | Miles City Field Office |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| RFD | Reasonably Foreseeable Developments |
| RMP | Resource Management Plan |
| ROD | Record of Decision |

**INTRODUCTION**

In 2018, this Court concluded that Resource Management Plans (RMP) and Environmental Impact Statements (EIS) prepared by the United States Bureau of Land Management's (BLM) Field Offices in Miles City, Montana, and Buffalo, Wyoming, failed to satisfy certain requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and ordered BLM to consider certain alternatives to and impacts of development in the Powder River Basin. BLM undertook those analyses and, in 2019, approved Resource Management Plan Amendments (ARMPA) and Supplemental Environmental Impact Statements (SEIS) prepared by the Miles City Field Office (MCFO) and Buffalo Field Office (BFO).

Several organizations now challenge both ARMPAs, alleging that they fail to satisfy the Court's order and, accordingly, NEPA's requirements by failing to consider a reasonable range of alternatives or analyze the downstream effects of non-greenhouse-gas (GHG) emissions. But BLM's range of alternatives and analyses of potential emissions complies with both the Court's order and NEPA, and BLM was not required to revisit the air-quality analysis that the Court found satisfactory in the previous action, and which addressed the effects of non-GHG emissions. Plaintiffs' motion for summary judgment should therefore be denied, and Federal Defendant's cross-motion granted.

1

## LEGAL BACKGROUND

### I.     National Environmental Policy Act

NEPA requires federal agencies to consider the environmental consequences of major federal actions significantly affecting the quality of the human environment. *See* 42 U.S.C. §§ 4321, 4331, 4332; 40 C.F.R. § 1501.1.[1] This consideration serves NEPA's dual purpose of informing agency decisionmakers of the environmental effects of proposed actions and ensuring that relevant information is available to the public so that it "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An agency can comply with NEPA by preparing an EIS, which is a detailed statement subject to extensive regulations regarding format, content, and methodology. *See* 40 C.F.R. pt. 1502. An EIS "must consider and assess the environmental consequences of the proposed action and reasonable alternatives to the action." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing 40 C.F.R. § 1502.14). NEPA itself

---

[1] The Council on Environmental Quality issued new NEPA-implementing regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the administrative actions challenged in this case were subject to the previous regulations, *see* 40 C.F.R. § 1506.13, all citations herein are to the version of the regulations in effect at the time the relevant decisions were made, 40 C.F.R. Part 1500 (2019).

"does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350 (citations omitted).

Judicial review of agency NEPA compliance is therefore deferential. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989). In reviewing agency action for NEPA compliance, courts ensure that agencies have taken a "hard look" at the environmental consequences of their decisions. *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017); *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340–41 (D.C. Cir. 2002). In doing so, a "court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands*, 376 F.3d at 865 (citing *Robertson*, 490 U.S. at 350). The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983); *Sierra Club*, 867 F.3d at 196.

## II.    Federal Land Policy and Management Act

The Federal Land Policy and Management Act of 1976 (FLPMA) instructs the Secretary of the Interior, through BLM, to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). BLM does this, in part, by developing, maintaining, and revising RMPs. 43 U.S.C. § 1712(a);

43 C.F.R. § 1601.0-5(n). RMPs "are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. §§ 1601.0-2. As such, "a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 71 (2004). Approval of an RMP "is considered a major Federal action significantly affecting the quality of the human environment," triggering an EIS under NEPA. 43 C.F.R. § 1601.0-6.

### III.   Mineral Leasing Act of 1920

The Mineral Leasing Act of 1920 governs the leasing of federal coal. 30 U.S.C. §§ 181 (generally), 201 (coal). The development of federal coal deposits begins with identifying lands containing coal deposits "in a comprehensive land use plan or land use analysis." 43 C.F.R. § 3420.1-4(a); *see also* 30 U.S.C. § 201(a)(3)(A)(i). That plan or analysis—typically in the form of an RMP—must "contain an estimate of the amount of coal recoverable by either surface or underground mining operations or both." 43 C.F.R. § 3420.1-4(d); *see also* 30 U.S.C. § 201(a)(3)(B).

As a prerequisite to deciding which lands to make available for further consideration for coal leasing, BLM completes a "coal screening" process, through which it applies four specific criteria or screens. 43 C.F.R. § 3420.1-4(e). The coal

screen process originates in SMCRA, 30 U.S.C. § 1272(b), and BLM's regulations require that it identify "areas acceptable for further consideration for leasing" by, among other things, screening them for: (1) "development potential," (2) whether the areas are "unsuitable for all or certain stipulated methods of mining," (3) whether coal production would interfere with other important "resource values and land uses," and (4) whether the surface owners, if any, have a "preference for or against mining by other than underground mining techniques." 43 C.F.R. § 3420.1-4(e)(1)– (4); *see also* 43 C.F.R. subpt. 3461 (process for unsuitability review).

After lands have been allocated in the RMP, the planning process is complete. During the life of the plan, a coal operator may apply for coal leases on those lands identified in the land-use plan as acceptable for further consideration for leasing. This process is known as "leasing on application." *See* 43 C.F.R. subpt. 3425. Before leases can be issued, BLM re-applies the coal screening process to the lands proposed in the application using current data and prepares a second level of environmental analysis in the form of "an environmental assessment or [EIS] of the proposed lease area." 43 C.F.R. §§ 3425.2, 3425.3. While BLM can modify an existing coal lease to add new land in certain circumstances, 30 U.S.C. § 203(a)(1); *see also* 43 C.F.R. subpt. 3432, a modification can be approved only after the preparation of "an environmental assessment or [EIS] covering the proposed lease area," 43 C.F.R. § 3432.3(c).

Finally, once a lease or modification has been issued, the Secretary must approve a mining plan before surface-disturbing activities can proceed. 30 U.S.C. § 207(c); 43 C.F.R. § 3425.3(b). Yet another level of NEPA review must be completed before a recommendation issues to the Secretary for such approval. 30 C.F.R. § 746.13.

## IV.   Administrative Procedure Act

Plaintiffs ask the Court to overturn agency actions under the Administrative Procedure Act (APA). The APA allows review of "agency action," dictating the type of agency action that is judicially reviewable, when it is judicially reviewable, the scope of review permitted, and the standard to be applied by a reviewing court. 5 U.S.C. §§ 701–706. In evaluating the legal sufficiency of informal agency actions, such as those challenged here, the Court applies the "arbitrary and capricious" standard of the APA. 5 U.S.C. § 706(2)(A). *See also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004). The standard of review for decisions challenged on these grounds is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016) (citation omitted).

"The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Rather,

a court's role is to decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*; *see also Balt. Gas & Elec.*, 462 U.S. at 105. Plaintiffs, as the party challenging an agency's action, bear the burden of proof. *See George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009) (citing *City of Olmsted Falls, Ohio v. F.A.A.*, 292 F.3d 261, 271 (D.C. Cir. 2002)).

## PROCEDURAL BACKGROUND

On September 21, 2015, the Secretary of the Interior and the Director of BLM approved land use plans for the Rocky Mountain Region Greater Sage Grouse Conservation Strategy. This decision approved, among others, RMP revisions for two field offices in the Powder River Basin: the Miles City sub-region in Montana and the Buffalo sub-region in Wyoming. These RMPs carried forward lands identified in previous planning processes as acceptable for further consideration for coal leasing.

Several of the Plaintiffs challenged the 2015 decision approving the Miles City and Buffalo RMP revisions under NEPA and the APA. The Court ultimately granted those plaintiffs' motion for summary judgment on three of their six claims, *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt. (WORC II)*, No. CV 16-21-GF-BMM, 2018 WL 1475470, at *9–18 (D. Mont. Mar. 26, 2018) (Morris, J.), *appeal dismissed,* No. 18-35836, 2019 WL 141346 (9th Cir. Jan. 2, 2019), and

ordered BLM to complete "new coal screening and remedial NEPA analyses in compliance with" that order, *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt. (WORC II)*, No. CV 16-21-GF-BMM, 2018 WL 9986684, at *2 (D Mont. Jul. 31, 2018) (Morris, J.). Specifically, it required BLM to: (1) consider as alternatives "options that modified or foreclosed the amount of acreage available for coal development," *WORC II*, 2018 WL 1475470, at *9; (2) consider in the EIS the "impact on the climate borne by the burning of greenhouse gases" through the "downstream combustion of the coal, oil and gas resources potentially open to development under these RMPs," *id.* at *13; and (3) explain the use of a global-warming potential calculated over a 100-year time horizon and consider, in the Buffalo EIS, estimates of global-warming potential over a 20-year period,[2] *id.* at *15–16. It found that BLM's analyses of the cumulative effects of non-GHG emissions—which BLM concluded would not exceed the National Ambient Air Quality Standards (NAAQS) and equivalent state standards—satisfied NEPA, however, and did not require BLM to conduct that analysis anew. *Id.* at *16.

BLM complied. Following the Court's remand decision, the BFO and the MCFO each prepared a supplemental NEPA analysis. BLM's Acting Wyoming State Director then signed the ROD approving the BFO ARMPA on November 22,

---

[2] Plaintiffs do not challenge anew BLM's global-warming potential analysis.

2019.[3] BLM's State Director for Montana and the Dakotas likewise signed a separate ROD approving the MCFO ARMPA on November 25, 2019.[4] After this Court set aside that decision, *see Bullock v. United States Bureau of Land Mgmt.*, No. 4:20-CV-00062-BMM, 2020 WL 6204334, at *4 (D. Mont. Oct. 16, 2020), the MCFO issued a new ROD on January 4, 2021. The new ROD was signed by Secretary of the Interior David Bernhardt and indicated that a new and independent protest review had been conducted by the Secretary and his staff.[5]

## ARGUMENT

In conducting its supplemental NEPA analysis and preparing the MCFO and BFO ARMPAs, BLM complied with the Court's orders in the previous case and with NEPA. Specifically, both Field Offices engaged in an updated coal screening process and considered alternatives that allocated reduced amounts of acreage as acceptable for further consideration for coal leasing. Plaintiffs' arguments to the contrary misread the EISs by assuming that allocations under the considered alternatives are equivalent to projections under the Reasonably Foreseeable Developments (RFD) analysis and do not account for BLM's reasoned explanations

---

[3] BFO-ARMPA-004644. The 2019 BFO ROD appears in the administrative record at document no. 355, which is mislabeled in the index.

[4] BLM-MCFO-0046205.

[5] BLM-MCFO-0046294.

for not considering Plaintiffs' proposed "no-leasing" alternative. Both EISs also considered the impact of GHG emissions from downstream coal combustion, as the Court required. Finally, because the Court found BLM's prior air-quality analysis sufficient, BLM's decision not to conduct that analysis anew on remand was not arbitrary or capricious.

## I.      BLM considered a reasonable range of alternatives

NEPA's implementing regulations require agencies to "evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The range of alternatives an agency must consider is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (quotations and citations omitted). As a result, "[p]roject alternatives derive from an Environmental Impact Statement's 'Purpose and Need' section . . . ." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *N. Alaska Env't Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (quotation and citation omitted). "Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)

(quotations and citation omitted). A court's inquiry "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.* Courts give agencies "considerable discretion in defining the scope of an EIS." *Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995) (quotation and citation omitted).

## A.   BLM's range of alternatives complied with NEPA and the Court's order

BLM's consideration of alternatives that made reduced acreages available for further consideration for coal leasing complied with the Court's order and with NEPA. The plaintiffs challenging the 2015 RMPs alleged that BLM violated NEPA when it "failed to consider any alternative that would decrease the amount of extractable coal available for leasing." *WORC II*, 2018 WL 1475470 at *6. In their 2015 analyses, both the MCFO and the BFO considered alternatives which the Court found identified the same potential acreage for coal leasing and identical amounts of expected coal production. *WORC II*, 2018 WL 1475470 at *7.

In preparing these alternatives, both offices had carried forward previous coal screening processes. *Id.* Because "BLM's previous coal-screening decisions had not addressed [climate change] concerns," the Court concluded that BLM could not "make a reasoned choice as to whether foreclosing development on additional acreage would serve its multiple use mandate and would address concerns that may arise from the changing conditions that spurred the RMP revision, including climate

11

change" without conducting a new coal screen. *Id.* at *9. The Court therefore concluded that BLM violated NEPA when it "fail[ed] to consider any alternative that would decrease the amount of extractable coal available for leasing" and "to consider options that modified or foreclosed the amount of acreage available for coal development." *Id.* It ordered BLM to complete an updated coal screening process in conducting its remedial NEPA analyses. *WORC III*, 2018 WL 9986684, at *2.

BLM did so. First, both Field Offices prepared updated coal screenings, which—as the Court required—used more current data.[6] Based on the results of the coal-screening processes, both Field Offices considered alternatives that would reduce the amount of acreage available for coal development.

The MCFO analyzed three alternatives. Its no-action alternative, Alternative A, brought forward decisions from the coal screens used in the 2015 Plans.[7] For Alternative B, it applied the updated coal screens and, in doing so, considered "a criterion for maintaining air quality standards as part of the multiple-use screen."[8] Finally, for Alternative C, it applied the updated coal screens and, in

---

[6] BLM-MCFO-0044042; BLM-MCFO-0044153–60; BFO-ARMPA-009509; BFO-ARMPA-009587–94. Plaintiffs do not dispute that BLM prepared updated coal screenings that addressed climate change concerns in compliance with the Court's order.

[7] BLM-MCFO-0044045.

[8] BLM-MCFO-0044045–6, BLM-MCFO-0044062.

doing so, further applied "additional air resource criterion based on [GHG] emissions that would result from additional transportation to deliver coal to the existing infrastructure."[9] As the table below demonstrates, Alternatives B and C reduced the amount of land available for further consideration for coal leasing, as the Court required. *See WORC II*, 2018 WL 1475470 at *7.

| Alternative[10] | Acreage Available | Acreage Unavailable |
|---|---|---|
| Alternative A | 1,581,240 | 325,430 |
| Alternative B | 1,214,380 | 530,420 |
| Alternative C | 158,400 | 1,586,400 |

The BFO analyzed two alternatives. Its no-action alternative, Alternative A, brought forward all management decisions from the coal screen process from the 2015 Plans, albeit using updated resource information in its unsuitability criteria.[11] For Alternative B, it reduced the boundary of the coal-development potential area— that is, the area where coal mining is economically feasible —"by applying lower strip ratios and retaining higher quality coal."[12] As the table below demonstrates,

---

[9] BLM-MCFO-0044046.

[10] BLM-MCFO-0044045; BLM-MCFO-0044062; BLM-MCFO-0044065.

[11] BFO-ARMPA-009529.

[12] BFO-ARMPA-009530.

both alternatives contemplated different amounts of acreage as acceptable for further consideration for coal leasing, as the Court required. *See WORC II*, 2018 WL 1475470 at *7. Alternative B completely eliminated Sheridan County and reduced the acreage available in Campbell County by one third so that some 20 billion fewer tons of coal would be available for leasing. [13]

| Alternative[14] | Acreage Available | Acreage Unavailable |
|---|---|---|
| Alternative A | 686,896 | 33,137 |
| Alternative B | 455,467 | 25,672 |

Finally, both of the coal-screening processes also considered climate-change concerns. For example, the MCFO's Alternative B considered a criterion for maintaining air quality standards as part of the multiple-use screen and Alternative C "applied an air resources multiple-use criterion" during the coal-screen process "based on greenhouse gas emissions that would result from additional transportation

---

[13] *See* BFO-ARMPA-009529–30, and -009535 (Alternative A contemplated 73.66 billion tons of coal compared to 52.24 billion tons for Alternative B.)

[14] All data in this table can be found at BFO-ARMPA-009529–30, and -009535. The approved Plan Amendment "added 39,784 acres to Alternative B to ensure flexibility for mining in the most efficient manner such as providing options for locating infrastructure in a manner that promotes the sensible use of the resource." BFO-ARMPA-004637.

to deliver coal to the existing infrastructure."[15] And the BFO eliminated deeper coal seams and poor quality coal from Alternative B, reducing coal availability by about 33%, which in turn reduced potential production emissions and downstream emissions.[16]

In short, this is clearly not a case where the only action alternatives considered in detail are "virtually identical," as Plaintiffs argue. *Cf. Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999). BLM followed the Court's directive and considered alternatives that make different amounts of land—and different lands—available for further consideration for coal leasing.

## B.   BLM was not required to consider additional alternatives

Despite this clear compliance with the Court's order, Plaintiffs argue that BLM's consideration of alternatives violated that order and NEPA. Specifically, Plaintiffs contend that BLM should have (1) considered alternatives based on different amounts of forecasted coal production[17] and (2) considered reduced-future-leasing or no-future-leasing alternatives.[18] Neither argument has merit.

---

[15] BLM-MCFO-0044159.

[16] *See* BFO-ARMPA-009530.

[17] Pls.' Br. in Supp. of Mot. for Summ. J. at 16–19, ECF No. 49 ("Pls.' Mem.").

[18] *Id.* at 19–24.

### 1.    Plaintiffs' "meaningful difference" argument is based on a misunderstanding of the EIS

First, Plaintiffs contend that BLM's alternatives lacked a meaningful difference. As explained *supra* Part I.A, however, both Field Offices considered alternatives that identified reduced acreages as available for further consideration for coal leasing. Despite this clear compliance with the Court's order, Plaintiffs draw numbers from each Field Office's RFD to argue that the alternatives are functionally identical.[19]

In doing so, Plaintiffs misread the EIS. An RFD is not an allocation or decision. It is an analysis that describes anticipated coal development within the respective Field Offices over the next 20 years, based on existing coal development and development trends, for purposes of conducting the underlying environmental analysis and disclosing impacts from the RMP allocations.[20] The amount of coal production projected in the RFD thus serves as a baseline for analytic purposes. It does not establish the amount of coal open for extraction or available for further consideration for coal leasing under each alternative. Nor does it serve as the

---

[19] Pls.' Mem. at 14 (citing BLM-MCFO-044069 (MCFO coal development); BLM-MCFO-044084 (MCFO GHG emissions); BFO-ARMPA-9539 (BFO coal development); BFO-ARMPA;9554 (BFO GHG emissions)).

[20] *See* BLM-MCFO-004207; BFO-ARMPA-009539.

ultimate decision of an RMP—that is, which lands will be made available for further consideration for coal leasing.

Ultimately, however, even BLM's RFD analyses could not be significantly narrower in this case. As each Field Office explained, its RFD describes anticipated coal development based on existing leases or applications pending at the time the decisions issued. Specifically, the MCFO's RFD derived its forecasted production "from contract and future estimates provided by the operators and existing lease applications," and that, "[b]ased on this information, the BLM determined that there would be no additional leasing[.]"[21] As a result, the scenario itself was "limited to the approved leases and existing lease applications . . . ."[22] Drawing on those existing leases and lease applications, as well as existing mine infrastructure, and market trends, BLM concluded that approximately 775 million tons of coal would be mined over the 20-year life of the MCFO Plan.[23] Of that 775 million tons, 727 million tons (or 94%) is anticipated to be produced through existing coal leases.[24] The remaining

---

[21] BLM-MCFO-0044067; *see also* BLM-MCFO-0044208 ("The BLM considered information collected from operators and did not consider future leasing in the decision area; therefore, this RFD scenario is limited to the approved leases and existing lease applications.").

[22] BLM-MCFO-0044067.

[23] BLM-MCFO-0044209.

[24] BLM-MCFO-0044210.

48 million tons (or 6%) would be produced through lease applications already being pursued on federal or non-federal, unleased lands.[25] As the RFD explains, any *additional* leasing beyond existing leases or lease applications pending when the Plan issued would require additional NEPA analysis when any future lease applications are processed.[26] As the MCFO explained, the RFD scenario "is the same under all alternatives" because it "is limited to the approved leases and existing lease applications . . . ."[27]

Similarly, for analytic purposes, the BFO's RFD relied on the U.S. Energy Information Administration's projection in its 2018 Annual Energy Outlook that some 4.9 billion tons of coal would be mined over 20 years.[28] But this development scenario even more narrowly accounts for coal production only from *existing mines*. Specifically, it "assumes that all federal [coal] production between 2019 and 2038 will occur at the 12 mines currently operating in Campbell County."[29] And it explained that *this*—along with the fact that tracts excluded through the new coal

---

[25] *Id.*

[26] BLM-MCFO-0044208.

[27] BLM-MCFO-0044073.

[28] BFO-ARMPA-009617.

[29] BFO-ARMPA-009662.

screen (and thus excluded from Alternative B) were not subject to existing leases or next to recoverable reserves held under existing leases—was the reason that the reasonably foreseeable development in the coal-development potential area "is anticipated to be the same under both alternatives."[30] Again, further NEPA analysis would occur prior to coal leasing.[31]

Tellingly, Plaintiffs cite no authority for the proposition that potential coal production forecast assumptions for the environmental analysis must differ for each alternative. Nor could they cite any that applied to *this* case, because the RFDs projected the amount of development for analytic purposes by accounting for existing leases or pending lease applications. And, at the RMP stage, the BLM does not make determinations on individual leases or mining operations; rather, it is limited to the determining whether there are areas suitable for future leasing and development. *See* BLM H-1601-1, Land Use Planning Handbook, at C21–22 (BLM 2005). Moreover, like all decisions made under FLPMA, the BLM's land use plan decisions are made subject to valid existing rights. 43 U.S.C. § 1701 note (h). An EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Carmel-By-The-Sea*, 123 F.3d at 1155 (citing 40 C.F.R. § 1502.14(a)-(c)).

---

[30] *Id.*

[31] BFO-ARMPA-009588.

Alternatives that required canceling existing leases or disapproving approved mine plans would not be "feasible," let alone "reasonable," and so are not required here.

### 2. BLM adequately explained its rejection of a no-leasing alternative

Plaintiffs' argument that BLM failed to explore "all reasonable alternatives" by not considering a "no leasing" alternative meets the same fate.[32] "By necessity, an agency must select a certain number of [alternatives] for serious study and eliminate the rest without detailed analysis." *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1012 (10th Cir. 2012). "For alternatives which were eliminated from detailed study," the EIS must only "*briefly* discuss the reasons for their having been eliminated." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Cir. 2004) (internal citation and quotations omitted).

First and foremost, the Court's prior order did not require BLM to consider a no-leasing alternative—it only required BLM to consider an alternative that "modified or foreclosed the amount of acreage available for coal development" so as to "decrease the amount of extractable coal available for leasing," *WORC II*, 2018

---

[32] Pls.' Mem. at 19–24. By "no-leasing" alternative, Plaintiffs appear to mean an alternative that foreclosed any *future* leasing. As explained above, BLM cannot cancel an existing lease through the land-use planning process, so an alternative that rendered *all* lands within the Field Offices unavailable for leasing would not be viable—and thus need not be considered. *Carmel-By-The-Sea*, 123 F.3d at 1155.

WL 1475470, at *9, which BLM did. *See supra* Part I.A. Complying with the Court's order was the purpose of the Project—that is, BLM described the purpose and need of the Project as "to determine the lands to be made available for coal leasing" (and otherwise comply with the Court's prior order)[33] and because the Court required BLM to "consider alternatives that would reduce the amount of recoverable coal."[34] BLM's range of alternatives was thus "reasonably related to the purposes of the project." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir.1994) (citing *City of Angoon*, 803 F.2d at 1021–22). Plaintiffs have not demonstrated that BLM's chosen alternatives were inconsistent with the purpose and need of the project or with the Court's requirements.

Both Field Offices also provided the requisite brief explanations for not considering a no-leasing alternative. *See Sausalito*, 386 F.3d at 1207. Specifically, the Field Offices explained that such an alternative would be inconsistent with the land-use-planning process.[35] In that process, BLM is required to use the coal-screening process to determine which lands should be removed from consideration

---

[33] BLM-MCFO-0044047–48; BFO-ARMPA-9517.

[34] BLM-MCFO-0044047; BFO-ARMPA-9517.

[35] BLM-MCFO-0044067; BFO-ARMPA-9536.

for future coal leasing.[36] 43 C.F.R. § 1610.7-1. Though a land-use-planning decision can functionally preclude coal development by making areas unacceptable for further consideration of leasing, BLM uses the coal-screening process to determine which lands are acceptable and unacceptable—which it did here, in compliance with the Court's previous order.[37] *See* 43 C.F.R. § 3420. Decisions of whether to actually lease lands made acceptable would be made at the application stage—at which point a no-leasing alternative must be considered and additional NEPA analysis conducted.[38] 43 C.F.R. § 3425.3.

Plaintiffs challenge the reasonability of this explanation on the basis that the Court "rejected BLM's reliance on coal screens . . . ."[39] But it did not do so—nor would it have been proper, because BLM's regulations require BLM to go through the coal-screening process at the land-use planning stage. 43 C.F.R. 1610.7-1. Rather, the Court rejected BLM's reliance on coal screens carried forward from previous land-use plans, and ordered BLM to prepare updated screens. *WORC II*, 2018 WL 1475470, at *9, *17. Consistent with that order, BLM prepared updated

---

[36] BLM-MCFO-0044067; BFO-ARMPA-9536.

[37] BLM-MCFO-0044067; BFO-ARMPA-9536.

[38] BLM-MCFO-0044067.

[39] Pls.' Mem. at 21.

coal screens and, as it explained and as its regulations require, determined which lands are acceptable or unacceptable for coal development through that process.[40]

Finally, as Plaintiffs point out, the Mineral Leasing Act authorizes the Secretary of the Interior to offer coal deposits on public lands for leasing. 30 U.S.C. § 201(a). BLM does consider a no-action alternative when analyzing a lease by application under 43 C.F.R. Subpart 3425. Plaintiffs have not explained how NEPA or the Court's prior order required it to do so here.

### 3.   BLM considered "reduced-leasing" alternatives and the BFO reasonably its decision to eliminate a "reduced emissions" alternative

Finally, Plaintiffs argue that BLM should have considered a "reduced leasing" alternative, citing the Court's conclusion that BLM's "failure to consider any alternative that would decrease the amount of extractable coal available for leasing" violated NEPA.[41] But as explained *supra* Part I.A, BLM complied with that requirement by considering alternatives that reduced the amount of acreage available for further consideration for coal leasing.

To the extent Plaintiffs argue that the BFO should not have eliminated an alternative "that would reduce air emissions by limiting leasing to only areas

---

[40] BLM-MCFO-0044045–6; BLM-MCFO-0044061–2; BLM-MCFO-0044065; BLM-MCFO-0044153–88; BFO-ARMPA-009529–30.

[41] Pls.' Mem. at 19–20, 24.

immediately adjacent to the existing coal mines,"[42] they have not demonstrated error. The BFO contemplated such an alternative to "consider the consolidation of infrastructure used in the mining and transportation of the coal."[43] But the BFO reasonably rejected such an alternative because "the supporting infrastructure is already consolidated and highly interconnected in the eastern half of Campbell County" and the BFO determined that it was "highly unlikely . . . that new infrastructure would be constructed during the next 20 years."[44] The BFO also explained that it did not consider this alternative because "it could not be implemented without disrupting existing mining operations."[45] This explanation satisfies the requirement that BLM briefly explain its reasons for dismissing an alternative. *See Sausalito*, 386 F.3d at 1207.

Nor is this explanation "legally irrelevant" or "astounding," as Plaintiffs characterize it. As explained above, the law constrains BLM from cancelling existing leases or disapproving approved plans of operations through land-use planning. Agencies are only required to consider viable alternatives, *Kempthorne*,

---

[42] BFO-ARMPA-009536; Pls.' Mem. at 20.

[43] BFO-ARMPA-9536.

[44] *Id.*

[45] *Id.*

457 F.3d at 978, and the BFO reasonably explained why this is not one. That also

distinguishes this case from *High Country Conservation Advocates v. U.S. Forest

Serv.*, 951 F.3d 1217 (10th Cir. 2020), on which Plaintiffs rely.[46] Here, BLM

provided a "logically coherent explanation for its decision" not to consider the

reduced-emissions alternative, because, as explained above, it was not "significantly

distinguishable from the alternatives already considered." *Id.* at 1227.

## II.   BLM complied with NEPA and the Court's prior order in analyzing the downstream effects of coal combustion

BLM also complied with the Court's order and NEPA with respect to its air-

quality analysis. In the previous action, the plaintiffs alleged that "NEPA require[d]

BLM to consider the indirect effects of downstream combustion of resources

extracted from the planning area" at the planning stage. *WORC II*, 2018

WL1475470, at *11. Both 2015 FEISs estimated the amount of GHG emissions

stemming from fossil fuel development under the RMPs in their respective planning

areas over the 20-year life of the plans. *See id.* at *11–12. The Court concluded that

the RMPs "contained enough specifics" about these emissions "to permit a

'productive analysis' of the downstream burning of the coal, oil and gas open to

potential development" under them such that BLM should have analyzed the

---

[46] Pls.' Mem. at 20.

"impact on the climate borne *by the burning of greenhouse gases*" at the planning stage. *Id.* at *13 (emphasis added). Accordingly, the Court concluded that "NEPA require[d] BLM to consider in the EIS the environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development under [the] RMPs," without deferring that analysis to the leasing stage. *Id.* at *13. In the ARMPAs, BLM conducted this analysis.

### A.    BLM analyzed the downstream effects of GHG emissions

Specifically, BLM analyzed the impacts of the three main GHGs associated with the production, transportation, and downstream combustion of coal, oil, and gas over the life of the ARMPA, including in the context of climate change.[47] In conducting that analysis, BLM assumed that virtually all of the coal forecast for production during the life of the ARMPA would be burned.[48] This assumption was conservative to ensure that BLM considered the full potential for GHG-related impacts. Plaintiffs do not argue that BLM's analysis of the downstream effects of GHG from combustion of the coal open to potential development under the ARMPAs fails to satisfy NEPA and the Court's prior order.

---

[47] BLM-MCFO-0044074–93; BFO-ARMPA-009544–63.

[48] BLM-MFCO-0044083–85; BFO-ARMPA-009553–54.

26

**B.      BLM was not required to analyze non-GHG emissions**

Instead, Plaintiffs argue that BLM failed to adequately analyze the downstream air-quality effects of *other* pollutants from fossil fuel combustion.[49] But the Court's order did not require that in the supplemental NEPA analysis. To the contrary, it concluded that BLM took the requisite hard look at the impacts of fossil fuel combustion on air quality—that is, the impact of non-GHG emissions on air quality—in the 2015 Plans.

Specifically, Plaintiffs previously claimed that "BLM violated NEPA failing to consider impacts at levels at, or below, the [NAAQS]" and, further, "by failing to consider cumulative impacts on air quality for all federal mineral development and for regional (non-BLM) sources of air pollution." *WORC II*, 2018 WL 1475470, at *16. But, as the Court observed, both 2015 EISs contained sufficient analyses of air quality in their respective planning areas and surrounding areas. *WORC II*, 2018 WL 1475470, at *16–17. They provided a baseline overview of air quality in the region, and then analyzed the potential effect on air quality for each alternative. *See id.* *16. Based on those analyses, both EISs concluded that the NAAQS and relevant state

---

[49] Pls.' Mem. at 29 ("non-greenhouse gas emission of pollutants including sulfur dioxide, nitrogen oxides, particular matter, volatile organic compounds, and toxic heavy metals, among others"); *id.* at 31 ("non-GHG air pollution from downstream fossil fuel combustion").

air-quality standards would not be exceeded in the planning area under any of the alternatives. The Court concluded that "[t]his analysis fostered 'informed decision-making' by providing an appropriate context to evaluate BLM's emissions," and that "BLM reasonably used the NAAQS as a standard in these analyses." *WORC II*, 2018 WL 1475470, at *16 (quoting *Block*, 690 F.2d at 761); *see also id.* ("BLM's decision to rely on the NAAQS likewise does not qualify as arbitrary and capricious."); *Sierra Club v. U.S. Dep't of Transp.*, 310 F. Supp. 2d 1168, 1202 (D. Nev. 2004) (agencies do not act arbitrarily and capriciously or violate NEPA's hard look mandate through reliance on NAAQS).

So, as BLM explained, it did not conduct further air-quality analysis in the supplemental EIS because "[t]he air quality and air quality related values analyses contained in the 2015 Proposed ARMPA/Final EIS were upheld and were not the subject of the court order."[50] As such, and as BLM has explained, such an analysis was outside of the scope of the EIS.[51] Nor would it have been necessary to include a new analysis, because the estimated coal production in the 2019 RFDs was lower than that on which the 2015 analysis—which the Court concluded was sufficient—

---

[50] BLM-MCFO-0044074; BFO-ARMPA-009520–21.

[51] BLM-MCFO-0044052; BFO-ARMPA-009520–21.

was based, and there were no changes to oil and gas from the 2015 RFD.[52] BLM's decision not to re-evaluate the effects on air quality from downstream combustion was therefore not arbitrary or capricious.

In any event, any *more* specific analysis of the effects of non-GHG on air quality is more appropriately undertaken at the leasing stage and at the mine-plan approval stage, when the specific amounts of coal to be extracted is known. BLM's decision to defer such analysis until the site-specific stage is entitled to deference and is not arbitrary or capricious. *See High Sierra Hikers Ass'n v. U.S. Dep't of Interior*, 848 F. Supp. 2d 1036, 1052 (N.D. Cal. 2012) ("[I]f the [agency] is not using the [management plan] to make any *new* decisions that alter current or future [resource] use, it is premature to insist that the [plan] should consider detailed alternatives to these unmade decisions—they will be evaluated in the upcoming [site-specific plans].").

Finally, Plaintiffs argue in a footnote that BLM's "touting economic benefits, while ignoring costs was arbitrary."[53] But the analysis they invoke for this argument is not a "benefits analysis," as they suggest, but rather BLM's analysis of the

---

[52] *See* BLM-MCFO-0044082–83; BFO-ARMPA-009618.

[53] Pls.' Mem. at 30 n.18.

economic effects of its decision—which NEPA requires.[54] *See* 40 C.F.R. § 1508.8(b). And a new economic analysis was required here, because the RFD contemplated a different amount of coal being produced than did that underlying the 2015 Plans.[55] BLM's consideration of the ARMPAs' economic impacts is not the sort of one-sided "cost-benefit" analysis that courts have deemed arbitrary and capricious, *cf. High Country Conservation Advocs. v. United States Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014), especially where—as here—the Court has already concluded that "NEPA [did] not require a cost-benefit analysis under these circumstances." *WORC II*, 2018 WL 1475470, at *14.

## III.   Plaintiffs waived their third claim

Plaintiffs have not moved for summary judgment with respect to their final claim. Plaintiffs amended their complaint in this action to add a third claim, challenging the decisions under the Federal Vacancies Reform Act and the Appointments Clause of the United States Constitution.[56] Because Plaintiffs have not submitted arguments or evidence in support of that claim, Federal Defendant is entitled to summary judgment on it. *See Abington Mem'l Hosp. v. Burwell*, 216 F.

---

[54] *See* BLM-MCFO-0044107–20; BFO-ARMPA-00963–69.

[55] *See* BLM-MCFO-0044107; BFO-ARMPA-009540.

[56] Second Am. Compl. ¶¶ 67–78.

Supp. 3d 110, 142 (D.D.C. 2016) (deeming waived arguments not raised in summary judgment brief in record review case); *Saunders v. Mills*, 172 F.Supp.3d 74, 96 (D.D.C. 2016) (same).

## CONCLUSION

The allocation decisions of the ARMPAs reduced the areas available for future coal leasing, and any future lease applications will be subject to additional NEPA analyses, which will include a no-leasing alternative. And BLM complied with the Court's requirement concerning its GHG analysis. Because Plaintiffs have not carried their burden of demonstrating that BLM's decisions in the Buffalo and Miles City ARMPAs were arbitrary or capricious, Federal Defendant respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant its cross-motion.

Respectfully submitted this 7th day of January, 2022.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Arwyn Carroll*
ARWYN CARROLL (MA Bar 675926)
Trial Attorney, Natural Resources Section
United States Department of Justice
Environment and Natural Resources Div.
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  202-305-0465

Fax:  202-305-0506
arwyn.carroll@usdoj.gov

LUTHER L. HAJEK (CO Bar 44303)
Trial Attorney, Natural Resources Section
United States Department of Justice
Environment and Natural Resources Div.
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Phone: (303) 844-1376
Fax: (303) 844-1350
luke.hajek@usdoj.gov

LEIF M. JOHNSON
Acting United States Attorney

MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667
Fax: (406) 657-6058
mark.smith3@usdoj.gov

*Counsel for Federal Defendant*

## CERTIFICATE OF WORD COUNT

I certify that this memorandum complies with LR 7.1(d). It contains 6,434 words, as counted using the word count feature of Microsoft Word, excluding the caption, table of contents, table of authorities, table of acronyms, and certificate of word count.

/s/ *Arwyn Carroll*
A<small>RWYN</small> C<small>ARROLL</small>
U.S. Department of Justice