Shiloh S. Hernandez
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9649
shernandez@earthjustice.org

Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Nathaniel Shoaff (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS et al., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, <br><br> Defendant, <br><br> and <br><br> STATE OF WYOMING, <br><br> Intervenor-Defendant. | Case No. 4:20-cv-00076-BMM-JTJ <br><br><br> **PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY ........................................................................................ vii

INTRODUCTION ................................................................................ 1

ARGUMENT ........................................................................................ 3

I.  BLM Failed to Consider Reasonable Alternatives to Limit the Plans' Climate Impacts. ................................................................ 3

    A.  BLM Failed to Adequately Respond to this Court's Order in *WORC II*. .............................................................................. 4

    B.  BLM Improperly Rejected Conservation Groups' Proposed Alternatives, Which Are Well Within the Plans' Purpose and Need and BLM's Statutory Mandate. ..................................... 7

        1.  Conservation Groups' proposed alternatives are within the plan's purpose and need. ................................ 8

        2.  Conservation Groups' proposed alternatives are within BLM's statutory authority. ............................... 11

        3.  BLM's new coal screening process cannot save its impermissibly narrow range of coal and climate alternatives. .............................................................. 13

        4.  BLM concedes that it will consider future coal leases under all considered alternatives. ............................... 15

    C.  BLM's Straw Man Arguments Do Not Save Its Impermissibly Narrow Range of Coal Alternatives. .......................... 16

II.  BLM's Excuses for Refusing to Analyze the Devastating Public Health Impacts of Downstream Emissions Lack Merit. ................ 18

A.   This Court's Prior Ruling Required BLM to Consider the "Environmental Consequences of the Downstream Combustion" of Fossil Fuels Without Qualification...........................19

B.   Even if This Court's Prior Ruling Limited BLM's Analysis on Remand, BLM Reopened the Record and Scope of Review............................................................................................22

C.   BLM's Suggestion that Analysis of the Harmful Effects of Non-GHG Emissions from Downstream Fossil Fuel Combustion Should Be Deferred Lacks Merit...................................25

D.   BLM's Analysis Touting Economic Benefits While Omitting Harm from Fossil Fuel Combustion Was Misleading and Arbitrary. ...................................................................26

III.   Neither BLM Nor Wyoming Challenge Conservation Groups' Proposed Remedy. ..........................................................................28

CONCLUSION .................................................................................29

CERTIFICATE OF COMPLIANCE...................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Wildlands v. Kempthorne*,
    530 F.3d 991 (D.C. Cir. 2008)...........................................................11

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ...........................................................2, 4

*Cape Cod Hosp. v. Sebelius*,
    630 F.3d 203 (D.C. Cir. 2011).............................................................23

*Conservation Cong. v. U.S. Forest Serv.*,
    No. 2:13-CV-1977-JAM-DB, 2018 WL 1142199 (E.D. Cal. Mar.
    2, 2018)...........................................................................................24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)........................................................................25

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
    681 F.2d 1172 (9th Cir. 1982) ............................................................26

*Fox v. Gov't of Dist. of Columbia*,
    794 F.3d 25 (D.C. Cir. 2015)..............................................................11

*Friends of the Earth v. Haaland*,
    No. 21-2317 (RC), 2022 WL 254526 (D.D.C. Jan. 27, 2022) ................. 25-26

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ..............................................................8

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
    52 F. Supp. 3d 1174 (D. Colo. 2014).................................... 27-28, 28

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
    464 F.3d 1083 (9th Cir. 2006) ..............................................................8

*Indigenous Envtl. Network v. U.S. Dep't of State*,
    347 F. Supp. 3d 561 (D. Mont. 2018)................................................23

*Kern v. BLM*,
    284 F.3d 1062 (9th Cir. 2002) ............................................................26

*Michigan v. EPA*,
   576 U.S. 743 (2015)......................................................................25

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) ......................................................21

*Mont. Envtl. Info. Ctr. v. OSM* (*MEIC*),
   274 F. Supp. 3d 1074 (D. Mont. 2017).............................21, 27, 28

*Or. Nat. Desert Ass'n v. BLM*,
   625 F.3d 1092 (9th Cir. 2010) .......................................................9

*Pub. Citizen, Inc. v. FAA*,
   988 F.2d 186 (D.C.Cir.1993)........................................................23

*Pub. Emps. for Envtl. Resp. v. Hopper* (*PEER*),
   827 F.3d 1077 (D.C. Cir. 2016).......................................23-24, 24, 25

*New Mexico ex rel. Richardson v. BLM* (*Richardson*),
   565 F.3d 683 (10th Cir. 2009) ......................................7, 10, 12, 12-13

*W. Org. of Res. Councils v. BLM*,
   CV-16-21-GF-BMM (D. Mont. July 14, 2017).............................20

*W. Org. of Res. Councils v. BLM* (*WORC II*),
   No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26,
   2018) ..............................................................................*passim*

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ..........................................................9

*WildEarth Guardians v. Bernhardt*,
   No. CV 17-80-BLG-SPW, 2021 WL 363955 (D. Mont. Feb. 3,
   2021) ..................................................................................21, 27, 28

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 706(2)(A).....................................................................15

42 U.S.C. § 4332(2)(B)..................................................................26

## REGULATIONS AND ADMINISTRATIVE MATERIALS

40 C.F.R. § 1502.9(c)(1)(ii) ............................................................................23

§ 1502.14(a) .............................................................................2, 13, 17

§ 1502.16(b) ...........................................................................................3

§ 1508.8(b) .............................................................................................3

46 Fed. Reg. 18,026 (March 23, 1981) ................................................................14

## GLOSSARY

APA                  Administrative Procedure Act

BFO                  Buffalo Field Office

BLM                  Bureau of Land Management

EIS                  Environmental Impact Statement

FLPMA                Federal Land Policy Management Act

FSEIS                Final Supplemental Environmental Impact Statement

GHG                  Greenhouse gas

MCFO                 Miles City Field Office

MLA                  Mineral Leasing Act

NEPA                 National Environmental Policy Act

RMP                  Resource Management Plan

**INTRODUCTION**

The questions before the Court are simple: (1) whether the National Environmental Policy Act (NEPA) allows the Bureau of Land Management (BLM) to elevate form over substance by analyzing alternatives that vary the acres open to leasing on paper but result in *no difference* in the one variable relevant to climate change: the amount of greenhouse gases (GHGs) emitted; and (2) whether BLM can, in that analysis, ignore the impacts to human health (and the economy) from burning approximately six billion tons of coal. The only possible answer to each is an unequivocal no.

Despite acknowledging "the urgency of reducing greenhouse gas emissions now" in its 2017 federal coal scoping report, all alternatives BLM considered in its 2019 final supplemental environmental impact statements (FSEISs) for its Powder River Basin resource management plans amendments (RMPs or plans) entail identical levels—billions of tons—of GHG emissions from mining and burning publicly owned coal over the next 20 years. Although BLM previously acknowledged that "[GHG] emissions endanger public health, now and in the future," that the planet "may be approaching a critical climate threshold beyond which rapid and potentially permanent" changes to ecosystems may occur, and that "reducing emissions of [GHGs] across the globe is necessary in order to avoid the worst impacts of climate change," MCFO-AR-54-1679-82, the alternatives

considered in BLM's Buffalo and Miles City FSEISs fail to provide agency decisionmakers *any* option that would reduce the GHG emissions or climate impacts from the plans. BLM refused to consider two reasonable climate alternatives that would have responded to the climate crisis by reducing or eliminating new coal leases throughout the planning areas (referred to here as the "No New Leasing" and "Reduced Leasing" alternatives). This unlawfully constrained review violated NEPA regulations that require agencies to consider "all reasonable alternatives," 40 C.F.R. § 1502.14(a), and this Court's Order requiring BLM to evaluate a sufficient range of options "necessary to permit a reasoned choice" regarding the level of acceptable climate impacts from the Buffalo and Miles City RMPs. *W. Org. of Res. Councils v. BLM* (*WORC II*), No. CV 16-21-GF-BMM, 2018 WL 1475470 at *7 (D. Mont. Mar. 26, 2018) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

Further, despite this Court's instruction to BLM to "supplement the Miles City FEIS and Buffalo FEIS with an analysis of the environmental consequences of downstream combustion of coal, oil, and gas open to development under each RMP," *id.* at *18, the agency failed to consider the impacts to public health and the associated economic costs of particulate matter, sulfur dioxide, nitrogen oxides, lead, mercury, and other non-GHG pollutants that result from the downstream combustion of approximately six billion tons of coal and vast quantities of oil and

2

gas. BLM's crabbed analysis again violates NEPA's requirement to take a hard look at foreseeable indirect effects, 40 C.F.R. §§ 1502.16(b), 1508.8(b), and the direction from this Court.

Accordingly, Plaintiffs Western Organization of Resource Councils et al. (collectively, "Conservation Groups") ask this Court to invalidate BLM's analyses and send these decisions back to the agency, once again, with instructions to BLM to prepare new plans consistent with NEPA and the terms and sideboards set out in Conservation Groups' opening brief. (Doc. 49 at 31-32.[1])

**ARGUMENT**

## I.     BLM FAILED TO CONSIDER REASONABLE ALTERNATIVES TO LIMIT THE PLANS' CLIMATE IMPACTS.

Defendants do not dispute that NEPA requires agencies to consider "all reasonable alternatives," or that the alternatives considered in the Buffalo and Miles City plans, respectively, are identical in two key respects: the tons of coal that will be mined and the tons of GHGs that will be emitted. (Doc. 57 at 9-25; Doc. 54 at 12-24.) These concessions are fatal to BLM's defense. BLM's attempt

---

[1] Conservation Groups filed their Amended Complaint on December 14, 2020, adding a claim under the Federal Vacancies Reform Act (FVRA). (Doc. 21.) On January 4, 2021, BLM subsequently issued a new Record of Decision for the Miles City RMP signed by then-Secretary of Interior David Bernhardt. (Doc. 57 at 9.) Without commenting on the adequacy of BLM's January 4, 2021, action, Conservation Groups no longer pursue the FVRA claim here.

3

to sidestep NEPA's alternatives requirement and this Court's *WORC II* Order must therefore fail.

As with the prior iterations of the Buffalo and Miles City environmental impact statements (EISs) that this Court invalidated in 2018, BLM's alternatives result in identical climate impacts, thus precluding a "reasoned choice" with regard to acceptable levels of climate change impacts from the plans. *WORC II*, 2018 WL 1475470 at *7. Although BLM now hangs its hat on differences in acreage open to leasing, it does not dispute that each FSEIS considered alternatives that result in identical GHG emissions and thus identical climate impacts from BLM's management of the Powder River Basin, where the vast majority of federal coal reserves lie.

### A.   BLM Failed to Adequately Respond to this Court's Order in *WORC II*.

By proposing meaningless differences in acres open to leasing without in fact limiting development in areas where coal mining might actually occur, (Doc. 49 at 14, 18 n.12-13), BLM has elevated form over substance. Courts reviewing agency alternatives under NEPA ask whether the agency considered a sufficient range of alternatives "necessary to permit a reasoned choice." *WORC II*, 2018 WL 1475470 at *7 (quoting *California v. Block*, 690 F.2d at 767). BLM's prior EISs were identical in the amounts of "acreage available for [coal] leasing," and "expected coal development," as well as GHG emissions from burning coal from

the planning areas. *Id.* at *6-9 (acres available and expected coal development),

*13 (noting all coal burned to generate electricity). As this Court explained, the

point of considering different levels of coal mining is to allow BLM to consider

management options that actually address climate impacts. "Climate change

concerns presented a reasonable basis for BLM to conduct a new coal-screening

and to consider adopting an RMP that foreclosed coal extraction in additional

areas." *Id.* at *9. Without that analysis, "BLM could not make a reasoned choice as

to whether foreclosing development on additional acreage would serve its multiple

use mandate and would address concerns that may arise from the changing

conditions that spurred the RMP revision, including climate change." *Id.*

Here, *none* of BLM's alternatives on remand address climate concerns

because they all result in *identical* climate impacts. On remand, BLM addressed

the Court's direction only in part: BLM redid the coal screens and evaluated

alternatives that differ only in the amount of *acres* available for lease.[2] But despite

the differences in acres potentially open to development, both alternatives

_____

[2] For the Buffalo plan, coal leasing will occur on approximately 36,000 acres,
whereas Alternative A allows mining on more than 686,000 acres and Alternative
B on more than 455,000 acres. (Doc. 54 at 8-9). For the Miles City plan, mining
will occur on 9,730 acres, whereas Alternative A allows mining on 1.5 million
acres, Alternative B on 1.2 million acres, and Alternative C on 158,000 acres.
(Doc. 49 at 18 n.13; *accord* Doc. 57 at 13-14 (listing acres available for
alternatives but not expected development).)

considered in the Buffalo FSEIS and all three alternatives considered in the Miles City FSEIS, respectively, nonetheless entail *identical* tons of coal mined and tons of GHGs emitted, and thus identical levels of climate impacts. (Doc. 49 at 14.) And while Wyoming critiques Conservation Groups' "selective use" of BLM's analysis as to the identical climate impacts of each of the considered alternatives, (Doc. 54 at 16), it does not suggest that the climate impacts of considered alternatives actually differ or that the GHG emissions that BLM disclosed in the FSEISs, and Conservation Groups cited in their brief, are inaccurate. Similarly, Wyoming's complaint that Conservation Groups cite the GHG emissions quantified in BLM's FSEIS chapters on environmental consequences rather than the chapters on alternatives is factually and legally irrelevant. (*Id.* at 14.) Those figures are *BLM's own estimates* of the environmental consequences of the alternatives it chose to consider. The fact that those GHG emissions are identical across alternatives is BLM's own doing and is one of the principal reasons the parties are back before this Court.

And while BLM now cites the differences in acres available to coal leasing, the alternatives considered failed in their fundamental purpose: to provide decisionmakers with a reasoned choice on what level of climate harms to allow under the plans. BLM's preferred approach—only closing areas to mineral development that will *never* be developed whether they are open or not—is a

charade, with zero impact on levels of coal mining, GHGs emitted, or climate impacts imposed on the public. Instructed by this Court to provide a range of alternatives that would "permit a reasoned choice" based on climate concerns, BLM balked and considered alternatives with identical climate impacts, despite an increased understanding of the severity and growing urgency of the climate crisis.[3]

### B.   BLM Improperly Rejected Conservation Groups' Proposed Alternatives, Which Are Well Within the Plans' Purpose and Need and BLM's Statutory Mandate.

BLM's four record excuses for not analyzing Conservation Groups' proposed alternatives, which call for BLM to eliminate or reduce *future* coal leasing in the planning areas, are arbitrary, (Doc. 49 at 20-24)—the alternatives urged by Conservation Groups are well within BLM's statutory mandate and the plans' purpose and need. Citing the Tenth Circuit's holding in *New Mexico ex rel. Richardson v. BLM* (*Richardson*), 565 F.3d 683 (10th Cir. 2009), this Court previously explained that courts look at "two guideposts of reasonableness" when analyzing proposed alternatives under NEPA: (1) whether the proposed alternative "falls within the agency's statutory mandate" and (2) whether it meets "an agency's objectives for a particular project." *WORC II*, 2018 WL 1475470 at *8 (citing *Richardson*, 565 F.3d at 709). This Court noted that agencies "must

---

[3] *See supra* Introduction; MCFO-AR-1679-82.

evaluate a broader range of alternatives where a proposed action constitutes 'an integral part of a coordinated plan to deal with a broad problem.'" *Id.* at *7 (quoting *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1098 (9th Cir. 2006)).

As an initial matter, this Court should reject BLM's request for "considerable discretion" in determining the scope of its FSEIS and thus the alternatives it considers, (Doc. 57 at 11), as it did in *WORC II*: "BLM's 'considerable discretion' to establish the scope of an EIS fails to absolve BLM of its duty to 'look at every reasonable alternative.'" 2018 WL 1475470 at *9 (quoting *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008)).

### 1. Conservation Groups' proposed alternatives are within the plan's purpose and need.

Defendants err by flipping the purpose and need analysis on its head. BLM argues that "Plaintiffs have not demonstrated that *BLM's* chosen alternatives were inconsistent with the purpose and need of the project." (Doc. 57 at 21 (emphasis added).[4]) But Conservation Groups do not need to make such a showing. The appropriate comparison is whether *Conservation Groups'* proposed alternatives were consistent with the purpose and need for the plans (and therefore improperly

---

[4] (*See* Doc. 54 at 16 (Wyoming arguing: "The purpose of the Buffalo RMPA is 'to determine the lands to be made available for coal leasing.' The Bureau met its objective…." (internal citation omitted)).)

rejected). *See Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1122 (9th Cir. 2010) ("[T]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004))).

Moreover, BLM never stated in the record that Conservation Groups' proposed No New Leasing and Reduced Leasing alternatives were outside the scope of the need for the plan revisions, nor could they have justified doing so. Here, the plans' purpose and need included the obligation to "[c]onsider an alternative that would reduce the amount of recoverable coal and consider climate change impacts, in order to make a reasoned decision on the amount of recoverable coal made available." BFO-AR-501-9509; MCFO-AR-339-44042. Reducing or ultimately eliminating the amount of acceptable future coal leasing, as Conservation Groups proposed, falls well within that purpose and need by reducing areas open to coal leasing in a way that actually reduces climate impacts. As Defendants repeat, BLM's considered alternatives now differ in terms of acres available. (Doc. 57 at 13-14.) Conservation Groups' proposed alternatives would take the same approach, but, rather than a paper exercise, they would meaningfully restrict future leasing such that the amount of coal mined and the resulting GHG emissions would actually differ across alternatives.

9

The Tenth Circuit's analysis in *Richardson* is instructive. (Doc. 49 at 22.)
There, the Court invalidated a BLM resource management plan that opened certain
desert grasslands to mineral development because BLM failed to consider a
reasonable range of more protective alternatives. *Richardson* 565 F.3d at 710.
BLM argued that closing the area to mineral development (similar to Conservation
Groups' proposed alternatives here) was inconsistent with the purpose of the RMP
amendment process, which included the need to "identify[] lands suitable for fluid
mineral development." *Id.* The Tenth Circuit held that this purpose and need did
not preclude consideration of an alternative that closed more, or even all, of the
planning area to mineral leasing:

> Contrary to BLM's arguments … this stated purpose does not take
> development of the Mesa as a foregone conclusion. To the contrary, the
> question of whether *any* of the lands in the plan area are "suitable" for
> fluid minerals development is left open, and is precisely the question
> the planning process was intended to address. It would fit well within
> the scope of the plan objectives for BLM to conclude that no lands in
> the plan area are suitable for leasing and development. Accordingly, a
> management alternative closing the Otero Mesa would have been fully
> consistent with the objectives of the RMPA.

*Id.* at 710-11. The same is true here. It would have been consistent with
BLM's stated purpose and need for the Buffalo and Miles City RMPs, which
included the obligation to "consider climate change impacts" and "determine
the lands to be made available for coal leasing," BFO-AR-501-9509;
MCFO-AR-339-44042, for BLM to determine that no lands are suitable for

leasing on the basis of the extraordinary climate impacts of mining and

burning coal from the planning areas.

### 2. Conservation Groups' proposed alternatives are within BLM's statutory authority.

In its brief, BLM is silent on three of its four record justifications for

rejecting Conservation Groups' No New Leasing alternative, choosing instead to

defend its decision based on the coal screening process alone. (Doc. 57 at 21-23.)

BLM has thus waived any argument that Conservation Groups' proposed

alternatives are somehow inconsistent with BLM's statutory authority under the

Federal Land Policy Management Act (FLPMA) or the Mineral Leasing Act

(MLA),[5] or could be dismissed merely because coal mining is one allowable use of

public lands. (*See* Doc. 49 at 20-24 (explaining BLM's statutory authority under

FLPMA and MLA and rejecting each record excuse for excluding more protective

alternatives).[6]) Moreover, BLM explicitly rejects these waived excuses by

---

[5] BLM's uncontroversial statement that the MLA authorizes coal leasing on public lands (Doc. 57 at 23) does not address the validity of its record justification, which was that the leasing requirements of the MLA preclude consideration of a No New Leasing alternative. Nor does it counter Conservation Groups' legal citations demonstrating that the MLA authorizes but does not require coal leasing. (Doc. 49 at 23.)

[6] BLM may not resurrect waived arguments in its reply brief. *See Fox v. Gov't of Dist. of Columbia*, 794 F.3d 25, 29 (D.C. Cir. 2015) ("[An] argument first appearing in a reply brief is forfeited." (citing *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008))).

conceding that "a land-use-planning decision can functionally preclude coal development." (Doc. 57 at 22.) Having conceded it could close the planning areas to mining, BLM cannot credibly claim it is precluded from doing so by FLPMA or MLA.

BLM incorrectly asserts, without actually naming or defending its record justifications, that "Plaintiffs' arguments … do not account for BLM's reasoned explanations for not considering Plaintiffs' proposed 'no-leasing' alternative." (Doc. 57 at 9-10.) That is inaccurate. Conservation Groups' opening brief, unlike BLM's brief, actually lists the four record justifications BLM offered for not analyzing a No New Leasing alternative, and explains why each is unavailing and irrational. (Doc. 49 at 20-24 (citing BFO-AR-501-9536 and MCFO-AR-339-44067).) Because BLM waived its arguments regarding FLPMA, the MLA, and that coal leasing must be allowed under the plans because coal leasing is one authorized use of public lands, (*see* Doc. 57 at 11-23 (not addressing excuses)), this Court can quickly dispense with them. It is instructive, however, that *Richardson* expressly rejected the notion that FLPMA's multiple use mandate somehow requires BLM to keep areas open to mineral leasing:

> It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses…. Thus, an alternative that closes the Mesa to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

*Richardson* at 710.

Because Conservation Groups' No New Leasing and Reduced Leasing alternatives meet BLM's stated purpose and need for the RMP amendments and are within BLM's statutory authority, BLM's decision to exclude these alternatives violated NEPA's obligation to consider "all reasonable alternatives." 40 C.F.R. § 1502.14(a); *WORC II*, 2018 WL 1475470 at *7.

> ### 3.   BLM's new coal screening process cannot save its impermissibly narrow range of coal and climate alternatives.

BLM's only argument in its brief supporting *any* of its record justifications for not analyzing a No New Leasing alternative is to assert that "such an alternative would be inconsistent with the land-use planning process." (Doc. 57 at 21) (citing BFO-AR-501-9536 and MCFO-AR-339-44067).) Although BLM concedes that "a land-use-planning decision can functionally preclude coal development by making areas unacceptable for further consideration of leasing," it states that it "uses the coal-screening process to determine which lands are acceptable and unacceptable." (Doc. 57 at 22 (citing BLM-MCFO-339-44067 and BFO-AR-501-9536).) But BLM never explains how a coal screening process that allows BLM to reduce the acres available to future coal leasing, as this one did (Doc. 57 at 13-14), somehow precludes BLM from excluding *additional* acres from future coal leasing in line with a Reduced Leasing or No New Leasing

alternative. *See* Council on Environmental Quality, Forty Most Asked Questions

Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg.

18,026, 18,027 (March 23, 1981) ("When there are potentially a very large number

of alternatives, only a reasonable number of examples, covering the full spectrum

of alternatives, must be analyzed and compared in the EIS. An appropriate series of

alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the

Forest to wilderness.").

Moreover, the notion that once the coal screening process is finished BLM

can never consider more protective alternatives is undercut by the fact that BLM

did exactly that in the Miles City FSEIS (albeit without reducing mining or GHG

emissions). As BLM explained for Miles City, "Alternative C uses the coal screens

described under Alternative B, but it applies an additional multiple-use criterion

for air resources. Under this alternative, coal availability would be restricted to an

8-mile infrastructure area around four existing mines." MCFO-AR-339-44033.

Thus, having considered an alternative that reduced the area available to leasing

*after* completing the coal screening process, BLM cannot credibly claim it is

precluded from doing so. Because the Administrative Procedure Act (APA)

requires that agency reasoning be rational, BLM's grounds for rejecting

alternatives must not be arbitrary or unsupported by law. 5 U.S.C. § 706(2)(A).

Here, BLM has failed to provide a rational or consistent explanation for rejecting Conservation Groups' proposed alternatives.

### 4. BLM concedes that it will consider future coal leases under all considered alternatives.

BLM's suggestion in its brief that further coal leasing may not happen during the 20-year planning period contradicts the record. (Doc. 57 at 17-19.) During the administrative process, BLM did *not* predict that no new leases would occur for either planning area. On the contrary, BLM admits that the Miles City Plan will allow development on proposed but not yet leased lands. (*Id.* at 17 (including both "existing leases [and] applications pending").) As to Buffalo, where 4.9 billion tons of coal development will occur, (Doc. 49 at 14), although all the coal mined will occur at 12 existing mines in the planning area, (Doc. 57 at 18),[7] BLM clearly stated that "[a]s lease by [sic] applications are received, the BLM will continue to consider future tracts in the [planning area] for leasing." BFO-AR-501-9622.[8] BLM's own record statements thus demonstrate that future

---

[7] (*Accord* Doc. 49 at 15 (explaining that "because it is prohibitively expensive to open a new coal mine and construct the necessary infrastructure, in order to meaningfully reduce coal mining and GHG emissions from the planning areas, BLM would have to consider at least one alternative that limited the ability of existing mines to expand" onto new leases.).)

[8] *Accord* BFO-AR-501-9724 (stating in response to comments that it added nearly 40,000 acres to the preferred Alternative B in part to "provid[e] for the *expansion of existing mines* and associated mining infrastructure").

leasing is contemplated and, consequently, that a Reduced or No New Leasing alternative would result in reduced coal mining and GHG emissions.

### C.     BLM's Straw Man Arguments Do Not Save Its Impermissibly Narrow Range of Coal Alternatives.

BLM sets up and then knocks down two straw man arguments that have no bearing on the reasonableness of Conservation Groups' proposed alternatives. First, Conservation Groups are *not* advocating that BLM consider an alternative that ends mining on *current* leases, nor did they propose such an alternative during the remand process, as BLM suggests. (*See* Doc. 57 at 20 ("Alternatives that required canceling existing leases or disapproved mine plans would not be 'feasible,' let alone 'reasonable' and so are not required here."), 20 n.32 (same), 24 ("[T]he law constrains BLM from cancelling existing leases or disapproving approved plans of operations through land-use planning.").) Instead, as Conservation Groups consistently submitted as part of the record for both plans throughout the remand process, including in their draft SEIS comments, "the alternative proposed by Conservation Groups would not extinguish existing leases, as BLM suggests, but instead preclude issuance of future leases in the planning areas."[9] BFO-AR-461-8188. BLM surely understands this, as its brief and NEPA

---

[9] *Accord* MCFO-AR-54-1384 ("A 'no leasing' alternative, which would bar all *new* leasing within the Miles City and Buffalo Field Offices would be an excellent way to address competing uses within the area and could be a very significant part of U.S. efforts to address climate change.") (emphasis added); (Doc. 49 at 15 ("[I]n

analyses make clear. (*See* Doc. 57 at 15 ("Plaintiffs contend BLM should have …

considered reduced-future-leasing or no-future-leasing alternatives."); BFO-AR-

501-9536 ("[S]everal commenters suggested analyzing a no leasing of future coal

alternative."); MCFO-AR-339-44067 (same).)

Second, Conservation Groups do not advocate, as BLM suggests, that BLM

should have analyzed a reduced-local-air-emissions alternative. (*See* Doc. 57 at 23-

24 ("To the extent Plaintiffs argue that the BFO should not have eliminated an

alternative 'that would reduce air emissions ….'").) Such an alternative would do

nothing to meaningfully reduce GHG emissions, and Conservation Groups do not

ask the Court to set aside BLM's analysis on that basis. On the contrary, this Court

should set aside BLM's alternatives analysis because it considered exactly zero

alternatives that would reduce the amount of coal mined or GHGs emitted,

contrary to NEPA and this Court's clear instruction. 40 C.F.R. § 1502.14(a);

*WORC II*, 2018 WL 1475470 at *6-9.

---

order to meaningfully reduce coal mining and GHG emissions from the planning
areas, BLM would have to consider at least one alternative that limited the ability
of existing mines to expand.")).

## II.   BLM'S EXCUSES FOR REFUSING TO ANALYZE THE DEVASTATING PUBLIC HEALTH IMPACTS OF DOWNSTREAM EMISSIONS LACK MERIT.

BLM's refusal to disclose and evaluate the public health impacts from "downstream combustion of coal, oil, and gas," *WORC II*, 2018 WL 1475470 at *18—including widespread premature mortality and morbidity—was egregious and arbitrary.

Most telling in Defendants' response briefs are the points they tacitly concede. Defendants do not—and could not with any credibility—dispute that substantial public health impacts are a foreseeable result of burning approximately six billion tons of low-grade, highly polluting, sub-bituminous coal from the Powder River Basin. (*Compare* Doc. 49 at 26-31, *with* Doc. 57 at 27-30, *and* Doc. 54 at 25-30.) They notably fail to challenge the amount of harm that such foreseeable combustion impacts will cause: tens of thousands of premature deaths, countless cases of respiratory and cardiac illness, extensive harm to the brain development of children, and public health costs ranging from tens of billions to more than one trillion dollars. (*See* Doc. 57 at 27-30; Doc. 54 at 25-30.) These omissions are fatal. Defendants attempt to side-step BLM's error by insisting that this Court's 2018 ruling narrowly restricted BLM's supplemental analysis of downstream combustion exclusively to *GHG emissions*. They mistakenly assert that this Court's prior ruling held that BLM adequately addressed non-GHG

emissions from downstream fossil fuel combustion. (*See* Docs. 57 at 27; Doc. 54 at 25-26.)

Defendants are wrong on both counts: (1) this Court's 2018 decision did *not* so restrict BLM's supplemental analysis of downstream combustion to GHG emissions; and (2) this Court's 2018 ruling on BLM's analysis of the cumulative effects of air pollution only addressed *local* impacts in Montana and Wyoming from fossil fuel *extraction*—not air pollution impacts from *downstream* fossil fuel *combustion*. Further, even if the court had previously limited the scope of the remand to analysis of GHG impacts from fossil fuel combustion (which it did not), BLM was nevertheless required to address the Conservation Groups' evidence about the public health effects of burning Powder River Basin fossil fuels because the agency *re-opened* the record to expand its discussion of the economic benefits of fossil fuel development. Finally, BLM's additional *post hoc* arguments about deferring analysis of combustion impacts to a later date and touting economic benefits, but not costs, are both mistaken. Conservation Groups address these points in turn.

### A.  This Court's Prior Ruling Required BLM to Consider the "Environmental Consequences of the Downstream Combustion" of Fossil Fuels Without Qualification.

BLM erroneously contends that the agency was only required to analyze downstream GHG emissions because this Court's prior ruling "concluded that

BLM took the requisite hard look at the impacts of fossil fuel combustion on air quality." (Doc. 57 at 27.)

First, while it is accurate that plaintiffs' indirect effects argument in the prior case focused on downstream GHG emissions, Mem. in Supp. of Pls.' MSJ, *W. Org. of Res. Councils v. BLM*, CV-16-21-GF-BMM, at 16-21 (D. Mont. July 14, 2017), this Court's ruling and remand order were not so narrow. This Court actually held: "In light of the degree of foreseeability and specificity of information available to the agency while completing the EIS, *NEPA requires BLM to consider in the EIS the environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development under these RMPs*." *WORC II*, 2018 WL 1475470 at *13 (emphasis added). Consistent with this broad ruling, the Court's remand instruction addressed downstream emissions without qualification and was not restricted to GHGs: "BLM must supplement the Miles City FEIS and Buffalo FEIS with an analysis of the environmental consequences of downstream combustion of coal, oil, and gas open to development under each RMP." *Id.* at *18. At no point did this Court restrict the required analysis of downstream combustion emissions to GHGs. Indeed, Defendants conspicuously ignore the plain text of this Court's instruction to BLM for remand. (*Compare id.* at *18, *with* Doc. 57 at 27-30, *and* Doc. 54 at

20

25-30.[10]) Accordingly, the first premise of BLM's argument—that the remand was narrowly restricted to analysis of GHG emissions—is false.

The second premise of BLM's argument is also demonstrably false: this Court did *not* previously hold that BLM took a hard look at non-GHG air pollution impacts from downstream fossil fuel combustion. (*Cf.* Doc. 57 at 27; Doc. 54 at 27-30.) While it is true that this Court held that BLM's EISs adequately considered cumulative impacts to "*regional or statewide* air quality *from BLM and non-BLM sources,*" *WORC II*, 2018 WL 1475470 at *16 (emphasis added), this analysis focused on "federal mineral development" and "BLM activity within the planning area[s]"—i.e., emissions from fossil fuel *extraction*—not emissions from downstream *combustion* of the billions of tons of coal and significant volumes of oil and gas that are produced in the planning areas but then shipped out of the region for consumption. *Id.*; *see* MCFO-339-44080 (noting "average one-way train

---

[10] Of course, during the administrative process, BLM might have declined to consider downstream non-GHG emissions if the agency reached a defensible scientific determination that such emissions were not sufficiently foreseeable, but the agency never made any such determination during administrative review and may not make such an argument now. *But see Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549-50 (8th Cir. 2003) (finding nature of downstream non-GHG air pollution from coal combustion sufficiently foreseeable to require disclosure and analysis under NEPA); *accord WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955, at *7-8 (D. Mont. Feb. 3, 2021); *Mont. Envtl. Info. Ctr. v. OSM* (*MEIC*), 274 F. Supp. 3d 1074, 1093-94 (D. Mont. 2017).

haul distance" for coal in the Miles City Planning Area is "1,500 miles"); BFO-501-9550 (noting "average one-way train haul distance" for coal in Buffalo Planning Area is "1,115" miles); *see also* BFO-798-9083-84, -9125 (showing that Montana and Wyoming consume 8.9 and 24 million short tons of coal per year, respectively, but produce 35 and 316 million short tons of coal per year, respectively, indicating that the vast majority (over 90%) of coal from these states is consumed beyond state borders). Thus, the second premise of BLM's argument—that this Court somehow reviewed and upheld BLM's (non-existent) analysis of non-GHG emissions from fossil fuel combustion in its prior ruling—is false.

In sum, Defendants' excuses for ignoring the tens of thousands of deaths, countless illnesses, and tens of billions of dollars in damage from non-GHG pollution from downstream fossil fuel combustion are without merit.

**B.     Even if This Court's Prior Ruling Limited BLM's Analysis on Remand, BLM Reopened the Record and Scope of Review.**

BLM does not dispute that on remand it ignored Conservation Groups' detailed expert reports about the health consequences of coal combustion or that it simultaneously considered new information about economic benefits of fossil fuel development. Consequently, even if this Court's prior ruling restricted the scope of analysis of downstream emissions on remand, BLM's proposed double standard—

by which the agency can ignore new information from the public while supplementing the record with its preferred information—would still be impermissible.

The APA requires agencies to make reasoned decisions based on the administrative record available at the time of their decision. Action is arbitrary when the agency fails to respond to "relevant and significant public comments." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C.Cir.1993)). Further, NEPA prohibits agencies from blinding themselves to new information, and instead requires agencies to consider "significant new circumstances or information relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1)(ii); *see also Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 578-79 (D. Mont. 2018) (agency failed to consider new information on remand about greater than expected GHG impacts). Moreover, when an agency reopens the administrative record on remand to add information, it must be evenhanded and also consider information submitted by the public. *Pub. Emps. for Envtl. Resp. v. Hopper* (*PEER*), 827 F.3d 1077, 1090 (D.C. Cir. 2016) (when agency "decided" to "reopen the administrative record" on its own, it "was required to consider plaintiffs' submissions").[11]

---

[11] In support of its argument that the remand analysis was strictly limited, Wyoming cites *Conservation Congress v. U.S. Forest Service*, No. 2:13-CV-1977-JAM-DB, 2018 WL 1142199, at *7 (E.D. Cal. Mar. 2, 2018). (Doc. 54 at 28.) That

Here, this Court's prior order did not require BLM to conduct additional analysis on remand of the beneficial economic impacts of fossil fuel development. *WORC*, 2018 WL 1475470 at *17-18. However, as BLM admits, on remand the agency opted to reopen the record to develop a "new economic analysis" because "the RFD [reasonably foreseeable development analysis] contemplated a different amount of coal being produced than did that underlying the 2015 Plans." (Doc. 57 at 30.) As in *PEER*, because BLM decided to reopen the record to consider "effects" (read, economic benefits) of coal development that were not addressed in the prior EISs, BLM was required to be evenhanded and consider Conservation Groups' submissions about the widespread harm to public health from fossil fuel combustion. 827 F.3d at 1090.

Thus, "[e]ven if the district court's order did not reopen the administrative record" with respect to the effects of fossil fuel development, it was "arbitrary and capricious" for BLM to reopen the record to add its own information about

---

case, however, is inapposite. The issue there was whether to dissolve an injunction, which was, accordingly, "limited to the scope of the prior litigation and the injunction order at issue." *Id.* at *2. The court expressly recognized that outside of the confines of a motion to dissolve the injunction, the plaintiff could raise "[n]ew claims" in a "new action" on remand, as here. *Id.* As noted, when an agency chooses to reopen a record on remand, it must also accept new information from the public. *PEER*, 827 F.3d at 1090.

economic effects of coal development, while "disregard[ing] plaintiffs'

submissions." *Id.*

### C.   BLM's Suggestion that Analysis of the Harmful Effects of Non-GHG Emissions from Downstream Fossil Fuel Combustion Should Be Deferred Lacks Merit.

BLM also misses the mark in its assertion that an analysis of the impacts of

non-GHG emissions from combustion should wait until a later stage of

development (at the stage of lease sales or mining-plan approvals). (Doc. 57 at 29.)

This argument was not presented in the administrative record[12] and is, therefore, an

improper *post hoc* rationalization. *See Dep't of Homeland Sec. v. Regents of the

Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of

administrative law' that judicial review of agency action is limited to 'the grounds

that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576

U.S. 743, 758 (2015))). Moreover, this Court already rejected BLM's argument

that the agency could defer analysis of foreseeable downstream combustion

impacts. "NEPA requires that the agency conduct analysis of environmental

consequences 'as soon as it can reasonably be done.'" *WORC II*, 2018 WL

1475470 at *13 (quoting *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002));

*accord Friends of the Earth v. Haaland*, No. 21-2317 (RC), 2022 WL 254526 at*9

---

[12] *See* MCFO-AR-339-44074; BFO-AR-501-9520-21.

(D.D.C. Jan. 27, 2022) (rejecting "just trust us" argument for deferring NEPA

analysis). Accordingly, BLM's argument fails.

### D. BLM's Analysis Touting Economic Benefits While Omitting Harm from Fossil Fuel Combustion Was Misleading and Arbitrary.

BLM's refusal to evaluate substantial "environmental consequences of

downstream combustion"—namely impacts to public health—contrasts starkly

with the agency's decision to reopen the record to introduce an extensive new

analysis touting economic benefits of fossil fuel development. MCFO-AR-339-

44107-20; BFO-AR-501-9514, -9563-69, -9639-42.

NEPA requires agencies to "develop methods and procedures … which will

insure that presently unquantified environmental amenities and values may be

given appropriate consideration in decisionmaking along with economic and

technical considerations." 42 U.S.C. § 4332(2)(B). In practice, this means that

agencies must ensure that "environmental factors [are] considered on an equal

basis with other, more traditional, concerns." *Found. for N. Am. Wild Sheep v. U.S.*

*Dep't of Agric.*, 681 F.2d 1172, 1177 (9th Cir. 1982). An agency fails this mandate

when it thumbs the scales of its analysis by disclosing economic benefits but

refusing to disclose economic costs of environmental harm. *WildEarth Guardians*,

2021 WL 363955, at *8; *MEIC*, 274 F. Supp. 3d at 1098.

BLM failed to meet this obligation here by reopening the record to add substantial information about the economic benefits of fossil fuel development, MCFO-AR-339-44107-20; BFO-AR-501-9514, -9563-69, -9639-42, while refusing even to consider a detailed expert report on the economic consequences of fossil fuel combustion. MCFO-AR-54-1402-18; BFO-AR-42-3497-513. BLM attempts to excuse this unbalanced analysis by asserting that it was merely an analysis of "economic effects" not "economic benefits." (Doc. 57 at 29-30.) But this is a "distinction without a difference": an analysis of exclusively beneficial economic effects is, in reality, an analysis of economic benefits. *MEIC*, 274 F. Supp. 3d at 1096 n.9.

BLM also cites this Court's prior ruling declining to require use of the social cost of carbon on the basis that "NEPA does not require a cost-benefit analysis under" the circumstances in that case. (Doc. 57 at 30 (citing *WORC II*, 2018 WL 1475470, at *14).) However, there, the plaintiffs had not argued that BLM conducted a one-sided, benefits-only analysis. Thus, the Court distinguished the "compelling" analysis of other cases rejecting agency decisions to exclude environmental costs as speculative, while elaborating "proposed benefits." *WORC II*, 2018 WL 147547 at *14 (citing *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1190 (D. Colo. 2014)). This case is analogous to *High Country*, *WildEarth Guardians*, and *MEIC*, where the agency detailed

economic benefits while ignoring substantial economic costs from environmental harm. As in those cases, BLM's analysis here was unbalanced, misleading, and arbitrary.

In sum, BLM's refusal to assess the severe public health impacts—tens of thousands of premature mortalities and countless cases of respiratory, cardiac, and other illnesses—caused by non-GHG pollutants from downstream fossil fuel combustion was arbitrary and capricious. BLM also acted arbitrarily by touting positive economic effects of fossil fuel development, while ignoring the tens of billions to more than one trillion dollars of negative economic effects to public health from foreseeable fossil fuel combustion under the plans.

## III.    NEITHER BLM NOR WYOMING CHALLENGE CONSERVATION GROUPS' PROPOSED REMEDY.

To remedy BLM's NEPA violations, Conservation Groups asked this Court to require BLM to revise the Buffalo and Miles City RMPs in timely fashion. (Doc. 49 at 31-32.) Consistent with *WORC II*, 2018 WL 147547 *19, Conservation Groups also asked this Court to require coal-related BLM management decisions in the planning areas during remand to undergo further NEPA review consistent with the Court's decision. (Doc. 49 at 31-32.) Neither BLM nor Wyoming offered any argument regarding remedy. Conservation Groups therefore respectfully ask this Court to grant the relief requested in Conservation Groups' opening brief. (*Id.* at 32).

28

## CONCLUSION

This Court should grant Plaintiffs summary judgment and issue the requested relief.

Respectfully submitted this 4th day of February, 2022.

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9649
shernandez@earthjustice.org

Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Nathaniel Shoaff (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 7.1(d)(2), I hereby certify that this brief contains 6,497 words, excluding caption, certificate of compliance, tables, and signatures. I relied on the word count of the word-processing system used to prepare this brief to calculate this word count.

/s/ Shiloh Hernandez
Shiloh Hernandez