# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

WESTERN ORGANIZATION OF
RESOURCE COUNCILS, *et al.*,

        Plaintiffs,

vs.

U.S. BUREAU OF LAND
MANAGEMENT,

        Defendant, and

STATE OF WYOMING,

        Intervenor-Defendant.

**4:20-cv-00076-GF-BMM**

**ORDER**

## INTRODUCTION

The Western Organization of Resource Councils, Montana Environmental Information Center, Powder River Basin Resource Council, Northern Plains Resource Council, Center for Biological Diversity, Wildearth Guardians, and Sierra Club (collectively "Plaintiffs") brought this action against the U.S. Bureau of Land Management ("BLM"). Plaintiffs allege that BLM improperly approved the amended Miles City and Buffalo resource management plans ("RMPs") in violation of the National Environmental Policy Act ("NEPA") and the

Administrative Procedure Act ("APA")). (Doc. 37.) The State of Wyoming ("Wyoming") intervened as a defendant. (Doc. 9.)

The Parties filed competing motions for summary judgment. (Docs. 48, 53 & 56.) BLM filed a motion for remand without vacatur in lieu of filing a reply brief in support of its cross-motion for summary judgment. (Doc. 62.) The Court held a hearing on the motions on March 14, 2022. (Doc. 69.)

## BACKGROUND

### Factual Background

BLM revised or amended 98 land management plans to adopt sage-grouse protections across the bird's range in ten Western states in 2015. Among those 2015 Plans, BLM published revisions that encompassed two adjacent BLM field offices in the Powder River Basin: the Miles City Field Office in Montana and the Buffalo Field Office in Wyoming. BLM approved both the Miles City RMP and the Buffalo RMP through a single record of decision.

A nearly identical set of plaintiffs as in this case challenged those two RMPs in 2016 for failure to comply with NEPA. The Court invalidated the Miles City and Buffalo RMPs based upon an inadequate environmental analysis for each RMP. *See W. Organization of Res. Councils v. BLM* ("*WORC II*"), No. CV 16-21-GF-BMM, 2018 WL 1475470, at *6 (D. Mont. Mar. 26, 2018), *appeal dismissed*, No. 18-35836, 2019 WL 141346 (9th Cir. Jan. 2, 2019). Specifically, the Court held

that NEPA required BLM to undertake the following actions: 1) consider alternatives that would reduce the amount of available coal; 2) conduct new coal screenings; 3) supplement the EISs with an analysis of the environmental consequences of downstream combustion of coal, oil, and gas open to development under each RMP; and 4) provide a longer timeline for review of the impacts of coal development. The Court remanded the RMPs to BLM to correct those deficiencies in conformity with the Court's previous order. *W. Organization of Res. Councils v. BLM* ("*WORC III*"), No. CV 16-21-GF-BMM, 2018 WL 9986684, at *2 (D. Mont. July 31, 2018).

BLM completed its reconsideration of the RMPs in November 2019. (Docs. 23-2 & 23-5.) BLM undertook additional analyses and approved Resource Management Plan Amendments (ARMPA) and Supplemental Environmental Impact Statements (SEIS) prepared by the Miles City Field Office and Buffalo Field Office. Those actions are the subject of this litigation. Plaintiffs argue that those actions again failed to comply with NEPA and the APA.

*Legal Background*

## I.   RMPs

RMPs "guide and control future management." 43 C.F.R. § 1601.0–2. A RMP may identify lands available for leasing, define resource use, and levels of production. 43 C.F.R. § 1601.0–5(n)(1)–(2). Before federal coal, oil, or gas

resources may be developed, however, the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181, *et seq.*, prescribes additional procedures. Coal remains subject to a different leasing process than that required for oil and gas development.

After BLM identifies areas suitable for coal leasing in an RMP or other programmatic document, the agency then identifies potential leases for sale. *See* 43 C.F.R. § 3425. Coal leases and coal lease modifications trigger the preparation of an EIS of the proposed lease area. 43 C.F.R. §§ 3425.2, 3425.3, 3432.3(c). A lessee seeking to develop leased resources must submit a plan for operation and reclamation for approval by the Secretary of Interior. 30 U.S.C. § 207(c). The Secretary of Interior bases approval on a recommendation from the Office of Surface Mining Reclamation and Enforcement. The Office of Surface Mining Reclamation and Enforcement must comply with NEPA in evaluating the plan. 30 C.F.R. § 746.13.

BLM offers oil and gas leases for sale consistent with the RMP. 43 C.F.R. § 1610.5–3(a). A lessee seeking to develop oil or gas must submit an Application for Permit to Drill (APD) at least thirty days before commencement of operations. 43 C.F.R. § 3162.3–1(c). "NEPA applies at all stages of the process." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006).

RMP approval represents a major federal action that significantly affects the quality of the human environment. 43 C.F.R. § 1601.0–6. RMP approval triggers

the preparation of an Environmental Impact Statement ("EIS") under NEPA. *Id.* The EIS and RMP shall be "published in a single document" whenever possible. *Id.*

## II.   NEPA

The National Environmental Policy Act ("NEPA") requires federal agencies to "take a hard look" at the "environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations omitted). The statute "does not mandate particular results." *Id.* NEPA instead "prescribes the necessary process" that agencies must follow to identify and evaluate "adverse environmental effects of the proposed action." *Id.* Such effects may be direct, "indirect," or "cumulative." 40 C.F.R. § 1502.16.

The NEPA process requires preparation of an EIS for "major Federal actions" that "significantly" affect the "quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. An EIS must provide a "full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. This discussion should "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*

## III.   APA

The Court reviews agency compliance with NEPA pursuant to the APA. *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008). The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

APA review requires the Court to consider whether an agency based a particular decision on "consideration of the relevant factors." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted). Such inquiry must be "thorough," "probing," and "in-depth." *Id.* at 415. The Court must defer to the judgment of the agency and reverse a decision as arbitrary and capricious only where "a clear error of judgment" has occurred. *League of Wilderness Defs.*, 549 F.3d at 1215. This "clear error of judgment" may entail the following scenarios: 1) the agency's reliance on factors "Congress did not intend [for] it to consider;" 2) the agency's failure to "consider an important aspect of the problem;" 3) the agency's explanation "runs counter to the evidence" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

*Legal Standard*

6

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

The movant satisfies its burden when the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52. Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but [. . .] must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

## ANALYSIS

The parties' motions for summary judgment present the following two issues: 1) whether BLM's supplemental NEPA analysis considered a reasonable range of alternatives; and 2) whether BLM adequately considered the downstream impacts of non-GHG emissions. BLM's motion for remand presents a separate issue—whether the Court should allow BLM to revisit the ARMPA and SEIS

without vacatur. BLM's motion for remand is not appropriate here. The Court will deny BLM's motion for remand. The Court, proceeding to the merits, determines that BLM failed to consider adequate alternatives or appropriately consider downstream impacts of non-GHG emissions in violation of NEPA and the APA.

## I.    The Court denies BLM's motion for remand without vacatur

BLM moved for the Court to remand, without vacatur, BLM's decisions approving the ARMPA and Supplemental Environmental Impact Statements prepared by the Miles City Field Office and Buffalo Field Office. (Doc. 63.) BLM contends that remand would be appropriate because BLM has determined, "in light of comments received on the coal-leasing program," that remand would allow the information from the leasing program review to "better inform the allocation decisions for future leasing under these plans" by considering an "expanded range of alternatives." (*See id.* at 2-4.) BLM identified "substantial and legitimate concerns" with its decision approving the 2019 ARMPAs. (*Id.* at 7.) BLM suggests that it may again conduct a revised screening based on climate change criteria.

Courts generally grant an agency's request for remand where it claims to seek revisions that would address the deficiencies in a plaintiffs claim. *See Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001)). Voluntary remand comports with the principle that '[a]dministrative

agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider.'" *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1141 (C.D. Cal. 2002) (quoting *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980)); *see also Lute v. Singer Co.*, 678 F.2d 844, 846 (9th Cir. 1982). Courts in the Ninth Circuit generally "only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (citing *SKF USA*, 254 F.3d at 1029).

Other courts have considered last-minute requests for voluntary remand after merits briefing or on the eve of oral argument to be frivolous or in bad faith. *See, e.g.*, *Miss. River Transmission Corp. v. FERC*, 969 F.2d 1215, 1217 n.2 (D.C. Cir. 1992) (denying motion and stating "extreme displeasure" over motion for voluntary remand "filed two days before oral argument"); *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 349 (D.C. Cir. 1998) (denying "last second motion to remand" where agency did not confess error or describe intentions on remand); *Util. Solid Waste Activities Grp.*, 901 F.3d at 437; *Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1288 (D.C. Cir. 2000).

The Court determines that, at this late-stage of the litigation, BLM's motion would be frivolous and demonstrates a lack of good faith. This Court previously found BLM's NEPA analysis deficient. *WORC II*, No. CV 16-21-GF-BMM, 2018

9

WL 1475470. As is discussed further below, BLM failed to address the Court's conclusions regarding the inadequacy of BLM's prior NEPA review. Plaintiffs requested, throughout the pendency of this litigation and before, that BLM remand to conduct NEPA analysis that would address the Court's prior order. BLM refused. BLM failed to request a remand until after the briefing deadlines for cross-motions for summary judgment had passed. To ignore the merits of the case now would substantially prejudice Plaintiffs. Remand at this late stage would also not serve the generally present public interest of allowing the agency to act more swiftly, given that the litigation in this case has come to its close.

Importantly, BLM's motion fails to admit specific error or demonstrate which actions will be taken to correct the infirmities alleged by Plaintiffs in this case. Specifically, the Court noted that Plaintiffs have argued throughout this litigation that BLM must consider downstream emissions. BLM makes no specific guarantees to consider downstream emissions in its motion. BLM also fails to define what NEPA alternatives it will consider. Given the timing and lack of guarantee that BLM will address the issues before the Court, the Court must deny to the motion for remand.

## II.    BLM failed to adequately consider a reasonable range of alternatives

The Court limits its review of the sufficiency of alternatives considered to whether the agency considered alternatives "necessary to permit a reasoned

choice." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). An agency violates this provision of NEPA where it considers "essentially identical" alternatives. *Friends of Yosemite Valley*, 520 F.3d at 1039. An agency also may violate NEPA when it fails to examine all reasonable alternatives. *'Ilio'ulaokalani Coal.*, 464 F.3d at 1095.

Statutory objectives "serve as a guide" to determine the reasonableness of objectives outlined in an EIS. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683 (10th Cir. 2009). BLM operates under a statutory mandate to "take into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c). These long-term needs of future generations include, but need not be limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values." *Id.* With specific regard to coal development, the multiple use mandate allows BLM to "eliminate" coal deposits from eligibility for leasing. 43 C.F.R. § 3420.1–4(e)(3). These coal deposits may be removed "to protect other resource values and land uses that are locally, regionally, or nationally important or unique." *Id.*

*Essentially identical alternatives*

The Buffalo SEIS considered two alternatives, and the Miles City SEIS considered three. BLM-MCFO-0044042; BLM-MCFO-0044153–60; BFO-

ARMPA-009509; BFO-ARMPA-009587–94. Based on the results of the updated coal-screening processes, both Field Offices considered alternatives that would reduce the amount of acreage available for coal development. *See* BLM-MCFO-0044045; BLM-MCFO-0044062; BLM-MCFO-0044065; BFO-ARMPA-009529–30; BFO-ARMPA-009535.

Plaintiffs argue that, though the total acreage of acceptable land available for coal leasing differs, the alternatives are effectively the same. (Doc. 49 at 24-27.) Plaintiffs argue that the total amount of expected coal development and greenhouse gas emissions present the relevant environmental considerations for a NEPA analysis of the RMPs. (*Id.*)

The Court determines that a meaningful difference exists between the alternatives considered by BLM, though Plaintiffs' distinction carries significant weight in further analysis of BLM's NEPA review. BLM correctly argues that the alternatives considered present a distinct range of *total* allotted acreage for coal leasing. *See* BLM-MCFO-0044045; BLM-MCFO-0044062; BLM-MCFO-0044065; BFO-ARMPA-009529–30; BFO-ARMPA-009535. The total acreage allotted for coal leasing presents one component of the analysis that the Court previously identified as lacking. WORC II, 2018 WL 1475470 at *7 (stating that, in its 2015 analyses, the BLM considered only alternatives with the same potential acreage for coal leasing and identical amounts of expected coal production.) BLM

12

took a half-step in considering the Court's directive by evaluating alternatives with different amounts of land available for coal leasing. The action alternatives considered in detail are thus not "virtually identical." *Cf. Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999). As is discussed further below, the alternatives BLM considered still fail to demonstrate a reasonable range, however, because each alternative presents an identical amount of expected coal production.

*Failure to consider a reasonable range of alternatives*

The Court stated plainly in *WORC II* that "BLM's failure to consider any alternative that would decrease the amount of extractable coal available for leasing rendered inadequate the Buffalo EIS and Miles City EIS in violation of NEPA." 2018 WL 1475470, at *9. The supplemental NEPA analysis now before the Court treads the same error.

BLM again failed to consider any alternative that decreases the amount of extractable coal practically available for leasing. BLM's alternatives present differing amounts of total allotted acreage, but precisely the same total expected amount of coal development. This result is the outcome of practicality: new coal mines are prohibitively expensive, and no new mines reasonably could be anticipated at this time. *See, e.g.*, MCFO-AR-339-44236-40, MCFO-AR-339-44268-69. Thus, all of the expected coal development comes from existing mines

13

and their expansion. BLM failed to consider any alternatives that would limit the expansion of existing mines, *see, e.g.*, MCFO-AR-339-44062, MCFO-AR-339-44065, despite explicit direction from this Court that NEPA required BLM NEPA to do so.

The Council on Environmental Quality (CEQ), the agency with authority over NEPA implementation, has provided the following analogy to describe alternatives analysis: "When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS. An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness." Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (March 23, 1981). BLM has failed, once again, to consider a lower-end alternative that provides a proper bookend for the analysis. BLM must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

The Court's prior order required BLM to consider an alternative that "*modified or foreclosed* the amount of acreage available for coal development" so as to "decrease the amount of extractable coal available for leasing." WORC II, 2018 WL 1475470, at *9. Put simply, NEPA requires BLM to bookend its analysis

by considering a no-future-leasing alternative and at least one alternative that further reduced leasing by reducing the potential for expansion.

BLM and the State of Wyoming argue that BLM could not have considered alternatives that further limited the scope of future coal leasing. Both argue that evaluating a no-leasing alternative would be inconsistent with BLM's land-use-planning process. (Doc. 57 at 28-29.) The Court finds no merit in this contention. FLPMA's multiple use mandate does not require BLM to prioritize mineral development over other uses, such as closing areas to fossil fuel development. FLPMA's "multiple use" directive requires BLM to manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources [. . .] without permanent impairment of the productivity of the land." 43 U.S.C. §§ 1701(a)(7). Coal mining represents a potentially allowable use of public lands, but BLM is not required to lease public lands. The multiple use mandate does not bar BLM from considering a no leasing alternative for public lands. *See, e.g.*, *New Mexico ex rel. Richardson v. BLM*, 565 F. 3d 683, 710 (10th Cir. 2009) ("BLM's obligation to manage for multiple use does not mean that development must be allowed [. . . .] Thus, an alternative that closes [public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.").

BLM and the State of Wyoming also contend that the updated coal screening identifies the lands acceptable for coal mining and that the decision whether to actually lease the land should be deferred to the lease application stage. Tellingly, BLM and the State of Wyoming point to nothing in the coal screening regulations that mandates practically available coal must be leased in whole or part in the final RMP. As the Court stated plainly in *WORC II*, the coal screening can, and must, take into account climate change. *WORC II*, 2018 WL 1475470, at *17. Subsequently, the RMP may consider reduced leasing alternatives regardless of the outcomes of the coal screening process. BLM cannot credibly argue that the coal screens restrict its ability to consider a no leasing alternatives in the RMPs. Given that neither statute nor regulation restrict BLM from considering a no leasing alternative, NEPA requires BLM to include such an alternative as a bookend to its NEPA analysis.

BLM could have also considered an alternative that would reduce expansion. BLM explained in the Buffalo analysis that it could have evaluated an alternative limiting leasing to areas immediately adjacent to existing mines, but chose not to because it was unlikely "that a new coal mine would start and new infrastructure would be constructed within the next 20 years." BFO-AR-501-9536. BLM undercut that rationale, noting that "some areas not immediately adjacent to, but between the mines, might be needed for future leasing." *Id.* BLM refused to

consider additional alternatives based on the reasoning that such alternatives "could not be implemented without disrupting existing mining operations." BFO-AR-501-9536. BLM's rationale fails to meet the hard-look requirements of NEPA.

The Ninth Circuit has "long described the zone of interests that NEPA protects as being environmental," and has "consistently held that purely economic interests do not fall within NEPA's zone of interests." *Ashley Creek Phosphate Co.*, 420 F.3d at 940; *see also Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."). BLM cannot exclude an alternative based on the agency's desire to support existing mining operations. *See High Country Conservation Advocates v. U.S. Forest Serv*, 951 F.3d 1217, 1227 (10th Cir. 2020).

## III.  BLM failed to adequately consider the downstream impacts of non-GHG emissions

The Court's prior order required BLM to assess "the environmental consequences of the downstream combustion of the coal, oil, and gas resources potentially open to development under these RMPs." *WORC II*, 2018 WL 1475470 at *13. Plaintiffs contend that BLM again failed to consider the downstream consequences of coal combustion, by failing to consider the effect of non-GHG emissions related to the combustion of coal—such as particulate matter, sulfur dioxide, nitrogen oxides, and toxic pollutants such as mercury and lead.

BLM's failure to consider the downstream impacts proves arbitrary and capricious, especially in light of the Court's prior order. "An EIS that does not adequately consider the indirect effects of a proposed action violates NEPA." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020). Air pollution of any kind is "an important aspect of the problem" presented by these RMPs, and failure to consider it is in violation of NEPA and the APA. *See Motor Vehicle Mfrs. v. State Farm*, 463 U.S 29, 43 (1983). The Court noted in the prior order that "[i]t is well established that downstream air pollution from fossil fuel combustion, including both GHGs and *other non-GHG pollution*, is a reasonably foreseeable result of fossil fuel extraction." *WORC II*, 2018 WL 1475470 at *13 (emphasis added). After recognizing that foreseeable result, the Court determined that "NEPA requires BLM to consider in the EIS the environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development under these RMPs." *Id.*

BLM argues that it was only required on remand to consider GHG emissions. (Doc. 57 at 34.) BLM contends that because the Court's prior decision found that BLM's reliance on National Ambient Air Quality Standards (NAAQS) was sufficient, *WORC II*, 2018 WL 1475470 at *16, no further downstream air quality analysis was necessary.

18

The Court agreed in *WORC II* that BLM appropriately had relied on NAAQS as the baseline for assessing local air quality impacts. *Id.* (citing *Sierra Club v. U.S. Dep't of Transp.*, 310 F.Supp.2d 1168, 1202 (D. Nev. 2004)). The Court's Order did not cabin the consideration of *downstream effects* to GHG emissions alone. On the contrary, the Court's order specifically required BLM to take a hard look at all downstream effects of fossil fuel combustion. *WORC II*, 2018 WL 1475470 at *13. The Court's analysis emphasized the downstream effects of carbon emissions and the effect of those emissions on human-caused climate change. The Court's Order clearly directed BLM, however, to look beyond the planning area to consider the broader impacts of fossil fuel leasing. The analysis of BLM's use of NAAQS as a baseline for local air quality impacts, by contrast, was in a distinct section of the Court's Order addressing impacts within the planning area. *Id.* at *16.

NEPA does not require BLM to consider local or regional air quality impacts below NAAQS for these RMPs. BLM must consider any foreseeable downstream air quality impacts as part of its NEPA analysis. NEPA requires agencies to analyze "any adverse environmental impacts which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). These impacts include "direct" and "indirect" effects. 40 C.F.R. § 1502.16(b). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are

still reasonably foreseeable." *Id.* § 1508.8(b). Without a full analysis of non-GHG downstream emissions, the EIS fails to "foster informed decision-making" required by NEPA. *Block*, 690 F.2d at 761.

## ORDER

Accordingly, **IT IS ORDERED** that:

- Plaintiffs' Motion for Summary Judgment (Doc. 48) is **GRANTED**.
  - BLM shall complete, within a reasonable amount of time, not to exceed twelve months of today's date, new coal screening and NEPA analyses. BLM shall consider no coal leasing and limited coal leasing alternatives and must disclose the public health impacts, both climate and non-climate, of burning fossil fuels from the planning areas;
  - Any new or pending leases of coal, oil, or gas resources in the planning areas subject to the Buffalo RMP and the Miles City RMP must undergo comprehensive environmental analyses in compliance with this order and all existing procedural requirements under NEPA and the APA.
- BLM's Motion for Summary Judgment (Doc. 56) and Motion for Remand (Doc. 62) are **DENIED**.

- State of Wyoming's Motion for Summary Judgment (Doc. 53) is

  **DENIED.**

Dated this 3rd day of August, 2022.


_____
Brian Morris, Chief District Judge
United States District Court